G. SCOTT SOBEL, Esq., SBN 124818
LAW OFFICE OF G. SCOTT SOBEL
1180 S. Beverly Drive, Suite 610
Los Angeles, CA 90035-1158
Tel: (310) 422-7067; Fax: (888) 863-5630
GScottSobel@gmail.com

Attorney for Rovier Carrington

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ROVIER CARRINGTON,<br><br>Plaintiff,<br><br>vs.<br><br>HARVEY WEINSTEIN; ESTATE OF SUMNER REDSTONE; NATIONAL AMUSEMENTS, INC.; BRIAN GRADEN; BRIAN GRADEN MEDIA LLC; VIACOMCBS INC.; PARAMOUNT PICTURES CORP.; TRUSTEES OF THE BRAD ALAN GREY TRUST; STANTON "LARRY" STEIN; DIANA A. SANDERS; RUSS AUGUST & KABAT LLP; WOOK HWANG; LOEB & LOEB LLP; CHRISTOPHER LLOYD LAVIGNE; STEPHEN ROBERT FISHBEIN; SHEARMAN & STERLING LLP; HON. KATHERINE POLK FAILLA (In her official and individual capacities); and DOES 1-100,<br><br>Defendants. | Case No:<br><br>**VERIFIED COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES:**<br><br>**1. DECLARATORY JUDGMENT**<br>28 U.S.C. § 2201<br><br>(Judge Failla's "Individual Rules of Practice in Civil Cases" and all Orders issued under it are unconstitutional and Void for lack of Due Process)<br><br>**2. SEXUAL ASSAULT OF MINOR**<br>Civil Penalties under Cal. Penal Code § 216.5 (STATUORY RAPE)<br><br>**3. SEXUAL ASSAULT OF ADULT**<br>Civil Battery under Cal. Penal Code § 216 (a) (RAPE)<br><br>**4. SEXUAL HARRASSMENT**<br>Cal. Gov. Code §§ 12923, 12940(j)<br><br>**5. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br><br>**6. DEPRIVATION OF CIVIL RIGHTS**<br>42 U.S.C. § 1983<br>Substantive And Procedural Due Process<br><br>**7. CONSPIRACY TO VIOLATE CIVIL RIGHTS**<br>42 U.S.C. § 1983<br><br>**8. ALTERNATIVELY, FRAUD BY CONCEALMENT**<br><br>**JURY TRIAL DEMANDED** |

1

TABLE OF CONTENTS

I.   SHORT AND PLAIN STATEMENT OF THE CLAIM ................................................. 6

   *Rovier Carrington Repeatedly Raped and Sexually Harassed by Hollywood Moguls* .....6

   *Prior Case Marred by Court Corruption* ...................................................6

   *Carrington Denied Any Legal Process Whatsoever* ..........................................6

   *Judge Failla's "Individual Rules of Practice in Civil Cases" is in Fatal Conflict with
   the Federal Rules of Civil Procedure* ....................................................7

   *Graden Lawyer Stein: "Niggers never win in a courtroom"* ................................8

   *Historic Opportunity to Address Systemic Bias* .........................................9

   *Sex Cult of the Hollywood Elite* .......................................................9

   *Carrington's Injuries Are Severe* .....................................................10

   *Carrington Pledges Punitive Damages to Charity* .......................................11

II.  PARTIES ...........................................................................11

   PLAINTIFF .........................................................................11

   DEFENDANTS ........................................................................11

   DOE DEFENDANTS ....................................................................14

   STATEMENT OF CORPORATE INTERESTS ..................................................15

III. JURISDICTION ......................................................................16

   FEDERAL QUESTION JURISDICTION .....................................................16

   SUPPLEMENTAL JURISDICTION .........................................................16

   *All Defendants Must Be Held As State Actors for Civil Rights Purposes* ................16

   *The Joint Action Test* ...............................................................17

   *Section 1983 Action Is Appropriate If Defense Counsel Worked Together With Judge
   Failla in a Common Plan* ..............................................................17

   *Section 1983 Action is Appropriate If Judge Failla Insinuated Herself into a Position of
   Interdependence with the Cult Members* ................................................18

   *Joint Action Test is Satisfied with "Willful Participation" by Defendants* .............18

2

CARRINGTON v. GRADEN et. al. COMPLAINT – Sex Cult - Civil Rights

1    *Conclusion to Joint Action Test* ........................................................21

2    THE ROOKER-FELDMAN DOCTRINE DOES NOT APPLY HERE........................ 21

3    JUDICIAL IMMUNITY WILL NOT PROTECT JUDGE FAILLA HERE ................... 22

4        *Legal Standard for Judicial Immunity: 2-Prong Stump Test* ...............23

5        *Judge Failla Cannot Meet the First Prong* ......................................23

6        *Judge Failla Cannot Meet the Second Prong Either*...........................25

7        *Conclusion to Judicial Immunity* ...................................................26

8    IV.   **VENUE** ....................................................................................**26**

9
     V.    **STANDING** ..............................................................................**27**
10

11   VI.   **FACTS REGARDING SEXUAL ABUSE** .......................................**27**

12       *Brian Graden in Summer 2006* .......................................................29

13       *October 2010 Paramount Pictures, Sumner Redstone* .........................30

14       *October 27, 2010 Sumner Redstone at Paramount* .............................31

15       *November 2010 Reno Logan* ..........................................................32

16       *November 23, 2010 Sumner Redstone MTV/Viacom Contract* .............33

17       *December 2010 Brad Grey (Deceased)*..............................................33

18       *December 2010 "The Fighter" Premiere Grauman's Theater*................33

19       *January 13, 2011 Brad Grey Management and Development Contract*.........34

20       *January 16, 2011 Golden Globe Awards (Beverly Hilton)* .................34

21       *January 17, 2011 Reno Logan and Sumner Redstone* .........................35

22       *January 30, 2011 Screen Actors Guild Awards* ................................35

23       *February 7, 2011 Audi and Weinstein party at Chateau Marmot*................35

24       *February 14, 2011 Sumner Redstone* ..............................................35

25       *February 25, 2011 Tom Ford Grand Opening Rodeo Drive* .................36

26       *February 27, 2011 Vanity Fair party* .............................................36

27       *February 2011 Tony DiSanto* .........................................................36

28       *March 2011 Shari Redstone* ...........................................................37

3

CARRINGTON v. GRADEN et. al. COMPLAINT – Sex Cult - Civil Rights

1       *April 2011 Brad Grey and Sumner Redstone* ..................................................... 37

2       *April 2011 Peninsula Hotel, Harvey Weinstein* ............................................... 38

3       *May 5, 2011 Beverly Wilshire Hotel Grey and Tom Cruise* ............................ 40

4       *June 8, 2011 Regency Village Theater "Super 8" premiere* ........................... 40

5       *July and August 2011* ....................................................................................... 40

6       *October 3, 2011 "Footloose" Premiere at Regency Village Theater* ............. 40

7       *June - July 2014 HBO* ....................................................................................... 41

8       *August 2014 - Brian Graden* ........................................................................... 41

9       *October 1, 2014 Brian Graden's Hollywood Hills home* ............................... 42

10      *April 22, 2015 Contract signing with Graden* .............................................. 43

11      *June 6, 2015 Brian Graden's house* ............................................................... 43

12      *June 2015 Brian Graden's house* .................................................................... 44

13      *June 2016 Brian Graden's house* .................................................................... 44

14      *November 6, 2016 Brad Grey* .......................................................................... 45

15      *November 6, 2016: The Polo Lounge* .............................................................. 46

16      *June 2016: Graden Steals Carrington Shows* ............................................... 46

17      *November 2017 Variety* .................................................................................... 47

18    VII.     **FACTS REGARDING THE PRIOR LITIGATION** ........................................ 47

19      *Judge Failla's "Individual Rules of Practice in Civil Cases"* ....................... 47

20      *The Landau Group* ........................................................................................... 51

21      *July 17, 2018 Court Hearing* ........................................................................... 51

22      *September 18, 2018 Court Hearing* ................................................................ 52

23      *The Hollywood Reporter* .................................................................................. 54

24      *Defense Counsel Together Submit Letter and Order Confirming Terms* ...... 54

25      *Fig. 1 – Image of 02-12-2019 Defense Counsel Letter to Judge Failla* ........ 55

26      *February 13, 2019 Order for Further Discovery (Docket No. 102)* .............. 56

27      *Attorney Fraud* ................................................................................................. 57

28      *Carrington's iPhone was cleared* .................................................................... 58

CARRINGTON v. GRADEN et. al. COMPLAINT – Sex Cult - Civil Rights

*Defense Counsel Violate Terms of the Order and Subpoena* ........................................ 58

*Judicial Misconduct and/or Collusion* ................................................................. 61

*TRO against Graden in Los Angeles Superior Court* ............................................... 64

*Further Judicial Misconduct and/or Collusion* ..................................................... 65

**VIII.    CAUSES OF ACTION** ............................................................................................ **65**

FIRST CAUSE OF ACTION ..................................................................................... 65

SECOND CAUSE OF ACTION ................................................................................. 71

THIRD CAUSE OF ACTION ..................................................................................... 71

FOURTH CAUSE OF ACTION ................................................................................. 72

FIFTH CAUSE OF ACTION ..................................................................................... 74

SIXTH CAUSE OF ACTION ..................................................................................... 76

SEVENTH CAUSE OF ACTION ............................................................................... 78

EIGHTH CAUSE OF ACTION .................................................................................. 79

**IX.    PRAYER FOR RELIEF** ............................................................................................. **80**

**X.    DEMAND FOR JURY TRIAL** .................................................................................. **81**

SWORN AFFIDAVIT AND VERIFICATION ............................................................. 82

5

CARRINGTON v. GRADEN et. al. COMPLAINT – Sex Cult - Civil Rights

## I.       SHORT AND PLAIN STATEMENT OF THE CLAIM

### Rovier Carrington Repeatedly Raped and Sexually Harassed by Hollywood Moguls

1.   As an aspiring television writer, actor and producer, Plaintiff Rovier Carrington was repeatedly raped and sexually harassed over a period of years by Hollywood moguls Brian Graden, Harvey Weinstein, Brad Grey, Sumner Redstone and others. Beginning in Carrington's teenage years, this abuse was made possible, in part, by a corporate culture at Paramount Pictures and ViacomCBS that not only tolerates, but actively welcomes ritualistic sex abuse of teenagers and young adults as a "normal" part of the entertainment industry.

### Prior Case Marred by Court Corruption

2.   Carrington attempted to bring a civil lawsuit against his abusers, Carrington v Graden, Case 1:18-cv-04609-KPF, only to have them exert their extraordinary power and corrupt influence over the news media and the court system to effectively destroy his lawsuit before it even began. By transferring the prior case into the courtroom of the Hon. Katherine Polk Failla, Carrington's abusers were - in effect - able to transfer the case *__out__* of the United States District Court system - which operates according to the Federal Rules of Civil Procedure - and *__in__* to what amounts to an entirely separate court *__system__*, operating under an entirely different and *__contradictory set of rules__*, something Judge Failla calls her "Individual Rules of Practice in Civil Cases." [EXHIBIT 004, p. 27-44]

### Carrington Denied Any Legal Process Whatsoever

3.   Litigating under Judge Failla's "Individual Rules of Practice in Civil Cases," (or "Failla Rules") Carrington was denied any legal process whatsoever on his sex-abuse claims. Carrington never got to conduct Discovery on the Defendants, because Discovery never Opened, because Judge Failla never made a Scheduling Order, because Defendants never filed any Pleading responsive to Carrington's Complaint.

4.   On the other hand, Defendants were allowed to conduct "further" Discovery *against* Carrington, on what amounts to Defendants' counterclaim against Carrington for being a false-accuser. "False accuser" is a plausible-sounding defense for the abusers to allege, and they would

be well-within their rights to argue that to a jury. But under the Federal Rules, the claims and counterclaims would have been litigated *together*, and Discovery would have opened both directions after the Rule 26 Scheduling Order. Under the Failla Rules however, Carrington's case was literally ignored, while Defendants were permitted to Open Discovery *against* Carrington, then prosecute Carrington for alleged Discovery misconduct, ultimately resulting in the dismissal of Carrington's entire case with prejudice, and a huge attorney fee award against him.

5.   Under the Federal Rules, it is not possible to dismiss a Complaint *with prejudice* absent a consideration of the merits of the case. Whether considering a Motion to Dismiss, Summary Judgment, Judgment on the Pleadings, or any other dispositive motion, the Judge must assume as true all well-pleaded facts alleged by the Plaintiff, and decide purely as a matter of law. But, under her own rules, Judge Failla was able to dismiss – with prejudice - Carrington's case without considering the merits at all. That is, Judge Failla did exactly what the Federal Rules disallow. In her 9-11-20 Order, Judge Failla candidly admits that:

> "the Court never had, and will never have, the opportunity to learn which, if any, of Carrington's claims are meritorious."

[EXHIBIT 002, p. 20]

6.   Plaintiff believes and hereby alleges that the only reason Judge Failla did not have "the opportunity to learn" about Carrington's sex-abuse claims is that she dismissed his entire case with prejudice before the Defendants were even made to file a responsive pleading. This legal result was only made possible by Judge Failla's complete disregard for the Federal Rules of Civil Procedure. Mandating that Defendants file a responsive pleading, then allowing discovery and motion practice to proceed as the Federal Rules require, would have been an excellent "opportunity" for Judge Failla to at least begin "to learn" whether Carrington's claims are meritorious.

### Judge Failla's "Individual Rules of Practice in Civil Cases" is in Fatal Conflict with the Federal Rules of Civil Procedure

7.   Instead of obeying the Federal Rules, Judge Failla mandated that Carrington and the Defendants proceed according to her own set of rules titled "Individual Rules of Practice in Civil

Cases." Judge Failla's "Individual Rules of Practice in Civil Cases" stands in fatal conflict with the Federal Rules, for at least four reasons: First, the Failla Rules impose no duty for Defendants to file a responsive pleading. Second, the Failla Rules do not require a Scheduling Order, thus Discovery never Opens. Third, despite Discovery never Opening, Judge Failla may allow *unilateral* Discovery on an ad hoc basis. And fourth, the Failla Rules do not allow parties to engage in motion practice.

8.   Rather than filing pleadings, notices, motions, oppositions, etc. (as routinely practiced throughout the federal court system since the adoption of the Federal Rules of Civil Procedure in 1938), the Failla Rules mandate that all parties communicate with her only by writing "Letters," and that they request her Orders only by bringing so-called "Letter Motions," and respond with "Response to Letter Motion," and the like. The Federal Rules do not recognize any of this.

9.   Judge Failla's "Individual Rules of Practice in Civil Cases" establishes a procedural framework that is foreign and antithetical to the procedural framework controlling the United Stated District Court system. The two are mutually exclusive. None of what took place in Judge Failla's courtroom is authorized under the Federal Rules. As evidenced by the prior Carrington case, obeying the Failla Rules results in legal conclusions *opposite* from what would occur by obeying the Federal Rules. Under the Federal Rules, Carrington's Complaint simply could not have been dismissed with prejudice absent a consideration of the merits. However, all of Judge Failla's Orders in the Carrington matter would be Void even if she had reached correct legal conclusions, because Judge Failla never had jurisdiction to make any orders at all.

### Graden Lawyer Stein: "Niggers never win in a courtroom"

10. Rovier Carrington's abusers certainly appear to be racially motivated, at least to some degree. For example, after a hearing in the California TRO matter, Defendant Brian Graden's attorney Larry Stein confronted Carrington outside the courthouse in the presence of witnesses, called him a "stupid fucking Nigger" and told him, "Niggers never win in a courtroom." While Judge Failla herself has not issued any statements that overtly indicate racial animus towards Carrington, insofar as Judge Failla disregarded the entire Federal Rules of Civil Procedure in

1    denying all procedure to Carrington, further inquiry into Judge Failla's motivations – racial or
2    otherwise - seems entirely appropriate.

3    ## Historic Opportunity to Address Systemic Bias

4       11. In 2020, it has become an accepted fact that American institutions, including the justice
5    system, are plagued by systemic race, gender, class and other biases that allow the privileged few
6    to operate above the law, while inflicting horrific abuses upon the unfortunate others who cross
7    their paths (hereafter "Systemic Bias").

8       12. Once seemingly taboo, the issue of Judicial Corruption was thrust into the mainstream
9    news with the June 30, 2020 publication of the Reuters News Special Report, "Thousands of
10   U.S. judges who broke laws or oaths remained on the bench." [see EXHIBIT 013, pp. 517-537]

11      13. The national conversation has now shifted from, "Does Systemic Bias exist?" to "What
12   are we going to do about Systemic Bias?"

13      14. As to Systemic Bias, this case, right here, right now, presents this Court and this Jury
14   with an historic opportunity to *do something about it*. Finding these Defendants liable for
15   damages - including punitive damages - is not only the Justice that Carrington deserves
16   personally, but it is also the Justice that America is crying out for. Finding these Defendants
17   liable will send a message loud and clear that the United States of America will no longer
18   tolerate racism, sex abuse cults or judicial corruption.

19   ## Sex Cult of the Hollywood Elite

20      15. Once trivialized by the term "casting couch," the sexually deviant and predatory lifestyle
21   maintained by elite, powerful Hollywood decision-makers long ago evolved into nothing less
22   than a full-blown sex-and-drug cult (hereafter "Cult"). Attractive young, talented people are
23   systematically lured and manipulated into the sexual control of elite Cult members under false
24   (or in some cases, true) promises of Hollywood stardom.

25      16. Recently, mostly due to the publicity around numerous other Harvey Weinstein criminal
26   and civil cases, the general public are belatedly gaining at least some awareness of the
27   astonishingly abusive Cult that the Hollywood elite power brokers have become. Standard

28

1   Operating Procedure in Hollywood now appears to be the following. (1) Lure aspiring young

2   actors and musicians, especially the most physically attractive and multi-racially exotic, like

3   Rovier Carrington, into compromising situations by "negotiating" future "deals," i.e. discussions

4   about starring acting roles, lucrative content production contracts, and the like.  (2) Require

5   alcohol and drug consumption at "negotiation" meetings. (3) Demand - and if necessary, force –

6   the young person to perform any and every sex act the abuser might desire. (4) Inform the young

7   person that what might overtly appear to be extortionist protectionism of an out-of-control sex

8   Cult is simply the way business is done in Hollywood, and that if the young person complains to

9   anyone in any way, that they will be blackmailed and blacklisted in the industry. Sex acts are

10  often video recorded for potential blackmail and blacklisting purposes.

11      17. The Rovier Carrington case is yet another example of depravity existing throughout an

12  industry now synonymous with sexual deviancy. It however, is not a story of the 'buxom blond'

13  or 'graceful starlet,' but of a young man, who left to the devices of a powerful few - became their

14  toy, a prop; used at the pleasure of those who could, and was discarded just as unceremoniously,

15  with only the memory of horrific acts, resentment of having his intellectual property stolen,

16  recipient of indefinite illusory promises used as vehicles for manipulation, and the pain that

17  never goes away from being anally raped and assaulted in a drug-induced state. When he brought

18  suit seeking justice, the industry attorneys manipulated and erased his emails, presented a false

19  narrative to the court, and with the help of the judge, defamed him to the press and public in

20  order to destroy his reputation and credibility.

21                          **Carrington's Injuries Are Severe**

22      18. Rovier Carrington has suffered devastating financial, physical, mental, emotional and

23  constitutional injuries at the hands of Defendants, and comes now to this Honorable United

24  States District Court demanding justice. Carrington rightly deserves to be monetarily

25  compensated for the pain and suffering and medical expenses he has endured because of the

26  underlying sex abuse, and compensated for the full property value of Carrington's meritorious

27  civil lawsuit Defendants destroyed. In addition, Carrington is rightly seeking an award of

28  punitive damages against these Defendants for their intentionally tortious and malicious conduct.

**Carrington Pledges Punitive Damages to Charity**

19. Justice for Carrington also means relief for other survivors of this type of abuse. Rovier Carrington has pledged under oath to donate any and all punitive damages awarded to him toward the establishment of a nonprofit organization dedicated to serving the needs of other abuse survivors. (See attached Affidavit of Rovier Carrington)

## II.    PARTIES

### Plaintiff

20.  **Plaintiff ROVIER CARRINGTON** is an adult, date of birth October 1988, of mixed race Black and Jewish ethnicity, currently and at all times alleged herein residing in the County of Los Angeles, California.

### Defendants

21.  **Defendant HARVEY WEINSTEIN** is a former film producer and convicted sex offender. Harvey and his brother Bob Weinstein co-founded the entertainment company Miramax, which VIACOMCBS (formerly known as "Viacom" and "CBS" separately, referred to herein by its present name "ViacomCBS") now operates with a 49% stake. After leaving Miramax in 2005, the Weinstein brothers founded a mini-major film studio, The Weinstein Company. Harvey was co-chairman of The Weinstein Company until he was dismissed in October 2017 following sexual abuse allegations. Throughout his life, including all times mentioned herein, Weinstein conducted business and resided in Los Angeles, California.

22.  **Defendant SUMNER REDSTONE,** who died on August 11, 2020, was majority owner and chairman of NATIONAL AMUSEMENTS, INC. theater chain, as well as the former Executive Chairman of both CBS and Viacom, positions he held until 2016. Through NATIONAL AMUSEMENTS, Redstone, until his death was, the majority voting shareholder of mass media conglomerate ViacomCBS, which in turn was the parent company of Paramount Pictures film studio. In February 2016, at age 92, after a court-ordered examination by a geriatric psychiatrist whose findings were not publicly disclosed, Redstone relinquished the chairmanship of CBS to Les Moonves and the chairmanship of Viacom to Philippe Dauman. Les Moonves was removed from CBS in September 2018 after multiple women accused him of sexual assault, but

1  not before receiving a severance package from CBS estimated at $240 million, demonstrating a

2  pattern of corporate tolerance of sexual predators, until such activities are publicly exposed.

3      23.  **Defendant ESTATE OF SUMNER REDSTONE** now owns 80% of NATIONAL

4  AMUSEMENTS, INC. Throughout his life, including all times mentioned herein, Redstone

5  conducted business and resided in Los Angeles, California.

6      24.  **Defendant NATIONAL AMUSEMENTS, INC**. is a privately owned theater company

7  and mass media holding company based in Norwood, Massachusetts, and incorporated in

8  Maryland while operating and conducting business in Los Angeles, California. It is the parent

9  company of defendant ViacomCBS. At the time of Sumner Redstone's death, he owned 70% of

10  the voting interest of ViacomCBS, which was controlled though National Amusements where he

11  owned 80% of the company. Sumner Redstone's estate currently controls his remaining 80%

12  interest in NATIONAL AMUSEMENTS.

13      25.  **Defendant BRIAN GRADEN** served as the President of Programming at MTV

14  Networks for 13 years and facilitated the launch of Logo Network, while serving as its initial

15  President of Programming. MTV Networks and Logo Networks are both properties of Defendant

16  ViacomCBS, and Mr. GRADEN maintains a long-standing, powerful relationship with

17  ViacomCBS, and its executives, and networks. GRADEN also helped develop, and was the

18  executive producer for the television show "South Park," a ViacomCBS production. GRADEN is

19  the founder and owner of Defendant BRIAN GRADEN MEDIA, LLC.  GRADEN is a resident

20  of Los Angeles, California, owning a residence here.

21      26.  **Defendant BRIAN GRADEN MEDIA, LLC ("BGM")**, is a California Limited

22  Liability Company, conducting business, principally, in Los Angeles, California. BGM is a

23  television production company, which has produced multiple television series for ViacomCBS

24  brands such as: MTV, VHl and Logo.  BGM and GRADEN recently produced a series entitled

25  "Finding Prince Charming," created by Plaintiff, for which Plaintiff has never been paid. On

26  information and belief, Defendant GRADEN is an alter ego of BGM.

27      27.  **Defendant VIACOMCBS INC**. is an American diversified multinational mass media

28  conglomerate formed through the merger of CBS Corporation and the second incarnation of

Viacom. ViacomCBS is headquartered in Manhattan, New York, NY while operating and conducting business in Los Angeles, California and throughout the world. ViacomCBS owns and operates among other properties, MTV Networks, Comedy Central, Logo Network, and their main asset, PARAMOUNT PICTURES CORPORATION, a film studio, with its headquarters in Los Angeles, California.

28.  **Defendant PARAMOUNT PICTURES CORPORATION, ("PARAMOUNT" or "PARAMOUNT PICTURES")** is an American film studio and a subsidiary of ViacomCBS. It is the fifth oldest film studio in the world, the second oldest film studio in the United States, and the sole member of the "Big Five" film studios still located in the city limits of Los Angeles. PARAMOUNT is headquartered in Los Angeles, California. ViacomCBS is the parent company of PARAMOUNT PICTURES, with NATIONAL AMUSEMENTS, INC. being the parent company to ViacomCBS, which ESTATE OF SUMNER REDSTONE now controls with 80% of shares.

29.  **Defendants TRUSTEES OF THE BRAD ALAN GREY TRUST**, are responsible for a trust devised during the lifetime of Brad Grey which hold his assets and real property, including real property located in Los Angeles, California. Brad Grey was the former Chairman and Chief Executive Officer of PARAMOUNT PICTURES, a position he held until being fired shortly before his death on May 14, 2017. During his life, he conducted business and resided in Los Angeles, California.

30.  **Defendants STANTON "LARRY" STEIN ("LARRY STEIN") and DIANA A. SANDERS** are attorneys licensed to practice law and reside in California, are employed by or shareholders in the firm, **Defendant RUSS AUGUST & KABAT LLP**, located in Los Angeles, California.

31.  **Defendant WOOK HWANG**, is an attorney licensed to practice law and residing in New York, employed by or a shareholder in the firm, **Defendant LOEB & LOEB LLP**, which has offices in Los Angeles, California. HWANG has appeared in the U.S District Court, Central District of California, in a case still pending post trial motions.

32.  **Defendants CHRISTOPHER LLOYD LAVIGNE and STEPHEN ROBERT FISHBEIN** are attorneys licensed to practice law in New York and reside in New York, are employed by or shareholders in the firm, **Defendant SHEARMAN & STERLING LLP**, which has offices in Menlo Park, California.

33.  **Defendant HON. KATHERINE POLK FAILLA** is a United States District Court Judge in the Southern District of New York. Judge Failla is sued in her official capacity with respect to the First Cause of Action, a Declaratory Judgment that her "Individual Rules of Practice in Civil Cases" ('Failla Rules') is unconstitutional. Judge Failla is, by necessity, sued in her individual capacity with respect for the Seventh and Eighth Causes of Action for Civil Rights violations. Plaintiff does not seek any damage award against Judge Failla. For that reason Plaintiff believes Judicial Immunity will not protect Judge Failla. Additionally, for the reasons discussed below under "Jurisdiction," Plaintiff believes Judicial Immunity would not protect Judge Failla even if she were being sued for damages.

34.  **Hereinafter, Defendants LARRY STEIN, DIANA A. SANDERS, RUSS AUGUST & KABAT LLP, WOOK HWANG, LOEB & LOEB LLP, CHRISTOPHER LLOYD LAVIGNE, STEPHEN ROBERT FISHBEIN and SHEARMAN & STERLING LLP** are referred to collectively as "Defense Counsel."

35.  At all relevant times herein, Defendants to this action resided in, worked in, or had offices or real property located in Los Angeles, California, and a substantial part of the events or omissions giving rise to Plaintiff's claims involve individuals and companies operating in Los Angeles, California. Therefore, venue is proper in this court.

**Doe Defendants**

36.  The true names and capacities, whether individual, corporate, associate or otherwise, of defendants sued herein as Does One through One Hundred inclusive, are unknown to Plaintiff, and therefore sues those Defendants by such fictitious names.  Plaintiff will amend the complaint to allege their true names and capacities when ascertained.  Plaintiff is informed and believes and thereon alleges that each of such fictitiously named Defendants are responsible in some manner

1  for the occurrences herein alleged and that Plaintiff's injuries herein alleged were proximately
2  caused by said wrongdoing.

3     37.  Plaintiff is informed and believes and thereon alleges that at all times herein mentioned
4  Defendants and each of them were acting as the agent, servant or employee of each of remaining
5  Defendants, and was at all times acting within the time, purpose, or scope of said agency or
6  employment, and was acting with the express or implied knowledge, permission or consent of
7  the remaining Defendants, and each of them.  Each of the Defendants held out the other as its
8  duly authorized representative and each of the Defendants ratified the conduct of its agents.

9  **Statement of Corporate Interests**

10     38.  Plaintiff alleges on information and belief that at all times herein mentioned, Defendants
11  held and now hold a beneficial interest in properties and assets listed in other names of
12  individuals, family members, corporations and other business entities and that there exists, and at
13  all times herein mentioned there existed, a unity of interest and ownership among Defendants,
14  and each of them, such that any individuality and separateness between and among such
15  Defendants has ceased, and Defendants are the alter egos of each other in that Defendants used
16  assets of each other for their personal uses, caused assets of each other to be transferred to each
17  other without adequate consideration, and withdrew funds from the bank accounts of each other
18  for their personal use; further, Defendants completely controlled, dominated, managed, and
19  operated each other and intermingled their assets to suit the convenience of Defendants, and each
20  of them; further, Defendants and each of them, operated the business Defendant as their
21  individual business and alter ego, in that the activities of the business entity were and are carried
22  out without the holding of directors, members, or partners or shareholders meetings; no records
23  or minutes of any corporate proceedings were and are maintained pursuant to the governing
24  California Corporations Code Sections, and Defendants entered into personal transactions with
25  the business entity Defendants without the approval of other directors or members or
26  shareholders, or partners; adherence to the fiction of the separate existence of Defendants and
27  each of them, would permit abuse of the corporate privilege and would sanction fraud in that
28  Defendants diverted the assets and income, including future business, from the business entity

Defendant all for the purpose of avoiding execution by creditors, including Plaintiff herein and thereby rendering Defendant business entities insolvent and unable to meet its obligations and empty business entity shells.

39.   Plaintiff is informed and believes, and thereon alleges that at all times material herein, each Defendant was and now is the alter ego of the other Defendant; there was and is a unity of interest and ownership among the Defendants such that the individuality and separateness among them, if any has ceased; that Defendant business entities herein were mere shells, instrumentalities and conduits through which each of the individual Defendants and other Defendant DOE corporations or business entities conducted their business, exercising control and dominance over such business, and using the assets of the other to such an extent that any individuality and separateness among the Defendants does not exist and has not existed; adherence to the fiction of the separate existence of each Defendant as a person or an entity distinct from each other Defendant would permit an abuse of the corporate privilege and would sanction fraud and promote injustice.

**III.  JURISDICTION**

**Federal Question Jurisdiction**

40.   Plaintiff asserts original federal subject matter jurisdiction under 42 U.S.C. § 1983 et. seq. (the Civil Rights Act), and 28 U.S.C. § 2201 et. seq. (the Declaratory Judgment Act).

**Supplemental Jurisdiction**

41.   The District Court should exercise supplemental jurisdiction over all State-law claims because they arise out of the same nucleus of operative facts as the Federal claims. The facts of the State claims are so inextricably intertwined with those of the Federal claims that it would be a waste of judicial resources to try them separately.

**All Defendants Must Be Held As State Actors for Civil Rights Purposes**

42.   Defendant Judge Failla is undisputedly a State Actor. All other named Defendants are nominally private citizens, but must be held as State Actors for civil rights purposes under the "Joint Action" or "nexus" test, discussed as follows.

**The Joint Action Test**

43.   A private party who jointly participates in the alleged constitutional wrongdoing with a state or local official is engaged in state action. See *Lugar v. Edmondson Oil Co*., 457 U.S. 922, 941 (1982); *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152 (1970).

44.   Joint participation requires (1) some type of conspiracy, agreement, or concerted action between the state and private party; (2) a showing that the state and private party shared a common goal to violate plaintiff 's federally protected rights; and (3) conduct pursuant to the conspiracy, agreement, or concerted action that violated the plaintiff 's federally protected rights.

45.   In *Dennis v. Sparks*, 449 U.S. 24 (1980), the Supreme Court held that private parties who corruptly conspire with a judge act under color of state law, *whether or not* the judge is protected by judicial immunity.

**Section 1983 Action Is Appropriate If Defense Counsel Worked Together With Judge Failla in a Common Plan**

46.   It is true that, besides Judge Failla, Defendants are not government officials. However, the U.S. Supreme Court established precedent under which a § 1983 claim will lie against a private citizen. *Adickes v. S.H. Kress & Co*. 398 U.S. 144 (1970) ("*Adickes*"). In *Adickes*, the operators of a private department store allegedly worked jointly with the police to maintain racial segregation at the store's lunch counter. Now, merely calling the police to enforce the law is not sufficient to turn the private party into a State Actor. Rather, there must be ***joint action*** - so that the government official and the private party are working together in a common plan. (See *Id*.; and see also *Smith v. Brookshire Bros*., 519 F.2d 93 (5th Cir. 1975); Barrett v. Harwood, 189 F.3d 297, 304 (2d Cir. 1999).)

47.   Here, a common plan existed as between all Defendants. The plan was to destroy Carrington's meritorious case by denying him any legal process whatsoever, while permitting Defense Counsel to conduct improper discovery and obtain huge sanction awards against Carrington based entirely on provably false, fabricated email evidence.

**Section 1983 Action is Appropriate If Judge Failla Insinuated Herself into a Position of Interdependence with the Cult Members**

48.   Holding private citizens as State Actors is appropriate where "the state has so far insinuated itself into a position of interdependence with the [defendant] that it was a joint participant in the enterprise." *Focus, supra*, at 1267. Here, the enterprise is the Sex Cult of the Hollywood Elite, or simply the Cult, as described throughout this complaint. It is difficult to imagine a deeper position of interdependence than that caused here by Judge Failla's advancing the Cult's objectives by destroying Carrington's rights.

49.   A court will examine whether the government and the acting party are "intertwined in a symbiotic relationship," as well as whether the relationship involves "the specific conduct of which plaintiff complains." *Id.* The Cult and Judge Failla are indeed intertwined in a symbiotic relationship. Without Judge Failla's cooperation in destroying meritorious sex-abuse lawsuits, like Carrington's, the Cult would surely be destroyed by millions or perhaps billions of dollars in liability and by public boycotts and general ostracism. And, without the Cult's cooperation in disallowing substantive media exposure on the issue of judicial bias and corruption, Judge Failla would suffer consequences of being removed from the bench, and of general ostracism.

**Joint Action Test is Satisfied with "Willful Participation" by Defendants**

50.   The U.S. Supreme Court has found that under the "joint action" test a private party can be fairly said to be a state actor where a private party is a "willful participant in joint action with the State or its agents." [*Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 923, 102 S. Ct. 2744, 2746 (1982) ("*Lugar*")] Defendants' conduct here is willful.

51.   A private party's joint participation with a state official in a conspiracy to discriminate would constitute both state action essential to show a direct violation of petitioner's equal protection rights under U.S. Const. amend XIV and action under color of law for purposes of 42 U.S.C.S. § 1983. [*Lugar, supra*, at 923]

52.   Carrington believes and therefore alleges that the sex abuse and consequent destruction of constitutional rights of which he complains was motivated, in part, by Carrington's race, gender, and or sexual orientation.

53.   The present case against is similar *Lugar*, *supra*, as the following detailed analogy shows. In *Lugar,* a private actor engaged the County to seize property in satisfaction of an alleged debt, by stating an alleged:

> …belief that the debtor was disposing of or might dispose of his property in order to defeat his creditors. Acting upon the petition, a clerk of the state court issued a writ of attachment, which was then executed by the county sheriff which effectively sequestered the debtor's property…

[*Lugar, supra* at 923]

54.   Here, just like *Lugar*, Defendants engaged Judge Failla to seize and destroy Carrington's property right in his meritorious lawsuit, and also destroy Carrington's right to petition, by colluding with Judge Failla to bring the case to a full dismissal with prejudice on factual findings but after no responsive pleadings, no Rule 12 Motion practice, no Rule 26 scheduling order, or any of the normal litigation procedures in a federal civil lawsuit.

55.  Presumably, Defendants will argue they are private, rather than State Actors. The Defendants in *Lugar* made that argument, but the Supreme Court rejected it, finding that a:

> "…private party's **joint participation** with state officials in the seizure of disputed property is sufficient to **characterize that party as a 'state actor'** for purposes of the Fourteenth Amendment."

[*Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 923, 102 S. Ct. 2744, 2746 (1982), emphasis added]

56.  Likewise, here Defendants jointly participated with Judge Failla in the unwarranted destruction of Carrington's right to petition. At least in *Lugar*, the nominally-private actor defendant could point to the fact that the State had previously issued a writ of mandate, giving at least some credence to the destruction of rights that took place thereafter. Nevertheless, the *Lugar* Court found a sufficient nexus between the private actor's conduct of engaging government officials on the one hand, and the subsequent seizure of property rights on the other hand, so as to find a "joint action" for Section 1983 purposes.

57.  The facts alleged against Defendants in the present matter are thus more egregious than those in *Lugar*, and joint action is more easily found, because here there are no facts that even arguably justify disallowing Carrington from pursuing his sex-abuse claims. There is more than

19

CARRINGTON v. GRADEN et. al. COMPLAINT – Sex Cult - Civil Rights

1   sufficient nexus between Defendants' conduct fabricating false evidence regarding email

2   accounts, then colluding with Judge Failla to conduct various legal proceedings which were

3   unauthorized by the Federal Rules of Civil Procedure, e.g. allowing Defendants to conduct

4   "further" discovery, and discovery motions, and terminating sanctions motions, prior to any

5   responsive pleading ever having been filed, let alone a Rule 26 Conference which ordinarily

6   signals the opening of discovery.

7       58. Legal annals fail to record another instance, apart from the prior Carrington litigation, in

8   which a series of "Letters" and "Letter Motions" to Judge Failla somehow bypassed the Federal

9   Rules of Civil Procedure and converted Carrington's case against Defendants for sexual abuse

10  into the Defendants' case against Carrington for abusing the legal system.

11      59. Carrington emphatically maintains at all times that he did not spoil evidence and did not

12  falsify any email data, and that it is Defendants who falsified email data by intercepting the

13  subpoena responses and interpreting it however they liked, without ever submitting it to FTI, the

14  forensic expert, while actually representing to the court that these were FTI's own findings.

15      60. But let us momentarily assume *for sake of argument* the correctness of Judge Failla's

16  finding that Carrington spoiled evidence, after first assuming *for sake of argument* that Judge

17  Failla had any legal authority to engage in fact-finding prior to Defendants filing any responsive

18  pleading. Even if Carrington engaged in wrongdoing, that is simply no reason to let Defendant's

19  get away with their wrongdoing, which is precisely what Judge Failla did.

20      61. As it stands, Carrington's sex-abuse case and his entire right to pursue legal remedy for

21  sex-abuse is forever destroyed. Judge Failla stated in her 9-11-20 Order that the Court never

22  reached any consideration of the merits of Carrington's case. *Supra.* Thus, a dismissal, if any,

23  should have been without prejudice. *Supra.* The only reasonable inference from a dismissal with

24  prejudice here and under the circumstances is that Judge Failla was colluding with the other

25  Defendants to protect the members of the Cult from the well-justified remedies sought by

26  Carrington. This is more than sufficient symbiosis for the Court to find a joint action for Section

27  1983 purposes.

28

62. Moreover, it is worth emphasizing that here, as in *Lugar,* the private actor's conduct engaging government officials worked to the **mutual benefit** of both Judge Failla and the Cult. Under the "**symbiotic relationship**" test a private party can be fairly said to be a state actor where "the state has so far insinuated itself into a position of interdependence" with a private party that "it must be recognized as a joint participant in the challenged activity." [*Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (holding privately owned restaurant's refusal to serve an African American customer constituted state action where the restaurant leased space from a parking garage owned by state agency)]

63. Here, the **benefits** obtained by Judge Failla, on the one hand, and by the Cult Defendants, on the other, are indeed **interdependent**. The Cult cannot maintain its control of Hollywood and its Sex Cult without the ability to destroy meritorious sex-abuse cases. Judge Failla cannot maintain her control and position as a Judge if her role in protecting the Cult ever becomes public knowledge. Thus, the requisite **interdependence** for joint action is shown.

64. That state action exists when the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so "purely private" as to fall without the scope of U.S. Const. Amend. XIV. [*Krynicky v. Univ. of Pittsburgh*, 742 F.2d 94, 95 (3d Cir. 1984)] Judge Failla insinuated herself into a position of interdependence with the other Defendants.

## Conclusion to Joint Action Test

65. Therefore, the Court should find that the factual allegations made by Rovier Carrington here satisfy the Joint Action test, such that each and every Defendant here will be considered a State Actor for Section 1983 purposes.

## The Rooker-Feldman Doctrine Does Not Apply Here

66. The Rooker–Feldman doctrine forbids a losing party in state court from filing suit in federal district court complaining of an injury caused by a state court judgment, and seeking federal court review and rejection of that judgment. See *Bell v. City of Boise,* 709 F.3d 890, 897

1    (9th Cir. 2013) ("*Bell*"). In *Bell*, the Ninth Circuit determined that Rooker-Feldman did not

2    preclude the exercise of subject matter jurisdiction over claims for prospective relief.

3         67. Federal courts should not sit in direct review of state court decisions unless Congress has

4    specifically authorized such relief. (see Fitzgerald et al. Bankruptcy, Rutter Group Practice

5    Guide, Vol. 1, Ch. 1 (Governing Law, Jurisdiction and Venue), ¶ 1:270 (The Rutter Group, a div.

6    of West, a Thomson Reuters Business, 2012)).

7         68. Congress has indeed specifically authorized the relief Plaintiff seeks here, by enacting

8    the Civil Rights Act and the Declaratory Judgment Act. Moreover, Plaintiff does not seek this

9    Court's direct review of any of the orders from the prior case, improper as they surely are.

10   Rather, Plaintiff is here seeking Judicial Declaration that the process and procedure undertaken

11   by Judge Failla in the prior case was unconstitutional *in its totality*, and must be done away with

12   *in its totality.* That Judge Failla's prior orders are swept away along with the entire rest of the

13   prior case is incidental.

14        69.  Plaintiff Rovier Carrington is here to vindicate his rights under the United States

15   Constitution, which rights he has never asserted before. It is true that Carrington is also again

16   attempting to litigate his sex abuse claims, which claims have never been litigated. It is true that

17   the prior federal case before Judge Failla was originated in State Court, before being removed to

18   federal. In that sense it would be considered a State Law case.  The outcome of the prior case

19   would surely be affected by a finding of liability in this case, but not through any direct review

20   of the merits of Judge Failla's Orders. Judge Failla's Orders are all Void no matter what they

21   say, because Judge Failla never had any proper jurisdiction for even a single one of her actions

22   taken in the prior case.

23        70. Therefore, none of these Causes of Action are barred by Rooker-Feldman.

24                    **Judicial Immunity Will Not Protect Judge Failla Here**

25        71. While Judge Failla must by necessity be sued in her individual as well as official

26   capacity, Plaintiff does not seek any damage award against Judge Failla, only a finding that she

27   violated Carrington's civil rights. For that reason, Plaintiff believes that Judicial Immunity must

28   not be invoked.

22

CARRINGTON v. GRADEN et. al. COMPLAINT – Sex Cult - Civil Rights

1

2

3

4

72. However, in the event that Judge Failla asserts Judicial Immunity in defense of any or all of the claims now against her, Plaintiff will now show that Judicial Immunity must not protect Judge Failla regardless of anything else, because Judge Failla acted in the complete absence of all jurisdiction.

5

**Legal Standard for Judicial Immunity: 2-Prong Stump Test**

6

7

8

9

10

73.  The standard for evaluating the scope of Judicial Immunity is given in the landmark Supreme Court case *Stump v. Sparkman*, 435 U.S. 349 (1978) ("*Stump*"). Judicial Immunity is extremely broad, and will protect a judge from liability for injuries caused by any "judicial act." A suit for damages may only be maintained against a judge for acts "in the clear absence of jurisdiction." [*Rankin v. Howard*, 633 F.2d 844, 846 (9th Cir. 1980) ("*Rankin*")]

11

12

13

14

15

74.  *Stump* sets out a two-prong test to determine whether the judge's act was a "judicial act," thus immunized. The first factor - whether the act was a function normally performed by a judge - relates to the "nature of the act itself." [*Stump, supra,* at 362] The second factor - whether the parties dealt with the judge in his judicial capacity - looks to the "expectations of the parties." *Id.*

16

**Judge Failla Cannot Meet the First Prong**

17

18

19

20

75.  Under the first prong, the Court must distinguish between "excess of jurisdiction," and "clear absence of jurisdiction." It might be argued that a judge acts in the clear absence of jurisdiction when acting in the absence of any particular statutory authority on point. That argument was made in *Stump,* but failed because, as Justice White explained:

21

22

23

...[I]t is more significant that there was no Indiana statute and no case law in 1971 prohibiting a circuit court, a court of general jurisdiction, from considering a petition of the type presented to Judge Stump

24

[*Stump, supra,* at 358]

25

26

27

28

76. Thus, a first-prong Judicial Immunity analysis under *Stump* will focus on whether or not there exists a statute or case law prohibiting a the judge from undertaking the injurious acts complained of. Put plainly, it is not enough for Carrington to show that no law explicitly authorized the judge's act. Rather, Plaintiff must affirmatively show there *is* a law *prohibiting*

1  the judge's act. The Supreme Court has long ago offered a hypothetical example illustrating the

2  distinction:

> A judge of a probate court who held a criminal trial would act in clear absence of
> all jurisdiction over the subject matter, whereas a judge of a criminal court who
> held a criminal trial for an offense that was not illegal would act merely in excess
> of his jurisdiction.

[*Bradley v. Fisher, 80 U.S.* 335, 352 (1872) ("*Bradley*")]

77. The Supreme Court could not be any more clear: A judge of one type of court who

purports to act in a completely different court *system* is acting in the clear absence of jurisdiction.

78. Beginning with her June 4, 2018 Order and continuing thereafter, Judge Failla acted

under color of law and in the clear absence of jurisdiction by conducting a series of "Letter

Motions" as authorized by her own "Failla Individual Rules of Practice in Civil Cases" instead of

and in absolute violation of the Federal Rules of Civil Procedure. In so doing, Judge Failla

established and operated her own independent court *system*, entirely distinct from the United

States District Court, which operates under the Federal Rules of Civil Procedure, and in which

"Letter Motions" and the "Individual Rules of Practice in Civil Cases" are unknown and foreign.

*Supra.*

79. Therefore, the Court must find that Judge Failla's conduct perfectly fits the Bradley

Benchmark test. Judge Failla did not make Orders as a Judge of the United States District Court,

because any such order must by necessity be in accordance with the Federal Rules of Civil

Procedure. Rather, Judge Failla made "Orders" as a "Judge" in her own "Court of Katherine Polk

Failla," and in accordance only of the "Failla Individual Rules of Practice in Civil Cases," and

certainly not under the Federal Rules of Civil Procedure, or anything else authorized under the

United States Constitution.

80. Having been trained in the law, Judge Failla knew that the Federal Rules of Civil

Procedure control a civil lawsuit in federal court, and knew that her "Individual Rules of Practice

in Civil Cases" are in contradiction to said Federal Rules of Civil Procedure. By implementing

her own "Individual Rules of Practice in Civil Cases," Judge Failla made a conscious, deliberate

and intentional decision to act in the clear absence of jurisdiction.

81. Judge Failla's "order" dismissing Carrington's prior sex-abuse with prejudice, while admitting she never reached the merits, means that Judge Failla intentionally denied Carrington the process and procedure set forth in the Federal Rules of Civil Procedure, with a specific intent to forever deny Carrington any and all ability to seek remedy for the sex abuse he suffered at the hands of Defendants, and at the same time allowing those same Defendants to sue Carrington for hundreds of thousands of dollars in attorney fee awards.

82. Therefore, the Court should find that Judge Failla cannot meet the first prong of the *Stump* test. For a District Court Judge to conduct *any* proceedings or to make *any* orders whatsoever under "authority" of this self-drafted and self-serving "Individual Rules of Practice in Civil Cases" - which purports to overrule the Federal Rules of Civil Procedure - constitutes action in the clear absence of jurisdiction.

**Judge Failla Cannot Meet the Second Prong Either**

83. The second prong of the *Stump* test requires the Court ask about the expectations of the parties. Carrington came to Judge Failla's courtroom expecting that matters would be conducted in accordance with the Federal Rules of Civil Procedure.

84. Carrington did not expect, and could not possibly have expected that Judge Failla would instead conduct matter in accordance with her own "Individual Rules of Practice in Civil Cases," which completely contradict the Federal Rules of Civil Procedure, and destroy essentially all of the procedural rights the Federal Rules of Civil Procedure are meant to uphold.

85. Therefore, the Court should find that Judge Failla cannot meet the second prong of the *Stump* test. No party to any proceeding reasonably expects any judge to ignore statutory, black letter law such as the Federal Rules of Civil Procedure, in favor of her own self-drafted and self-serving unconstitutional substitute document, the "Failla Individual Rules of Practice in Civil Cases."

86. Thus, the Court must find that Judge Failla cannot meet either prong of the *Stump* test, and must therefore conclude that Judge Failla's actions were acts taken in the clear absence of jurisdiction, and not merely in excess of jurisdiction.

87. Each of Judge Failla's purported orders was directed toward the ultimate goals of destroying Carrington's right to petition and jury trial, and inflicting severe emotional distress, and severe financial hardship upon him, and to thereby shield Carrington's legal adversaries from justice. Having taken an oath of office to uphold the Constitution, Failla knew of her duties, and made a conscious, deliberate and intentional decision to violate those duties.

88. While the hurdle to overcome judicial immunity is high, it is not infinite. The Ninth Circuit explained that judicial immunity is lost when: "there was a genuine issue of fact whether … attorneys induced … [a] judge to violate [Plaintiff's] rights." [Rankin, supra at 846]

89. Here, and similarly to *Rankin*, there is a genuine issue of fact whether attorneys *induced* Judge Failla to violate Carrington's rights. As discussed below in the civil rights conspiracy claim, Carrington reasonably believes, and on that basis alleges, that Judge Failla's "order" dismissing his case with prejudice and her "order" enjoining him from all litigation, and her "orders" of terminating sanctions and attorney fees are all motivated by her having accepted a bribes as "bribe" is defined in California Penal Code § 67 et. seq.

90. Carrington has no direct evidence of bribery. He has not seen money change hands, nor a cancelled check with a memo line reading "bribe to judge." But bribery and corrupt influence is a reasonable inference given the undisputed fact that Carrington's prior sex-abuse case was dismissed with prejudice with no consideration of the merits.

## Conclusion to Judicial Immunity

91. Therefore, with respect to any injury suffered by Carrington caused by Judge Failla's failure to proceed according to the Federal Rules of Civil Procedure, this Court must find that Judge Failla is *not* protected by Judicial Immunity.

IV.   VENUE

92. Venue is proper in the Central District of California, Western Division because the events giving rise to this action largely took place in and around greater Los Angeles. While some corporate entities named as Defendants hereunder are headquartered in New York, all understood as have a large presence, including legal representation, in Los Angeles.

## V.   STANDING

93. Plaintiff Rovier Carrington has standing to pursue civil rights claims because he has suffered constitutional and personal injury at the hands of Defendants. Carrington's right to petition and to a jury trial, as enumerated in the First and Seventh Amendments respectively, was destroyed by the corrupt collusion among Defendants insofar as it resulted in Rovier Carrington never getting his day in court for his sex abuse claims.

94. In addition to the purely constitutional injury, Carrington has suffered severe emotional distress from the realization that his ability to pursue justice was stolen from him. Knowledge that powerful elite Sex Cultists and their well-placed attorneys can rig a federal court case has caused Carrington emotional distress that is separate from, and in addition to, the emotional distress caused by the sex-abuse the Cult members perpetrated upon him in the first place. If the plain facts of Carrington's prior case with Judge Failla ever become common knowledge among the general public, there immediately becomes a severe risk that the general public will lose all respect and confidence in the justice system.

95. Carrington's injury is remediable by relief sought, because once his right to petition and to a jury trial have been restored, then his – and the general public's - faith in the justice system will be restored. This restoration will tend to reduce Carrington's mental anguish by medically-measureable degrees. While nothing can ever repair the totality of psychic damage done to Rovier Carrington's psyche from years of being passed around and used as a sex slave by narcissistic sex Cultists, the restoration of his – and the general public's – right to petition and jury trial will be a welcomed and measureable form of relief, however incomplete that relief must necessarily be to Carrington personally.

## VI.   FACTS REGARDING SEXUAL ABUSE

96. In the world of show business there are several executives who operate and control what is placed on the big and small screen until they are dethroned or deceased. These executives abuse power by forcing talent to comply with rules in order to gain remarkable success or become an entertainment mogul. They include Sumner Redstone, Harvey Weinstein, Brad Grey

and Brian Graden. Rovier Carrington had the misfortune of involvement with all four moguls throughout a ten-year period while attempting to build his producing and screenwriting career.

97. Mr. Carrington became a chess piece in Redstone's board game company, National Amusements, Inc. Through National Amusements, Redstone controlled ViacomCBS, Paramount Pictures, MTV, Paramount Network, Brad Grey, Brian Graden, Harvey Weinstein and all actors, producers, directors and executives under the National Amusements umbrella. Redstone also controlled Carrington with strings that came with consistent instructions and limited movement outside of his control. Utilizing his controls, Redstone compelled Carrington into situations that resulted in sexual violence committed by himself, Grey, Graden, Weinstein, and others, which were later covered up with threats, physical force, and lawyers not afraid to commit fraud and defamation to silence a victim.

98. At the age of 16, Carrington formed a relationship with a variety of executives at Viacom. Once Carrington was introduced to Sumner Redstone at the age of 22, Redstone viewed Carrington as "boyfriend material" for his many executives to share for romance and creative ideas. Redstone was among the small number of Hollywood moguls who decide the next Hollywood Star. Redstone also chose the love interest for his executives. Carrington was placed in the love interest category with potential to become a star due to his exotic appearance. Redstone, Weinstein, Grey and Graden continually told Carrington that his mixed features and skin tone afforded him the opportunity to make it in the entertainment business. They all demanded that Carrington never allow his skin tone to darken, as appearing "too black" would turn them off and end his career.

99. Brian Graden is known for the weekly sex parties at his Hollywood Hills home, which Brad Grey and Sumner Redstone attended regularly until their recent deaths. These parties provide teenage boys, celebrity men, alcohol and drugs to be shared amongst many seasoned executives and employees under ViacomCBS, Paramount, MTV, VH1, Logo and other sister companies. The parties are usually filmed in order to blackmail certain executives and employees, as well as the celebrities in attendance, so that favors are owed and control is provided to Graden and the higher-up executives at ViacomCBS.

1    100.  Carrington was manipulated into sex parties hosted by Redstone, Weinstein, Grey and

2    Graden for their entertainment and to own his freedom. In show business, people arrange

3    compromising incidents, placing you at their mercy: Carrington was drugged, sexually abused

4    and recorded on film. He was told that if he were to disobey or become disloyal, the videos of his

5    sexual abuse would be released, ruining his image and opportunities in the business.

6    **<u>Brian Graden in Summer 2006</u>**

7    101.  In late June or early July 2006, 17 year-old Rovier Carrington was recruited by several

8    executives at ViacomCBS in Santa Monica, California, to film an episode of MTV's "Parental

9    Control" & "Next." Carrington was introduced to Brian Graden, the President of Programming

10   for MTV, VH1, CMT and later, LGBT channel, Logo. Graden asked Carrington his age, to

11   which Carrington said 17. Graden told Carrington of his power at ViacomCBS, and invited

12   Carrington to dinner at a restaurant to discuss opportunities with ViacomCBS. Carrington

13   accepted Graden's offer, meeting him later that evening at his Hollywood Hills home.

14   102.  Carrington arrived with friend who watched Graden greet Carrington as he welcomed

15   him into his home alone. Graden initially discussed business with Carrington in his living room,

16   prior to moving to personal information, such as Carrington's romantic affairs. Carrington stated

17   he had a long term girlfriend, as Graden disappeared into the kitchen to pour Carrington a

18   cocktail, which Carrington did not realize was drug infused. Once Graden returned, he boasted of

19   his development role in the TV series "South Park." Graden insisted that Carrington drink his

20   cocktail. Apprehensive, Carrington began to drink. Graden came closer to Carrington after two

21   sips. Graden asked if Carrington still wanted dinner, but before Carrington could respond,

22   Graden suggested they stay in. Carrington said he felt ill, as his body temperature rose and his

23   head began spinning. Carrington attempted to stand, but he couldn't maintain his balance.

24   Carrington expressed his terrible state, but Graden ignored him and began French kissing

25   Carrington. Carrington's vision became blurred as he fell onto the couch.

26   103.  Graden picked up Carrington's immobilized body and carried him into an upstairs

27   bedroom, placing him onto the bed. Graden removed his clothing, sliding into bed with

28   Carrington. Carrington repeated his horrible state and protested, but Graden began removing

1   Carrington's clothes while saying, "You need air after drinking too much." Carrington said,

2   "Stop." Graden's predatory conduct increased, as he double slapped Carrington's face "for

3   denouncing him." Carrington began going in and out of consciousness. Graden whispered into

4   Carrington's ear, "Other boys your age obey orders." Graden shoved his unprotected penis into

5   Carrington's rectum several times. Carrington begged Graden to stop, however Graden

6   continued the sexual abuse. Carrington yet again went in and out of consciousness, which

7   infuriated Graden. Graden began slapping and choking Carrington, yelling "Wake up." "Enjoy

8   daddy's raw cock." Graden filmed every moment of Carrington's traumatic first sexual

9   encounter. Graden ejaculated inside Carrington's rectum before allowing him freedom to move.

10  Carrington managed to crawl into Graden's master bathroom, as Graden lay naked on the bed.

11  Carrington discovered he suffered massive blood loss and damage to his rectum, requiring weeks

12  to heal. Once Carrington emerged from the bathroom, Graden smiled and said, "You did great."

13  Graden grabbed Carrington's clothes and said, "You should leave." Graden told Carrington,

14  "You'll be a star, if you keep quiet about our encounter." Graden kissed Carrington's forehead

15  and said, "This better stay between us."

16  **October 2010 Paramount Pictures, Sumner Redstone**

17  104.  Rovier Carrington created, produced and starred in "The Life of a Trendsetter," a

18  reality show that Carrington uploaded to youtube.com on October 21, 2010, which caught the

19  eye of Paramount's Executive Producer and Casting Director, Reno Logan. Logan called the

20  same day of the uploading, requesting that Carrington appear at Paramount the following day

21  (Oct 22) to discuss signing the show.

22  105.  Tony DiSanto, MTV's President of Programming, also contacted Carrington about an

23  offer to sign Trendsetter. Logan told Carrington that with his Executive Producer title at

24  Paramount, he could be an asset to Carrington's career. Logan shared ideas for Carrington to

25  improve "The Life of a Trendsetter," before moving forward with Tony DiSanto's offer. Logan

26  desired an Executive Producer title on the show, in addition to Executive Producing Carrington's

27  dark comedy "Inheritance," which Carrington was building while on the reality show. Logan

28  wanted Paramount to sign "Inheritance," which would have been a crossover and lucrative deal.

1    Logan presented Carrington to other executives at Paramount because, according to Logan,

2    Carrington was "alluring and appeared underage."

3         106.  Logan utilized Carrington's appearance and projects to book meetings with Sumner

4    Redstone, now deceased. Redstone loved the idea of owning Carrington's cutting edge projects

5    under ViacomCBS, which he felt would produce revenue in the millions for National

6    Amusements, Inc.

7         107.  Logan began sending Carrington to more executives, including Sumner Redstone, who

8    called him "brilliant" and "adorable." Redstone reviewed Carrington's show content and

9    demanded he get an office on the lot. On October 25, 2010 Redstone asked Carrington for a

10   private meeting to discuss him "joining the family." Logan pushed Carrington to meet with

11   Redstone, as he could elevate both of their careers and "green light" production on Carrington's

12   shows. Logan didn't elaborate on what to expect, but told Carrington to "obey Mr. Redstone."

13                    **October 27, 2010 Sumner Redstone at Paramount**

14        108.  On or about October 27, 2010 Carrington was driven to Paramount by a personal town

15   car sent by Redstone. Carrington's manager and a friend followed in a separate car. Carrington

16   arrived at Paramount to meet Redstone for a one-on-one business meeting, which occurred

17   within Redstone's town car. Redstone's driver stood outside the car once Carrington entered the

18   backseat with Redstone. Redstone inquired Carrington's loyalty. Redstone said loyalty is

19   rewarded with green lighting projects and if Carrington wanted to be rewarded, he should be in

20   concurrence. Carrington told Redstone loyalty is fine, as long as Redstone didn't allow his

21   executives to sexually assault him, such as Brian Graden raping him when he was a minor.

22   Redstone stated that Graden was lucrative to him, he supports everything Graden does, and

23   Carrington should too, if he were to "join the family."

24        109.  Redstone asked: "Was Brian [Graden] your first?" and "How old were you?"

25   Carrington said: "Yes. 17." Redstone said: "You still appear 17. Don't tell people otherwise."

26   Redstone asked: "How good was the sex?" and "Did Brian leave a gift in you?" Carrington

27   attempted to exit the car as he was uncomfortable, but the child lock prevented him. Redstone:

28   "Not so fast." Redstone grabbed Carrington's face and said harshly: "Don't disrespect me."

1    Redstone began to massage Carrington's thighs and undo his belt and jeans. Carrington asked
2    Redstone not to touch him.

3        110.  Redstone slapped Carrington's mouth and said, "Relax." Redstone pulled Carrington's
4    pants and briefs below his knees, grabbing Carrington's penis with his rough and cold hands.
5    Carrington declined Redstone, but he continued massaging his penis and testicles. Redstone spat
6    on Carrington penis several times. Redstone said Carrington had "A perfect Jewish dick."
7    Redstone continued massaging Carrington while demanding: Carrington would meet someone
8    very important soon and he better obey all orders and remain loyal to him, or else. Once
9    Redstone finished assaulting Carrington, he alerted his driver to unlock the door. Redstone
10   smiled at Carrington and said, "Loyalty," as Carrington walked away fixing his pants. Carrington
11   walked into the arms of his manager and a friend as they stood nearby.

12                                   **November 2010 Reno Logan**

13       111.  Carrington and a friend had a meeting with Logan inside his Paramount office to
14   discuss Carrington's reality show. Logan requested Carrington audition for his upcoming film.
15   Carrington was asked to pretend to be dead, as Logan pretended to shoot him with a gun. The
16   next audition process involved Carrington flirting with Logan. Logan requested Carrington have
17   a few shots of liquor to get 'more involved in the scene.' Carrington began drinking. Logan
18   mentioned that Redstone was happy with Carrington. Logan began massaging his own penis
19   while saying Carrington should cast Logan's son in his reality show, and possibly date him.
20   Logan asked if Carrington was good at "sucking dick," and if he could handle his "long and thick
21   dick," which he pulled through his jeans. Logan walked towards Carrington and hugged him
22   from behind, rubbing his penis against Carrington's anus. Logan laughed off his assault, as
23   Carrington pulled away. Logan demanded Carrington make him a lot of money with his projects,
24   and insisted Carrington meet with Redstone for instructions on how to please a known actor, who
25   had arrived on the lot in a red Ferrari.
26   / / /
27   / / /
28

1

**November 23, 2010 Sumner Redstone MTV/Viacom Contract**

2

112.  On or about November 23, 2010 Sumner Redstone signed an entertainment contract with

3

Carrington for Viacom to produce Carrington's "The Life of a Trendsetter" with MTV, on condition

4

Carrington gave Redstone creative control of the cast and a percentage of Carrington's dark comedy

5

"Inheritance." Redstone agreed to allow Carrington to film his reality show on the Paramount lot, but

6

demanded that Carrington obey his "daily rules," and only work with producers Restone approved.

7

**December 2010 Brad Grey (Deceased)**

8

113.  Carrington was introduced to Brad Grey (deceased), Chairman and CEO of Paramount

9

Pictures, at Paramount by Sumner Redstone. Redstone demanded Carrington obey Grey's

10

demands. Grey said he loved fashionable people who commanded a room as Carrington did.

11

Grey explained his current relationship with Cassandra was for appearances, as they were both

12

gay. Grey became overly touchy with Carrington on the lot, despite Carrington's decline. Grey

13

and Carrington had dinner at the Polo Lounge the same evening. Grey drove Carrington home

14

and while sitting in front of his place, Grey began forcefully kissing Carrington. Carrington was

15

highly uncomfortable, but decided to go along after Grey threatened to tell Redstone he wasn't

16

willing to "play the game." Grey told Carrington that he could make or break his career,

17

depending on his "participation." Grey played Usher's music and pulled out a cigar. Grey

18

demonstrated with his lips on the cigar what he wanted to do to Carrington. Grey pulled

19

Carrington's jeans down. Grey kept repeating how good Carrington's "Jewish dick" tasted. Grey

20

begged Carrington to climax in his mouth or else he wouldn't let him back on Paramount's lot.

21

Carrington complied.

22

**December 2010 "The Fighter" Premiere Grauman's Theater**

23

114.  Carrington arrived with two friends. Carrington was introduced to Mark Wahlberg,

24

who was always respectful, and assaulted by Redstone. Redstone asked Grey if Carrington was

25

obeying? Grey relayed he was indeed. Carrington told Redstone, Grey forced oral sex. Redstone

26

laughed and stated, "As he should." "You better learn to like it, if you want your projects green

27

lite." Redstone grabbed Carrington's anus, pulling him from behind and wrapping his blazer

28

1    around Carrington. Redstone said he wanted to watch Grey "fuck" Carrington inside his home

2    and it should be arranged before Grey left for New York.

3                **January 13, 2011 Brad Grey Management and Development Contract**

4        115.  Brad Grey signed a management and development contract for Paramount Pictures

5    with Carrington on or about January 13, 2011. Grey agreed to manage Carrington's career and appear

6    with Carrington in his reality show "The Life of a Trendsetter," as the executive producer of Carrington's

7    dark comedy "Inheritance." The reality show would capture the casting, development and filming of

8    "Inheritance" at Paramount.

9                   **January 16, 2011 Golden Globe Awards (Beverly Hilton)**

10       116.  Grey requested Carrington's attendance at the Golden Globes. Carrington arrived with

11   his two friends and his manager. Grey introduced Carrington to Chairman and CEO of HBO,

12   Richard Plepler and Cassandra Grey. Grey requested he and Carrington discuss business in a

13   suite upstairs. Grey's conduct instantly became aggressive once inside the room. Grey held a

14   cigar and bottle of tequila. There was no mention of business. Grey pushed Carrington onto the

15   floor and held him down while pouring tequila down his throat. Grey pulled his pants and

16   underwear down before pulling down Carrington's. Grey shoved his penis in Carrington's face,

17   as he poured more tequila down his throat. Grey constantly repeated how good their "Jewish

18   bodies felt on one another." Carrington yelled for Grey to stop, however, Grey demanded

19   Carrington show him respect, if he wanted to continue at Paramount Pictures. Carrington yelled

20   for his manager and friend to help him, as they were outside the room. Grey started hitting

21   Carrington in the face and chest to shut him up. Grey turned Carrington onto his stomach and

22   banged his head into the floor to weaken him, as he slid his unprotected penis inside Carrington's

23   anus. Grey brutally raped Carrington for 10-15 minutes. Grey placed Carrington onto the bed

24   while he was immobilized and bloody. Grey placed Carrington's legs over his shoulders before

25   ejaculating inside him. Grey told Carrington he loved him, but needed him to remain silent about

26   their growing relationship, as his public relationship to his fiancé, Cassandra, meant a lot for his

27   image as a straight man.

28

**January 17, 2011 Reno Logan and Sumner Redstone**

117.  Carrington told Logan in detail about Grey raping him, however, Logan didn't care and told Carrington, he should be glad Brad Grey chose him. Redstone told Carrington, he wasn't loyal by continuing to complain about rape. Redstone said if Carrington didn't start playing along, he would be blacklisted.

**January 30, 2011 Screen Actors Guild Awards**

118.  Grey introduced Carrington to Harvey Weinstein on January 30, 2011 at the Screen Actors Guild Awards. Grey told Weinstein that Carrington was a new addition to the Paramount family. Grey said Weinstein could be a massive asset to Carrington's career, given he helped Grey commence his own career. Grey suggested they all work together on Carrington's dark comedy "Inheritance."

**February 7, 2011 Audi and Weinstein party at Chateau Marmot**

119.  On February 7, 2011, Carrington attended a party at Chateau Marmot a hosted by Audi and Weinstein. Harvey Weinstein asked Carrington to meet him in a private section. Weinstein pinned Carrington in a corner with Carrington's friends nearby. Weinstein told Carrington: "I want what Brad raves about." Weinstein called Carrington a "Lenny Kravitz look-alike" and said he would "have my way with" Carrington later that evening. Carrington avoided further contact with Weinstein that evening and left before any unwanted approaches.

**February 14, 2011 Sumner Redstone**

120.  Redstone demanded Carrington meet him outside his Beverly Park Estate and ride with him to an invite, however they met on Sunset Blvd. Redstone told Carrington to wear business casual clothing as they were attending an event. Redstone's driver opened the backdoor for Carrington to sit with Redstone. Redstone's face was bleeding on one side, which he kept wiping. Redstone's finger was cut with a band-aid halfway on. Redstone forced Carrington to apply a new band-aid to his cut finger while Redstone massaged his own chest with his other hand. Carrington was nervous, as he was unaware of Redstone's mental state. Redstone grabbed Carrington and told him to relax. Redstone's driver started to drive faster. Carrington was told to

continue seeing Grey, as Grey was in love with him. Carrington complained about Grey raping him the month prior. Redstone told Carrington to shut up. Redstone said Grey and Harvey Weinstein were going to produce his dark comedy "Inheritance," and he should thank him. Carrington thanked Redstone, but Redstone wanted an "oral thank you." Redstone kissed Carrington's lips and demanded Carrington kiss his penis. Carrington could not exit the situation, as the car was in motion. Once Carrington kissed Redstone's penis, Redstone told Carrington, "You're welcome." Redstone's driver pulled over and released Carrington from the car.

### February 25, 2011 Tom Ford Grand Opening Rodeo Drive

121.  Grey instructed Carrington to meet a "business connection" at the Luxe hotel next door to discuss "Inheritance." Harvey Weinstein appeared at the bar with a room key. Weinstein demanded they go upstairs to discuss the show, as he gripped Carrington's shoulder with his hand, while rubbing his erect penis into Carrington's back. Carrington refused to do anything with Weinstein. Weinstein screamed, "Get your ass up." Weinstein pulled Carrington from his chair, while his manager was present. Weinstein said Redstone and Grey would hear about his refusal. Weinstein called Carrington a "Stupid fucking bitch who's going to be sorry." Grey scolded Carrington in front of his fiancé Cassandra for declining Weinstein.

### February 27, 2011 Vanity Fair party

122.  Carrington and his friends encountered Sumner Redstone and his grandson. Redstone expressed Carrington's sexual declines to Grey and Weinstein were keeping him from succeeding. Redstone threatened to have Carrington psychically harmed by a "fixer" if he continued discussing being assaulted by himself and Grey. Redstone said he and others could touch Carrington whenever the fuck they wanted. Redstone proceeded to spit in Carrington's face and threatened to blacklist and sue him if he didn't "alter his thinking."

### February 2011 Tony DiSanto

123.  Tony DiSanto, MTV's President of Programming after Brian Graden's exit, offered Carrington a recurring role on a new series set to film in Atlanta entitled "Teen Wolf." DiSanto Executive Produced the series and attempted to purchase Carrington's silence after Disanto came

onto him. DiSanto expressed his friendship with Brian Graden and how they shared young men in the past, but DiSanto stopped engaging after becoming a family man. DiSanto said, he wish he could have shared Carrington with Graden or now if possible. DiSanto apologized for his behavior and began making phone calls to the head casting director to arrange further movement for Teen Wolf, but Carrington refused the role in order to remain in Los Angeles for his reality show and dark comedy.

**March 2011 Shari Redstone**

124.  Carrington spoke with Shari Redstone to discuss her father, Sumner Redstone, Brad Grey and Harvey Weinstein sexually assaulting him. Shari Redstone promised Carrington the sexual assaults would end and thanked him for telling her. However, they did not end.

**April 2011 Brad Grey and Sumner Redstone**

122.  Carrington met with Grey and Redstone at Grey's Holmby Hills estate in the late morning, just days before Grey's wedding to Cassandra. During the meeting, Redstone and Grey told Carrington that a "business meeting" had been set up at the Peninsula Hotel in the afternoon with Harvey Weinstein, who was in town for his movie premiere, "Hoodwinked Too!," saying, "Harvey agreed to sign onto 'Inheritance' as an executive producer." Redstone said: "If you want to be taken seriously as a screenwriter, having Grey and Weinstein attached would solidify your career." They told him that Harvey would have an actress there that he was thinking of casting in the production, so the meeting would be strictly professional. They told Carrington not to leave the meeting until Weinstein had officially signed on.

123.  Grey then served Carrington a spiked cocktail and insisted that he drink before sex with them. Grey said their threesome with Redstone would be "your wedding gift to me and Cassandra." Carrington refused. Grey struck Carrington in the chest, knocking the wind out of him. Redstone reminded Carrington that he would have his "fixers" beat him to a pulp if he did not behave. Redstone then demanded that Carrington strip, while both men removed their clothing. Once they were nude, Redstone sat in a chair and required Carrington sit on his lap. Redstone placed his tongue down Carrington's throat while rubbing Carrington's body in

1    order to gain an erection. Once Redstone was erect, Grey rubbed lube onto Redstone's penis.

2    Redstone asked Grey to choke Carrington's neck while Redstone inserted his unprotected

3    penis into Carrington's anus. Redstone directed Grey to masturbate while he watched him

4    rape Carrington. Redstone asked Carrington, "Do you love being raped?" continuing: "Rape is

5    just sex;" "You love sex;" "You love rape;" "It's all the same." After several minutes of

6    Redstone forcing Carrington to ride his penis while facing him, Grey repositioned

7    Carrington's body to face the opposite direction while Redstone's penis remained inside

8    Carrington's anus. Grey French kissed Carrington before forcing Carrington's head to

9    perform oral sex on Grey. Grey became more aggressive, insisting Redstone "cum inside his

10   ass before I shove my dick in there." Redstone proceeded to climax inside of Carrington's

11   anus while Carrington performed oral sex on Grey. Grey pulled Carrington's bottom off of

12   Redstone's penis before placing his penis inside of Carrington anus while standing up.

13   Redstone sat back in the chair, holding Carrington's legs up while Grey positioned himself in

14   and out of Carrington's anus. Grey began French kissing Carrington while raping him.

15   Redstone cheered Grey on until Grey climaxed inside of Carrington's anus and then moved

16   into Carrington's mouth to finish. Grey said: "Swallow my cum, so you remember who owns

17   you." Redstone commented calmly: "Loyalty."  Once they allowed Carrington to leave, they

18   told him to go to the Peninsula Hotel and wait at the hotel bar until Weinstein arrived.

19                   **April 2011 Peninsula Hotel, Harvey Weinstein**

20        124.  Shortly thereafter, Weinstein's female assistant took Carrington to a suite upstairs.

21   Carrington had his manager come up with them and stand outside the room.  Weinstein

22   welcomed Carrington into the room where an unknown actress lounged. Within minutes of

23   standing in the living room, Weinstein offered Carrington a drink as the actress pulled out

24   cocaine. Weinstein instantly removed his pants, despite Carrington saying the meeting was

25   not supposed to be inappropriate. Weinstein demanded the actress and Carrington snort lines

26   from his erect penis before sucking it. Weinstein jerked his penis in between lines being

27   snorted from his penis by the actress. Weinstein yelled, "Suck it." Carrington refused.

28   Weinstein became angry, pulling Carrington down by his long hair, forcing Carrington onto

1   his knees. Weinstein held Carrington's hair in his hand while pushing Carrington's mouth into

2   his cocaine-covered penis, which displayed blood. Weinstein repeated "Do as told, you know

3   the rules." Weinstein pointed to contracts and said we'd discuss business after he came.

4   Weinstein released Carrington's hair from his hand after several minutes of forced oral sex.

5   Weinstein and the actress disappeared into the bathroom. Carrington became lightheaded and

6   sick due to the cocaine. Carrington entered the next room to lie on the bed in the fetal

7   position, which helped decrease the pain. Carrington hoped Weinstein would have sympathy

8   for his pain and focus on business, as he was not to leave until Weinstein signed onto

9   "Inheritance."

10   125.   Weinstein remerged from the bathroom bare; he aggressively turned Carrington

11   onto his back with his knees pointed up. Weinstein got on top of Carrington with an erect

12   penis and lied in between his legs with his penis rubbing against Carrington's anus. Weinstein

13   kissed and licked Carrington's face and lips. Weinstein lifted himself, as he held Carrington

14   down with one hand. The actress assisted Weinstein in removing Carrington's drivers and

15   pants. Carrington couldn't remove Weinstein's heavy hand to prevent his actions, so he

16   shouted for them to stop. The actress removed Carrington's briefs to his ankles. Weinstein

17   lied back in between Carrington's legs as his knees were pointed up. Carrington tried pushing

18   Weinstein off, but his weight overpowered him. Carrington begged Weinstein to stop multiple

19   times. Weinstein said, "After I cum, boy." Weinstein ripped Carrington's briefs from his

20   ankles and began licking his fingers as he repeatedly placed them inside Carrington's anus.

21   126.   Weinstein spat on his unprotected erect penis before impelling Carrington's anus.

22   Carrington screamed through the pain while trying to wiggle from under him, as Weinstein

23   ripped tissue while going in and out. Weinstein became more aggressive and livid with

24   Carrington, wishing he'd enjoy the rape. Weinstein kept telling Carrington how good he felt.

25   Weinstein finally ejaculated inside Carrington, which weakened him and allowed Carrington to

26   wriggle away. Carrington grabbed his clothes and ran out of the hotel despite Weinstein saying

27   he'll ruin his career. Weinstein followed Carrington while bare, screaming, "You're fucked."

28   "I'm an important man." Carrington complained to Brad Grey and Sumner Redstone, but they

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

didn't help. Carrington complained to Reno Logan, but he told Carrington to remain silent yet again.

### May 5, 2011 Beverly Wilshire Hotel Grey and Tom Cruise

127.  Newly married Grey introduced Carrington to Tom Cruise and his family. Cassandra Grey was intoxicated while speaking to Carrington about her husband's love affair with Carrington. Tom Cruise inserted himself into the conversation and asked Carrington for a threesome with Grey later that evening. Cruise said, "I heard how tight and warm your ass is." Cruise pulled Grey closer and whispered to Carrington, "I want to fuck you with both our dicks inside you at the same time." Grey offered to host the threesome that evening as a gift to Tom Cruise for his special day, but Carrington managed to bow out that evening.

### June 8, 2011 Regency Village Theater "Super 8" premiere

128.  Grey pushed Carrington against the bathroom's wall, kissing his face and lips while begging him to be his boyfriend. Grey offered Carrington trips around the world on the jet and shopping after visiting countless museums, but Carrington declined and relayed, he wasn't interested and only wanted his shows produced. Grey became angry, mentioning their shared gatherings with several known actors, producers and directors, but Carrington declined him again. Grey grabbed Carrington's penis, licked his face and stated, "You'll never work again." "You don't listen." "I have you by the balls." Grey pushed Carrington to the floor in front of Carrington's manager and the Vice Chairman of Paramount, Rob Moore.

### July and August 2011

129.  During July and August 2011 Grey and Redstone appeared separately a few times at Carrington's condominium in the Hollywood Hills, demanding that Carrington sign a Non-Disclosure Agreement ("NDA") and delete the emails and text regarding their sexual abuse. Carrington declined each time.

### October 3, 2011 "Footloose" Premiere at Regency Village Theater

130.  Carrington and friends encountered Redstone and Grey at the Premiere of "Footloose" at the Regency Village Theater on October 3, 2011. In the presence of Grey and Carrington's

friends, Redstone offered Carrington $30 Million for as a settlement for the "rape," but told Carrington he could not pursue a career in entertainment if he were to accept. Carrington declined, causing contention between himself, Redstone and Grey. Redstone threatened to sue Carrington, as he was still under contract. Grey threatened to ruin Carrington's life with the assistance of the "fixers" on payroll at Paramount. Redstone chimed in, "You're not fully white;" "No one will believe you;" and in a long drawn out comment: "Black… listed." Carrington soon discovered that his career had been blacklisted from all National Amusements, Inc. owned companies as well as other major studios.

### June - July 2014 HBO

131.  In June and July of 2014, Michael Lombardo, the President of Programming at HBO, fell in love with Carrington's dark comedy "Inheritance." Lombardo told Carrington he loved his writing and storytelling style, and wanted to make an offer to sign the series. After two-months of promises, Lombardo told Carrington that he would not move forward with the offer because of Sumner Redstone and Brad Grey, who used their power to prevent the deal. Grey held major influence at HBO, Executive Producing such shows as "The Sopranos" and "Real Time with Bill Maher" for HBO.

### August 2014 - Brian Graden

132.  Brian Graden reemerged into Carrington's life after reaching out to apologize for sexually abusing him while he was a minor. Graden pleaded for Carrington's forgiveness and promised to Executive Produce Carrington's reality show "The Life of a Trendsetter," if Carrington were to depart his current working relationship with two prominent Producers and his affluent and well known cast. Carrington expressed Sumner Redstone and Brad Grey held him on the National Amusements, Inc. blacklist and ruined his working relationship with HBO, by which Graden promised to help remove Carrington from Redstone's blacklist. Graden persuaded Carrington to allow him full control of his career and become his "additional boyfriend," as Photographer Ted Sun was the first. Graden explained that Ted Sun arranged and filmed their sex parties at Graden's Hollywood Hills home, but Graden didn't have an emotional connection

with Sun, which he said he desired with Carrington.

133.  Graden found Carrington to be intelligent, fashionable and compassionate, which caused Graden to fall in love. Graden and Carrington entered a two-year personal and business relationship, ending in the summer of 2016 after Carrington realized Graden stole his reality show concept "Finding Prince Charming" and sold it to Logo Network.

**October 1, 2014 Brian Graden's Hollywood Hills home**

134.  Graden insisted he and Carrington discuss business by the pool with cocktails. Graden announced an offer he received to be the President of Programming for the Discovery Channel. Graden expressed his excitement for the offer and for Carrington's new reality show with Lawrence Fishburne's daughter, Montana Fishburne.

135.  Graden suggested they continue talking inside the pool. Carrington entered the pool with swimwear, Graden followed bare. Carrington expressed his reality show ideas with Graden until two older bare men exited the guesthouse. Carrington inquired who the men were, but Graden exited the pool to prepare new cocktails. Graden returned and insisted Carrington drink the cocktail before they entered the guesthouse alone. Unbeknownst to Carrington, the cocktail was laced with drugs, causing Carrington to feel highly sexual and lightheaded. Carrington became numb while on the bed with Graden. Graden expressed his love for Carrington as he removed his swimwear. Graden conducted multiple sex acts before entering Carrington's rectum unprotected. Graden ejaculated inside of Carrington's rectum without permission.

136.  Graden allowed the bare men to enter the guesthouse with a camera. Carrington was impaired due to the laced drink, but was able to beg the men to stop. Both men ignored Carrington's request and took turns inside his rectum unprotected, despite his continuous protests. Graden filmed the encounter while both men **"**double penetrated" Carrington's rectum at once (one from behind the victim and one from below), an extremely painful experience. Graden demanded that if Carrington wishes for him to continue with his offer to produce his dark comedy and reality show, Carrington should accept all of his fantasies. Both men then ejaculated inside of Carrington. Graden told Carrington "Loved every time, but this was the best."

**April 22, 2015 Contract signing with Graden**

137.  Late in the afternoon of April 22, 2015, Carrington met with Graden alone at the Mondrian Hotel in West Hollywood. At this meeting, Graden started out with cocktails which had been prepared prior to Carrington's arrival, assuredly with GHB. After a drink, Graden presented two contracts to Carrington explained to Carrington what they (presumably) meant. Carrington did not fully read them. He told Carrington that one was with Brian Graden Media to produce Carrington's reality show and his dark comedy, and the other was a Non-Disclosure Agreement ("NDA") which Graden required before he would sign the production contract. He explained that as a condition, the production contract required full control of Carrington's career and his email passwords. The NDA covered Graden's underage sex with Carrington and all other sexual contacts with ViacomCBS personnel. The contracts were fully executed and Carrington gave Graden his password.

138.  Graden immediately went into Carrington's cell phone and deleted all emails implicating Sumner Redstone, Brad Grey and Harvey Weinstein, as they required in order to remove him from the Blacklist. Thereafter, Graden plied Carrington with another cocktail and said: "Leave me with something to remember, since you're going to Palm Beach tonight," followed by his usual sexual abuse. Upon leaving the meeting, Carrington did not receive copies of the contracts. In fact, he never received copies.

**June 6, 2015 Brian Graden's house**

139.  Graden prepared cocktails while demanding that Carrington's publicists build his image in order for Carrington to star in "Finding Prince Charming." The business discussion turned into sex. During sex, Carrington felt his heartbeat and body temperature increasing. Carrington expressed he felt he was dying and wanted to call an ambulance. Carrington exited the bed, searching for his iPhone. Graden took Carrington's iPhone, refusing his call for help.

140.  Graden placed Carrington inside the shower, as he stood inside with him. Carrington lied on the floor with hard pressure water constantly covering him. Graden began having sex with Carrington, but Carrington could not endure the intercourse. Graden became aggressive, telling Carrington to leave, as he didn't want him to "die in his home." Graden begged

1   Carrington not to see a doctor, if he wanted Graden to proceed with producing his finding love

2   reality show. Graden said the following to Carrington that night:

3           "I drugged you to increase the sex."

4           "Papi wanted his Prince to take his dick all night."

5           "Please don't call 911. I can get into trouble if you say I drugged you."

6           "I have shows airing right now. You won't get a show if you tell."

7           "Don't ruin daddy. You love Daddy right?"

8           "You're Daddy's good nigga right?"

9           "I love you my Prince."

10   Once the drugging wore off, Graden said, "Glad you feel better."

**June 2015 Brian Graden's house**

12       141.   Graden held a party at his home, which Carrington arrived at with three friends. The

13   party was advertised as an entertainment party, but Carrington discovered it was a sex gathering

14   with underage boys and several Executives under ViacomCBS. After seeing Graden and several

15   underage boys, Carrington attempted to leave. However, Graden became argumentative and

16   abusive. Graden slapped and choked Carrington in front of his friends. Graden told Carrington if

17   he shared witnessing Graden and several know figures performing sex acts with the boys,

18   Graden wouldn't produce his shows, despite the recently signed contracts. Carrington was told,

19   "He'd be blacklisted again, and Sumner Redstone would make it permanent this time."

**June 2016 Brian Graden's house**

21       142.   Graden apologized to Carrington for all the physical and sexual abuse he committed,

22   as well as several men employed by Graden who inflicted indelible scars onto Carrington.

23   Graden expressed his distaste for the Redstones, as he wished to get out of their working

24   relationship to focus on his unrevealed music career. Graden ripped up Carrington's NDA and

25   business contract and threw them away, freeing Carrington to sign and produce shows with other

26   studios. Graden said he signed a new reality show with Logo Network thanks to the "new

27   rhythm" Carrington provided him, but he couldn't go into details, other than Logo's hesitation

about Graden's escort, Robert Sepulveda Jr., starring in the show. Graden said Logo's executives knew Graden and his other boyfriend, Ted Sun, participated in filmed sex with Robert, causing their fear of a scandal and lawsuit. Graden said a famous figure would also be joining the show.

143.  Carrington went through Graden's iPhone and MacBook Air to get details about the show and discovered videos of his sexual assaults, from the time he was underage until recently, as well as other young men. Carrington demanded that Graden erase the videos, but he refused. The videos pictured Graden and other executives participating in the acts of sex, including Graden's attorney, Larry Stein. Stein kissed Carrington and committed anal intercourse (penile penetration into Carrington in both the missionary position and 'doggie style,') and also with other teenage boys, all while the victims were unconscious. Graden threatened to show the videos of Carrington to other Executives if he mentioned the video collection, or tried writing about their relationship on his website "TheCarringtonDiaries.com" or inside one of his screenplays.

## November 6, 2016 Brad Grey

144.  Brad and Cassandra Grey approached Carrington and his friend at "Dan Tana's" in West Hollywood, CA. Grey asked how Carrington's career was going after Grey had seen him on red carpets and in interviews promoting his website, "TheCarringtonDiaries.com." Grey demanded Carrington come back into his life, and leave Graden if he wanted things to be easier for himself. Grey grabbed at Carrington's penis and relayed, "I miss our Jewish bodies rubbing against each other." Grey suggested Carrington join him in China for the premiere of Paramount's new film "Allied," as Cassandra wouldn't be attending. Carrington told him: "Fuck off. I haven't forgotten how you raped me and blacklisted my career." Grey relayed, "Your career won't succeed without me or Paramount fucking you. Fuck your career." "No one with a name will touch you, but you know that from experience." Grey laughed about Graden producing "Finding Prince Charming" without Carrington as the star. Grey shared, "Brian shared videos of him fucking you," "I came while watching every video."

/ / /

1

**November 6, 2016: The Polo Lounge**

2      145.  Carrington had dinner with friends after his encounter with Brad Grey. Grey's close

3  friend, Bob Saget, arrived with John Mayer and another gentleman and sat right next to

4  Carrington's booth. Saget made derogatory remarks to Carrington, causing Carrington to excuse

5  himself from the table. Saget then followed Carrington into the restroom, calling him a "whore"

6  and "cocksucker," saying, "You like sucking cock right? Suck mine. I know you do it well." He

7  cornered Carrington, pushing him onto the sink, and said, "Treat me like Brad." When someone

8  entered the restroom, Saget left. Carrington returned to his table and had to tolerate Sagets

9  continuing derogatory comments until the John Mayer told him to stop.

10     **June 2016: Graden Steals Carrington Shows**

11     146.  In June 2016, Graden signed "Finding Prince Charming," whereby Logo Network

12  agreed to premiere the show on their network, with Graden as the creator and Executive

13  Producer. Graden stole the show from Carrington. Promotion for the show came out in July

14  2016. Finally after a year of not talking to Graden, in August 2017, Carrington confronted

15  Graden for stealing "Finding Prince Charming." Graden admitted that he stole it and gave the

16  starring role to his escort, Robert Sepúlveda, Jr. Graden's attorney, Larry Stein assisted Graden

17  in concealing his admission, in exchange for Graden's offer to Executive Produce Carrington's

18  new dark comedy "Heiristocracy." Graden allowed Carrington creative control and gave him

19  permission to include other known Producers, like Darren Stein, who saw it as an opportunity to

20  work with Graden.

21     147.  In September 2017 Graden read "Heiristocracy's" pilot and discovered Carrington had

22  detailed his underage relationship with Graden, in addition to the sexual abuse Carrington

23  suffered from Brad Grey, Harvey Weinstein and Sumner Redstone. Graden punched Carrington

24  in the face multiple times and threatened to blacklist the show and compelled Darren Stein to

25  decline his Producer offer.

26     148.  In October 2017 Darren Stein removed himself from "Heiristocracy" via email, after

27  Brian Graden's influence. Within two-minutes, Stein sent a follow-up email with the exact

28

1  context minus Brian Graden's name. Stein had initially agreed to be attached to "Heiristocracy"

2  in order to work with Graden.

3  ### November 2017 Variety

4  149.  Carrington's publicist reached out to Executive Editor Debra Birnbaum regarding

5  Brian Graden's toxic and inappropriate relationship with Carrington. Birnbaum and Carrington

6  discussed Graden drugging, raping and physically abusing Carrington over a 10-year span.

7  Birnbaum learned Graden used physical force and blacklisting threats to keep Carrington silent

8  about it. Birnbaum spoke with eight witnesses and gathered evidence from Carrington,

9  confirming the abuse of Carrington. Birnbaum stated that Carrington was "Stupid to stay in a

10  relationship with Brian." Birnbaum confirmed the story was printing and she would reach out to

11  Graden for comment.

12  150.  Birnbaum called Carrington and his publicist, revealing that Gene Maddaus had taken

13  over the story and sold the evidence to Larry Stein and Brian Graden, as Stein is close friends

14  with Maddaus.

15  151.  After multiple reporters learned of Graden's  proclivity for pedophilia, Carrington and

16  his publicist received death threats from Larry Stein and Brian Graden. When Graden lied to

17  reporters about his relationship with Carrington, one reporter confronted him with the evidence:

18  photos, texts and emails.

19  VII.   **FACTS REGARDING THE PRIOR LITIGATION**

20  ### Judge Failla's "Individual Rules of Practice in Civil Cases"

21  152.  On June 4, 2018, citing no legal authority, Judge Failla issued at Docket No. 13

22  "NOTICE OF INITIAL PRE-TRIAL CONFERENCE." [EXHIBIT 003, pp. 23-25] Within this

23  "Notice," Judge Failla purports to Order that:

24  > This case has been assigned to me for all purposes. It is hereby ORDERED that
25  > counsel for all parties appear for an initial pretrial conference with the Court on
   > **July 20, 2018, at 3:00pm**, in Courtroom 618 of the Thurgood Marshall
26  > Courthouse, 40 Foley Square, New York, New York.

27  > [EXHIBIT 003, p. 23, emphasis in original]

28  153.  Judge Failla appears to be operating outside the Federal Rules of Civil Procedure

from the very beginning of Carrington's prior case. In the first part of Rule 16(b), the Federal Rules of Civil Procedure mandate that Judge Failla:

> (1) **Scheduling Order**. Except in categories of actions exempted by local rule, the district judge—or a magistrate judge when authorized by local rule—**must issue a scheduling order**:

> (A) after receiving the parties' report under Rule 26(f); or

> (B) after consulting with the parties' attorneys and any unrepresented parties **at a scheduling conference**.

> [FRCP Rule 16(b)(1), bolding added]

154.  Plaintiff believes and alleges that there are no "categories of actions exempted" [from Federal Rules compliance] by the Local Rules at the U.S. District Court, Southern District of New York that would exempt Carrington's sex-abuse case.

155.  Moreover, even if a Local Rule is discovered purporting to authorize a civil trial proceeding under Judge Failla's "Individual Rules of Practice in Civil Cases" (as opposed to the Federal Rules of Civil Procedure), no such Local Rule could survive even a modicum of Due Process scrutiny. On June 4, 2018, Judge Failla was unauthorized to Order any pre-trial conference, as a review of the next portion of FRCP Rule 16(b) makes clear.

156.  In the second part of Rule 16(b), the Federal Rules of Civil Procedure mandate that:

> (2) **Time to Issue.** The judge **must** issue the scheduling order as soon as practicable, but unless the judge finds good cause for delay, the judge must issue it within the earlier of 90 days after any defendant has been served with the complaint or 60 days after any defendant has appeared.

157.   The Federal Rules afford Judge Failla no discretion regarding the scheduling order, the purpose of which is clear: all parties have a right to be put on Notice of the claims against them and an adequate opportunity to prepare a defense. Federal Rule 16(b), and only Federal Rule 16(b), authorize Judge Failla to schedule any "pretrial conference," and only according to these mandatory rules:

> (3) **Contents of the Order.**

> (A) Required Contents. The scheduling order **must** limit the time to join other parties, amend the pleadings, complete discovery, and file motions.

> (B) Permitted Contents. The scheduling order may:

> (i) modify the timing of disclosures under Rules 26(a) and 26(e)(1);

(ii) modify the extent of discovery;

(iii) provide for disclosure, discovery, or preservation of electronically stored information;

(iv) include any agreements the parties reach for asserting claims of privilege or of protection as trial-preparation material after information is produced, including agreements reached under Federal Rule of Evidence 502;

(v) direct that before moving for an order relating to discovery, the movant must request a conference with the court;

(vi) **set dates for pretrial conferences** and for trial; and

(vii) include other appropriate matters.

[FRCP Rule 16(3), emphasis added]

158.  The improper setting of a "Pretrial Conference" is only the beginning of the stark contradictions between Judge Failla's "Individual Rules of Practice in Civil Cases" and the Federal Rules of Civil Procedure.

159.  Motion practice in federal court is governed under Title III of the Federal Rules of Civil Procedure (FRCP Rule 7 et seq.), and a very large body of relevant case law.

160.  In contradistinction, Judge Failla's "Individual Rules of Practice in Civil Cases" appears to bypass the Federal Rules completely, and instead introduces us to a novel legal concept involving what Judge Failla calls a "Letter Motion." At Sec. 2B, the Failla Rules first warn us that:  "Except as otherwise provided below, communications with the Court should be by letter." [EXHIBIT 004, p. 28]

161.  Judge Failla's " Letters-Only Rule" comes as quite a shock to any party or attorney experienced in federal practice in a different District, for example, here in the Central District of California, where "communications with the Court" should be by noticed motions as authorized under the Federal Rules of Civil Procedure. As a general matter, in all other District Courts of which Plaintiff is aware, "letters to the judge" are prohibited, or at least disfavored.

162.  Nevertheless, Judge Failla's "Individual Rules of Practice in Civil Cases" mandate that:

§ **2C - Letter Motions.** Letter motions may be filed via ECF if they comply with the Local Rules and the S.D.N.Y. Electronic Case Filing Rules and Instructions. All requests for adjournments, extensions, and pre-motion conferences should be filed as letter motions. If the letter motion is not on consent, any opposing party

49

CARRINGTON v. GRADEN et. al. COMPLAINT – Sex Cult - Civil Rights

should submit a letter setting forth its position, within three business days after
the initial letter motion is received. A courtesy copy of each letter motion must
also be provided to Chambers via e-mail.

[EXHIBIT 004, p. 28]

163.   The Federal Rules of Civil Procedure mandate Service of Notice on all parties for all
court proceedings. The Due Process Clause can withstand nothing less. However, any Service of
Notice requirements regarding these "Letter Motions" is conspicuously absent from Judge
Failla's "Individual Rules of Practice in Civil Cases." Obviously the Federal Rules of Civil
Procedure are silent on Notice requirements for "Letter Motions," because the concept of "Letter
Motions" does not exist.

164.   The Federal Rules of Civil Procedure and a great body of case law set forth many rules
necessary to conduct motion practice in a constitutional manner. The "Individual Rules of
Practice in Civil Cases" doesn't set out any rules at all, other than saying that everything has to
be by "letters," and nobody is allowed to file a Motion. Under Judge Failla's "Letter Motions,"
we have no idea what the rules really are, if any.

165.   Under the "Individual Rules of Practice in Civil Cases," how any party could possibly
bring any sort of Motion under the Federal Rules of Civil Procedure in Judge Failla's courtroom
is unknown and unknowable. One thing is certain, the Federal Rules of Civil Procedure do not
apply in Judge Failla's courtroom, at least not in the prior sex-abuse case brought by Rovier
Carrington.

166.   Judge Failla's purported jurisdiction under her own "Individual Rules of Practice in
Civil Cases" constitutes nothing less than the creation of her own independent Court **System**,
completely outside the United States District Court, and operating completely outside and in
contradiction to Federal Rules of Civil Procedure.

167.   Upon first encountering it, any competent and experienced federal litigator will
immediately understand the fatal impropriety of Judge Failla's "Individual Rules of Practice in
Civil Cases," and the clear results upon Carrington – the complete stonewalling of his
meritorious sex-abuse case, and the complete railroading of Defendant's malicious and legally
unauthorized "Letter Motion for Terminating Sanctions." The lack of any which leads us to a

discussion of The Landau Group.

## The Landau Group

168.  February 22, 2018: Mr. Carrington hired Attorneys Kevin and Zach Landau to sue his former abusers, Brian Graden, Brian Graden Media, Sumner Redstone, ViacomCBS, MTV, Paramount Pictures, National Amusements, Inc., Brad Grey's estate, Harvey Weinstein and The Weinstein Company. The Landaus told Carrington they wanted to leave Redstone and Weinstein out of the original complaint (filed May 1, 2018), preferring to spring their names in discovery, and add them in an amended complaint.

169.  Carrington both called (May 3, 2018) and texted (May 8, 2018) Kevin Landau, informing him of notifications from Google that his email accounts had been accessed by IP addresses other than his own. Landau advised not to change his password, in order to catch Graden in the act, but that information deleted automatically after 28 days.

170.  When preparing the amended complaint (filed June 18, 2018), Carrington wanted to append his declaration and those of witnesses, rather than emails that would be contested by defendants because they believed they had been deleted. After the Landaus had Carrington type up all relevant information against Redstone, Weinstein (and the others) for his declaration, the Landaus caved and left them both out of the amended complaint, as well as the declarations, instead using the emails. Although Carrington had made many requests to see it before filing, the Landaus did not, for obvious reasons.

## July 17, 2018 Court Hearing

171.  Defense counsel argued for the case to be dismissed and submitted an affidavit from an IT expert to prove Brian Graden and Darren Stein's emails were original and Carrington's were false. The expert actually stated Carrington's *could* be real, but could not be verified unless they were in original accounts (which had already been deleted by Brian Graden to protect his job and the other defendants). Stein and the defense offered to hire a third party IT expert to review Carrington's accounts, but not Graden's. They told the court that Reno Logan assured them the emails were false, but the judge said until Logan shows his email account and signs an

1    affidavit, she wouldn't hear his side. Grey's attorneys wanted the case dismissed because Grey is

2    dead and his name was "being ruined." Graden's attorney Larry Stein also claimed Carrington

3    was "ruining Graden's image" with the lawsuit.

4                              **September 18, 2018 Court Hearing**

5        172.  Summary: Defense counsel hired IT expert FTI Consulting ("FTI") to analyze

6    Carrington's iPhone and email data. Judge Failla requested Carrington's iPhone be mirror

7    imaged by FTI. Paramount Pictures and ViacomCBS's attorney, Christopher LaVigne confirmed

8    that FTI's Erik Hammerquist was not able to confirm whether or not Carrington fabricated any

9    emails. Hammerquist hypothesized as to three reasons why: 1) the emails could have been

10   fabricated; 2) forwarded from one account to the next; 3) deleted. LaVigne agreed this was not in

11   FTI's report, but a guess, however the Defense Counsel confirmed with the press and within all

12   their motions, Carrington fabricated evidence in his complaint — and it was proven by forensics.

13   Hammerquist said he accessed rovier@TheCarringtonDiaries.com and was not able to prove

14   fraud, fabrication or locate the emails. Hammerquist said he was not able to enter

15   TrendsetterRovheir@gmail.com as the account was deleted and haven't been used since 2015.

16   Reno Logan signed an affidavit stating he didn't send Carrington the emails in question, which

17   led to Carrington having to sign a subpoena for FTI to review his accounts data.

18       173.  Diana Sanders said her client, Brian Graden assured her he didn't have Carrington's

19   password or log into Carrington's accounts. This was a complete falsehood. Further, Graden had

20   been ordered to turn over his email account to FTI, per the Laudau request on July 17, 2018, but

21   he never did. Sanders talked the judge out of that obligation.

22       174.  Kevin Landau stated he wanted to subpoena Carrington's accounts and provide the

23   data to FTI. Landau also stated he added witness declarations and text messages coinciding with

24   Carrington's emails in the amended complaint to prove that the emails were authentic, but Judge

25   Failla said she didn't care what Carrington's witnesses confirmed.

26       175.  Christopher LaVigne stated he wanted FTI to have the data rather than the attorneys.

27   Judge Failla agreed, stating that she did not want anyone touching what comes from Google

28   through the subpoena, and she so Ordered. That direction of the court was violated. (See below)

176.  Transcript 86 confirms how Judge Failla insisted Carrington's data would be handled and counsel thereafter signed an agreement. Defense counsel were to subpoena the email data from Google, Office365 and GoDaddy, which were to be provided directly to FTI, the forensic expert. Counsel and Judge Failla signed an agreement as reported, but the Defense Counsel received the data, in violation of that agreement.

MR. LANDAU: Well we want to keep the contents confidential so we can provide it to the e-discovery vendor to the extent that there is certain information that is irrelevant to this case because if they go into the account they may, you know, obtain more than just the at-issue communications.

THE COURT: But I've got two allegations of hacking. How can I ensure that any forensic computer person would have this information and would be able -- I don't want anyone touching what comes from Google

…

MR. LaVIGNE: What we propose in our letter, Judge, and I'm sensitive to that, is that Google would be directed to turn over the content to FTI and we handle it using the same protocol. So essentially FTI would conduct the same searches as a neutral e-discovery vendor and would look in the trendsetter account for any evidence of the at-issue communications. On our side we're fine with that. Because all we're looking to do is focus on authentication. We want to keep this as narrow as possible.

THE COURT: Mr. Landau, disagree?

MR. LANDAU: Your Honor is there a way Google can supply the court directly?

...

THE COURT: [No] is the short answer. We are not FTI and I'm not going to make myself that.

MR. LANDAU: Although I know that the Court did determine that no conflicts exist and I respect the Court's decision as to that, is there perhaps a different third party that would be able to be the custodian of these e-mails so that neither of the parties have access to them that could analyze them accordingly.

THE COURT: I don't understand -- I hear the words that you're saying, sir. **But, if it's going to FTI neither party is going to have access to them. Isn't that the point?**

MR. LANDAU: Yes, your Honor.

…

THE COURT: **Then it can be produced to FTI.** I'm assuming, perhaps incorrectly, that counsel collectively can agree on the terms of a subpoena. If you want me to endorse it, I will. Just send me something that you've all agreed on. If you can't agree, you'll send me both sides.

. . .

THE COURT: I'm authorizing the subpoena to Google with the contents to be delivered to FTI. I am assuming, I'm understanding that Mr. Landau is going to have his client make whatever -- issue whatever consents he needs to so that the content is released as well. I'd ask you to get that subpoena to me if you want me to issue it or sign it as early as possible and I will do so. And let it go to FTI and have them look at it."

[EXHIBIT 014, pp. 586-605 Doc. 86, 9-18-2018 Transcript, 48:19-67:10 in original, edited for clarity]

### The Hollywood Reporter

177.  On September 25, 2018, The Hollywood Reporter published an article by writer Eriq Gardner entitled "Brad Grey Accuser's Attorney Seeks Out of Lawsuit Amid Email Authenticity Probe." The defendants had gotten to Carrington's attorneys so that they would give this interview. The purpose of the article was to assure that no other attorney would take Carrington's case. Gardner and Larry Stein were close friends. The Reporter honors Stein annually, and has done so for many years. Stein used The Hollywood Reporter to trash his litigation opponent Rovier Carrington, which worked in Stein's favor.

178.  According to the article (as originally published but later changed), stated that Carrington owed Landau over $200,000, which was absolutely false –- since there was only a contingency fee contract. It says that according to Landau, Carrington has advised him he has "other lawyers" lined up to represent him. It also claimed Carrington had been contacted for comment, which was also false. In fact, Gardner had blocked Carrington's phone/email/Instagram - everything. This article ruined Carrington's chances of hiring new counsel, as intended.

179.  February 7, 2019: Judge Failla agreed that if Carrington's iPhone and email accounts came up clear of wrongdoing by FTI, she would dismiss the case without prejudice, permitting Carrington to file a new case in Los Angeles.

### Defense Counsel Together Submit Letter and Order Confirming Terms

180.  As shown in Fig. 1 below, the February 12, 2019 letter of Defense Counsel to Judge Failla speaks for itself:

CARRINGTON v. GRADEN et. al. COMPLAINT – Sex Cult - Civil Rights

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RUSS
AUGUST
& KABAT
LAWYERS

Stanton L. Stein          Diana A. Sanders
lstein@raklaw.com         dsanders@raklaw.com

12424
Wilshire Boulevard
12th Floor
Los Angeles
California
90025

Tel 310.826.7474
Fax 310.826.6991
www.raklaw.com

February 12, 2019

*Via Email* (Failla_NYSDChambers@nysd.uscourts.gov)

The Honorable Katherine Polk Failla
United States District Court
Southern District of New York
40 Foley Square, Courtroom 618
New York, New York 10007

Re:      Carrington v. Graden et al, Case No. 1:18-cv-04609-KPF

Dear Judge Failla:

The undersigned counsel represent all Defendants in this action.

Following the February 7, 2019 telephonic conference, we respectfully enclose a proposed Order for Further Discovery, which (1) effectuates the issuance of Court-Ordered subpoenas to Google, Microsoft, and GoDaddy; (2) provides for Plaintiff's authorization to have Google, Microsoft, and GoDaddy turn over the available and recoverable emails in Plaintiff's three known email accounts to FTI, which in turn is directed to locate any At-Issue Communications in those emails and produce them in native format to the parties, together with a report of its findings; and (3) directs FTI to collect and review the mirror-image of Plaintiff's iPhone X for evidence relating to the At-Issue Communications, as well as non-content user activity associated with the relevant email accounts. Pursuant to the Court's direction at the February 7 conference, Defendants respectfully request that the subpoenas to Google, Microsoft, and GoDaddy (attached, respectively, as Exhibits A-C to the proposed order) be signed and so-ordered by the Court.

If Your Honor would like these documents to also be filed by ECF, we ask that your Clerk so advise and we will promptly file them.

Respectfully submitted,

RUSS AUGUST & KABAT

/s/ Stanton L. Stein
Stanton L. Stein (appearing *pro hac vice*)
Diana A. Sanders (appearing *pro hac vice*)

Attorneys for defendants Brian Graden and
Brian Graden Media, LLC

RUSS
AUGUST
& KABAT
LAWYERS

/s/ Wook Hwang

LOEB & LOEB LLP
Wook Hwang
Sarah Schacter
345 Park Avenue
New York, New York 10154

*Attorneys for Brad Grey, Brad Grey Estate and
Brad Alan Grey Trust*

/s/ Stephen Fishbein

SHEARMAN & STERLING LLP
Stephen Fishbein
Christopher LaVigne
599 Lexington Ave.
New York, NY 10022

*Counsel for Viacom Inc., Viacom International Inc.
and Paramount Pictures Corporation*

Enclosure

cc:      Rovier Carrington (via email and mail)
         Defendants' Counsel (via email)

## Fig. 1 – Image of 02-12-2019 Defense Counsel Letter to Judge Failla

[see EXHIBIT 015, pp. 609-610]

**February 13, 2019 Order for Further Discovery (Docket No. 102)**

IT IS HEREBY ORDERED that Defendants are permitted to serve Court- Ordered subpoenas on Google LLC ("Google"), Microsoft Corporation ("Microsoft"), and GoDaddy.com, LLC ("GoDaddy") for domain related information related to www.thecarringtondiaries.com and subscriber-related information for the following email accounts, as set forth in Exhibits A-C: (1) trendsetterrovheir@gmail.com; (2) roviercarrington@gmail.com; and (3) Rovier@thecarringtondiaries.com (the "Accounts").

IT IS FURTHER ORDERED that, within fourteen (14) days of receipt of the subpoenas, Google, Microsoft and GoDaddy shall provide responsive information for such accounts.

IT IS FURTHER ORDERED that, within seven (7) days of the entry of this Order, Plaintiff Rovier Carrington shall provide written consent to Google, Microsoft and GoDaddy in the form attached hereto as Exhibit D, which shall permit Google, Microsoft and GoDaddy to produce to FTI Consulting, Inc. ("FTI"), at the address, 350 S. Grand Ave. Suite 3000, Los Angeles, California 90071, the content of any and all available and/or recoverable email communications in the above-referenced Accounts, including, without limitation, all emails recoverable from deactivated or inactive Accounts, as well as all recoverable emails previously deleted from the Accounts. Plaintiff must file a copy of this written consent with the Court within seven (7) days of the entry of this Order. Plaintiff is further ordered to cooperate (to the extent necessary) with **Google's, Microsoft's, and GoDaddy's recovery, collection and transmission of the content of the above-referenced accounts to FTI.** Upon receipt of the content of the above-referenced accounts, FTI shall search the content so produced for evidence of any At-Issue Communications (as defined in the Court's August 7, 2018 Order, Dkt. # 64), and thereupon shall produce any and all At-Issue Communications produced by Google, Microsoft and GoDaddy (and only such At-Issue Communications), in original native format and with all accompanying metadata, together with a report of FTI's findings to Plaintiff and Defendants within seven (7) days of receipt of this information.

IT IS FURTHER ORDERED that Plaintiff shall provide to FTI, by February 28, 2019, Plaintiff's iPhone X previously identified by Plaintiff for mirror-imaging, whereupon FTI shall be permitted to forensically examine such mirror-image for evidence pertaining to the At-Issue Communications, including the transmission and/or

deletion thereof, as well as non-content user activity associated with the Accounts and/or concerning the dates of operation of such device, and thereupon shall produce the results of such examination by providing any and all At-Issue Communications in original native format and with all accompanying metadata, together with a report of its findings concerning the foregoing examination to Plaintiff and Defendants within seven (7) days thereof.

SO ORDERED.

Dated: February 13, 2019 New York, New York



KATHERINE POLK FAILLA United States District Judge

[See EXHIBIT 005, pp. 46-77, caption removed, emphasis added]

### Attorney Fraud

181.  February 1, 2019: Judge Failla endorsed Defense Counsel's Motion for Sanctions. Defense counsel intended to file the motion after Carrington was "proven" to have committed fraud by relying on fake or altered emails in the Amended Complaint filed by the Landaus.

182.  February 7, 2019: Judge Failla agreed to dismiss the case ***without prejudice*** if Carrington was cleared of falsifying the emails in question so that Carrington could re-file his lawsuit in Los Angeles. Carrington agreed to dismiss his request for change of venue in exchange for allowing FTI to mirror image his iPhone and receive his email data from Google, GoDaddy and Office365, for at-issue-communications only. Judge Failla agreed that once this process was completed, if Carrington did not falsify emails, she would dismiss the case without prejudice so that Carrington could re-file in Los Angeles. If Carrington's data proved he did alter email content or falsified emails, Judge Failla would grant sanctions.

183.  February 13, 2019: Judge Failla signed the subpoena created by Defense Counsel Larry Stein and Diana Sanders to gain access to Carrington's three email accounts. The Defense Counsel and Carrington signed the subpoena agreement, which specified that all data retrieved would only be transmitted to the forensic expert, FTI.

**Carrington's iPhone was cleared**

184.   February 25, 2019: FTI's Erik Hammerquist relayed to Carrington and the Defense Counsel, he didn't need Carrington's iPhone to search for original emails, as that information would be on the email providers servers, not in the phone. Hammerquist mirror imaged Carrington's phone, finding no at-issue-communications. FTI sent the report to both parties on March 5, 2019.

185.   Larry Stein submitted the subpoenas to Google and GoDaddy in March 2019. Office365 no longer had data to provide. Hammerquist had inspected the account in August 2018, and thereafter the account had been deleted. Hammerquist was never able to locate any at-issue-communications.

**Defense Counsel Violate Terms of the Order and Subpoena**

186.   March 4, 2019: GoDaddy submitted 76 pages of Carrington's website "TheCarrington Diaries.com" data to Stein, contrary to the Court Order of 2/13/19.

187.   March 11, 2019: Google reached out to Carrington for RovierCarrington@gmail.com, but not for TrendsetterRovheir@gmail.com, as that account had been deleted. Sara Plummer, Legal Investigation Support for Google spoke with Carrington. She said she was providing his data to Larry Stein and not to FTI, despite what the subpoena directed. Carrington went back and forth with Plummer until she finally agreed to follow the subpoena and send the data to FTI. However, Plummer sent the data for TrendsetterRovheir@gmail.com to Stein instead of FTI, contrary to the Court Order of 2/13/19.

188.   March 11, 2019: Google submitted TrendsetterRovheir@gmail.com data to Stein, contrary to the Court Order of 2/13/19.

189.   March 25, 2019: FTI/Hammerquist received the data for RovierCarrington@gmail.com. After conducting his test, Hammerquist could not locate any at-issue-communications. On March 28, 2019 Hammerquist sent his report to all parties, clearing Carrington of falsifying emails.

190.   March 28, 2019: 50% of Carrington's requirements were in the clear to dismiss the case without prejudice. Defendants and their counsel remained silent after receiving FTI's report

1   as they were livid with the results.

2   191.   Carrington reached out to GoDaddy and Office365 to make sure the email data for

3   rovier@thecarringtondiaries.com went to FTI. Office365 said they no longer had the data as it

4   was removed from their servers September 2018. GoDaddy said the subpoena would be

5   answered and followed regarding FTI, but there was no email data to provide.

6   192.   March 14, 2019: Carrington files FTI's reports with the court regarding both his

7   iPhone and RovierCarrington@gmail.com being cleared. Carrington also reached out to Google

8   and GoDaddy for the remaining accounts, and both companies said they did not have the email

9   data to submit to FTI. Neither Judge Failla nor Defense Counsel respond.

10   193.   On April 10, 2019 Defense Counsel submitted Docket No. 114, their "update" to the

11   Court on the results of the email subpoenas and FTI reports, delivering to Judge Failla

12   subpoenaed raw data and counsel's fraudulent representations of that raw data, and requesting

13   terminating sanctions. In it, they lay out for the Judge how, contrary to their signed agreement

14   and the specific Order that all subpoenaed records be turned over directly to FTI for analysis,

15   counsel intercepted original subpoenaed data from Google, Microsoft and GoDaddy. Defense

16   counsel mis-characterized the data and FTI's reports to falsely paint Carrington as having

17   deleted email accounts and falsified emails, spoiled evidence and tricked the Court – which is

18   exactly what Defense Counsel did in this document (No. 114), after brazenly violating the 2-13-

19   19 Court Order (No. 102 above). They certainly knew of their violation and that this submission

20   (No. 114) constituted a direct admission that they violated an Order of the Court. Either Defense

21   Counsel did not care, or they knew what the outcome would be before they acted.

22   194.   On May 13, 2019, Carrington submitted a letter and Motion objecting to Defense

23   Counsels' prior submissions and pointing out their egregious violations of the 2-13-19 Court

24   Order.  On the very same date, Docket No. 114 was redacted, apparently to protect detection of

25   Defense Counsel's violation of the Order and their fraud.

26   195.   The defense argued in No. 114: Trendsetter account only showed "June 19, 2018," the

27   date the account had been removed from Google's servers. Defense counsel argued that

28   Carrington deleted the account in order to avoid the subpoena and analysis. The account did not

1  reveal who had requested the deletion. Suit was filed on May 1, 2018. The request for deletion

2  had occurred approximately three weeks prior to actual deletion, as Google policy imposes a

3  recovery period. In fact, Google had notified Carrington several times of other IP addresses

4  accessing his email account in May 2018. Carrington reported this to the Landaus on May 3

5  (phone call) and May 8 (text), 2018. Brian Graden deleted TrendsetterRovheir@gmail.com in

6  order to protect himself and others, including Sumner Redstone, Harvey Weinstein, Brad Grey,

7  Reno Logan and Shari Redstone, from charges of sexual abuse and cover-ups.

8      196.  Defense counsel submitted 76 pages of data from Carrington's website, TheCarrington

9  Diaries.com, but nothing from his email account rovier@thecarringtondiaries.com. The

10  website's data did not show at-issue-communications, but it did show when passwords for the

11  website and email account had been changed. Defense counsel argued that change of the

12  website's password implied Carrington changed his email password in February 2018, so Brian

13  Graden could not have accessed the account to delete emails in May 2018. Larry Stein lied to the

14  court in the motion, claiming Carrington had changed the email password in February 2018

15  when the data clearly showed that he had not – all in order that Judge Failla would dismiss

16  Carrington's suit with prejudice, preventing Carrington from filing a new lawsuit in Los

17  Angeles.

18      197.  Defense counsel also employed references to conversations between Carrington,

19  GoDaddy and Office365 to say Carrington reached out to make sure they deleted the data and

20  did not provide it to the defendants. In reality, the documents stated Carrington reached out to

21  recover data and to provide it to FTI. For Defense Counsel to add and subtract words from

22  Carrington's conversations and submit a different story in their motion for sanctions shows they

23  knew FTI would have cleared Carrington's other two accounts, as at-issue-communications did

24  not show up in the data, which FTI stated in an email to Carrington on 7-31-19.

25      198.  Judge Failla apparently backed the defendant's motion for sanctions, taking the

26  scheduled conference to discuss the findings of FTI off calendar.

27      199.  April 10, 2019: Variety published an article in which Stein libeled Carrington, falsely

28  stating to Variety that Carrington had faked and deleted emails to avoid discovery, and that

1   Kevin Landau had left Carrington's case for failure to pay fees – on a contingency case. In fact,

2   Carrington fired The Landau Firm in September 2018 for: 1) filing the Amended Complaint

3   without his review and without naming Weinstein and Redstone, as had been agreed, and 2)

4   withholding information from the Court about the hacking of his emails.

5   200.   May 14, 2019: The Hollywood Reporter similarly libeled Carrington's name in

6   support of Larry Stein.

7   **Judicial Misconduct and/or Collusion**

8   201.   May 20, 2019: At Docket No. 127, Carrington filed his letter detailing Defense

9   counsels' violation of their subpoena agreement (letter of 2/12/19, *supra*) and Order of February

10  13, 2019, *supra*, by intercepting documents responsive to the subpoenas issued to GoDaddy,

11  Microsoft, and one of the two email accounts for Google. [see  5-20-2019 letter, EXHIBIT 006,

12  pp. 79-171]

13  202.   Defense counsel further withheld the documents from FTI, thus preventing FTI from

14  performing its Court ordered unbiased reports, and concealed the documents from the Court (and

15  plaintiff) for approximately 35 days.

16  203.   Docket No. 127 details how Defense Counsel fabricated evidence, made intentionally

17  false and misleading statements to the Court, and used false citations to the "record," all in order

18  to defraud Carrington and the Court. The letter further detailed Defense Counsel and defendants'

19  fraud, and requested remedies, including that all Defense Counsel be held in contempt of the

20  Court, be disbarred, and that the Court void its 4/12/19 Order which was procured through

21  Defense Counsels' fraud. [see *Id*]

22  204.   On May 20, 2019 Docket No. 114 (Defendants' 4-10-19 Letter Motion for

23  Termination Sanctions) was deleted from the Court Docket, although Carrington's 5-20-19 letter

24  was not yet posted. [see Letter Motion, EXHIBIT 010, pp. 389-505]

25  205.   On May 21, 2019 Judge Failla posted her ruling denying all requests of Carrington's

26  5-20-19 letter, even before the letter was posted to the docket. On 5-22-19 the Court finally

27  posted Carrington's 5-20-19 letter as Docket No. 127, in redacted form. Deletion of No. 114 and

28  redaction of No. 127 effectively **hid Defense Counsel's fraud from view**.

1    206.   Deletion of 114 from the Court Docket - as opposed to masking it - makes it disappear,

2    as if it had never existed. Deletion prevents anyone from viewing it, even on appellate review,

3    and is a felony in violation of 15 USC Sec. 1501 for altering a federal court record, punishable

4    by up to 20 years in prison. As a result, **all evidence of Defendants' wrongdoing disappeared**

5    **from the record, as well as the Court's reasoning for subsequently granting Defendants'**

6    **Motion for Termination Sanctions**. (See Carrington 5-20-19 Letter, EXHIBIT 006, pp. 78-

7    171)

8    207.   June 5, 2019: Carrington filed sexual assault reports with the Los Angeles Police

9    Department against Brian Graden and against Harvey Weinstein with the Beverly Hills Police

10   Department.

11   208.   On July 18, 2019 Plaintiff submitted Docket No. 136, a Letter to Restore Docket No.

12   114 (the 4-10-19 Defendants' Motion Letter) back to the Court's Docket. (See EXHIBIT 007, pp.

13   173-382)

14   209.   On 5-22-19, No. 114 was deleted from existence.

15   210.   On July 18, 2019 Plaintiff also submitted Docket No. 137, his Objections to Graden's

16   Declaration in Support of Sanctions (which had been filed with Graden's Reply brief re Request

17   for Sanctions), his June 5, 2019 LA and Beverly Hills police reports, and his request to depose

18   Graden regarding his declaration. At this writing, Docket No. 137 shows only a message stating

19   "You do not have permission to view this document". [see EXHIBIT 008, p. 384]

20   211.   Exhibits 7-9 to the Amended Complaint contain emails from Graden to Carrington.

21   For 12 months, the parties only litigated the authenticity of emails. The Court would not permit

22   Carrington to do *any* discovery on Brian Graden regarding those emails. Graden never submitted

23   a declaration regarding the emails in Exhibits 7-9 during that year, not even a statement or

24   declaration stating that he did not author them. After a year, Graden submits a declaration (new

25   evidence) with a Reply Brief in support of his own motion which should properly have been

26   attached to Defendants' Motion for Sanctions. Graden's declaration does not even state he did

27   not author the emails in Exhibits 7-9. Rather, Graden states that he did exchange emails with

28   Carrington "in the form" of Exhibits 7-9. Graden has Carrington's password to his email

CARRINGTON v. GRADEN et. al. COMPLAINT – Sex Cult - Civil Rights

1  accounts, hacked in and deleted relevant emails.  Defendants have a sole frivolous argument that

2  deleted emails prove that the emails are unauthentic, despite Defendants having the burden of

3  proof. Graden's lawyers have argued that Graden did not have Carrington's email passwords.

4  However, Graden's declaration does not state that he never had Carrington's passwords. Graden

5  states that he "never knowingly received Carrington's passwords." Graden's declaration and

6  Carrington's Objection Letter demonstrate the extent of Defendant's fraud, and under any

7  circumstances, Carrington's request to depose Brian Graden before ruling on sanctions should

8  and would have been granted. Instead, Judge Failla masked Docket No. 137 (Objection) from

9  public view, covering for Graden's fraud.

10     212.   On July 24, 2019 Judge Failla entered at Docket No. 138 an Order on Carrington's

11  Request to Restore Docket No. 114, filed originally at Docket No. 136. [see 7-24-2019 Order,

12  EXHIBIT 009, pp. 386-388; Carrington's Request to Restore Docket, EXHIBIT 007, pp. 173-

13  382; and see also Carrington's Objection, EXHIBIT 008, p. 384-385]

14     213.   Judge Failla completely **ignored** the fact that the **Court Docket No. 114 had been**

15  **deleted**, commented that some documents are given limited viewing for parties only "to protect

16  the privacy of parties" (fallaciously laying blame on Carrington for seeking privacy protection -

17  from the revelation of defense violations and fraud), and instructed the Clerk to "remove

18  restrictions on docket entry 114 and restore it to the active docket." She then addressed No. 137

19  and made no ruling whatsoever.

20     214.   On October 10, 2019 counsel for Carrington requested Judge Failla's permission to

21  either continue the following day's hearing, or to appear telephonically, as other Defense

22  Counsel were to appear by phone. She denied both requests, insisting that Carrington be

23  physically present. Carrington was afraid to appear due to rape and death threats he received

24  from Brian Graden and Larry Stein throughout the week before. The threats came after

25  Carrington refused to accept a settlement offer to drop his sexual assault charges against Graden.

26     215.   On October 11, 2019 Judge Failla dismissed Carrington's case with prejudice.

27  / / /

28  / / /

## TRO against Graden in Los Angeles Superior Court

216.   On October 11, 2019 Carrington filed for a Restraining Order in Los Angeles Superior Court against Brian Graden for the recent rape and death threats. The temporary order was approved. On October 14, 2019 many press outlets (including Google and Yahoo) revealed the details of the TRO and connected Brian Graden's name to South Park and underage rape. Within hours, the press accounts were taken down. Larry Stein, Graden's attorney, attempted urgently all day to speak with Carrington's attorney in order to demand that he drop Carrington as a client. When they finally spoke, Stein bragged that with ViacomCBS's influence, he had the press remove their coverage of the TRO. Carrington's attorney shared the existence of phone records of the threats. In response, Stein claimed: "Calls can be manipulated. I can make sure the calls are deleted from our end." Stein said he would lose his Bar license as well as his family if the TRO remained, revealing his sexual abuse of Carrington and underage boys. Carrington's attorney refused to back down.

217.   At the TRO hearing on November 5, 2019, Stein called Carrington a "whore" in arguments to the court, made other scandalous false assertions, such as Carrington having had sex with Rupert Murdoch, which Carrington denies. The court granted discovery, including taking the deposition of Stein, and continued the matter into 2020, much to the consternation of Stein. Immediately after the hearing, Stein confronted Carrington outside the courthouse, and in the presence of witnesses, called him a "stupid fucking Nigger" and told him, "Niggers never win in a courtroom."

218.   Stein met with Carrington's attorney a number of times, both before and after November 5. He feared being deposed, as all of his attorney misconduct in New York would be exposed. He bragged to Carrington's attorney that ViacomCBS had bribed the judge in New York, and threatened to use 'extreme measures' until Carrington ended up in jail if he continued to seek justice. Stein attempted to bribe Carrington's attorney several times, and threatened to bankrupt the attorney if he did not drop Carrington as a client. Carrington's attorney then promptly dropped his representation of Carrington in both the TRO and the New York case, leaving Carrington without counsel.

**Further Judicial Misconduct and/or Collusion**

219.   On August 27, 2020 Carrington made a settlement offer to Defendants herein (other than Judge Failla) in order to avoid the necessity of filing the present action. In response, Defense Counsel filed Docket No. 174 (filing the settlement offer under seal) requesting "an expedited pre-motion conference in advance of seeking further relief against Plaintiff Rovier Carrington based on his harassing and threatening conduct against Defendants and their counsel. Specifically, we seek an injunction against Mr. Carrington to prevent him from filing additional claims related to the subject matter of this case without leave of this Court." Further filings (Nos. 175-179) followed by Defense Counsel.

220.   On September 11, 2020 Judge Failla issued an Order (Docket No. 180) granting Defendants' request for a permanent injunction against Carrington:

> "The Court hereby ORDERS that Carrington be forbidden from filing any future suits in federal or state court arising from or relating to the subject matter in the instant action without the prior authorization of this Court. The Clerk of Court is directed to terminate the motion at docket entry 174."

[EXHIBIT 002, pp. 20-21]

221.   Once again, Judge Failla masks from the public eye Plaintiff's position as well as her Order. Judge Failla and Defendants placed an injunction against Carrington filing the present action in hopes of preventing Carrington from exposing their violations of Court Orders, fraud against Carrington in the U.S. District Court, collusion to defraud Carrington and hide those violations, as well as to cover up the years of sexual abuse by various Hollywood producers, actors, and their attorneys.

**VIII.   CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**DECLARATORY JUDGMENT 28 U.S.C. § 2201**
**Judge Failla's "Individual Rules of Practice in Civil Cases" and all Orders under it are Unconstitutional and Void for lack of Due Process**
[Against Judge Failla in her official capacity]

222.   Plaintiff repeats and incorporates by reference all factual allegations above as though set forth in full.

223.  An actual, justiciable controversy has arisen between Plaintiff Rovier Carrington and Defendant Hon. Katherine Polk Failla in her official capacity. Under the First and Seventh Amendments, Carrington believes he has a right to his "day in court" regarding his sexual abuse claims, which right cannot be extinguished until Carrington has been afforded the process and procedures as required under the Due Process Clause of the Fourteenth Amendment, which process and procedure is codified in the Federal Rules of Civil Procedure, as interpreted under a substantial body of case law. In particular, Carrington believes that his right to pursue civil claims against his sex abusers may not be dismissed with prejudice until the legal sufficiency of his claims has been tried in a competent court of law, as for example in an ordinary Rule 12 Motion.

224.  Judge Failla disagrees, and believes that Carrington's right to petition and to a jury trial may be done away with prior to *any* of the process and procedure mandated by the Federal Rules of Civil Procedure, and instead afford Carrington only that process and procedure allowed under Judge Failla's own "Individual Rules of Practice in Civil Cases."

225.  A Declaratory Judgment is urgently needed to settle the controversy and establish which will control process and procedure the United States District Court, Southern District of New York, as between these two conflicting and mutually exclusive sets of rules – The Federal Rules of Civil Procedure, or Judge Failla's "Individual Rules of Practice in Civil Cases."

226.  To state a Substantive Due Process claim, Carrington must show as a threshold matter that a State Actor deprived him of a constitutionally protected life, liberty or property interest. [*Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008)] Judge Failla is undisputedly a State Actor, and as to this Declaratory Judgment claim, Judge Failla is sued in her official capacity only.

227.  Procedural Due Process claims look for State action that "shocks the conscience", and requires that the Plaintiff show (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections. [*Kildare v. Saenz*, 325 F.3d 1078, 1085 (9th Cir. 2003)]

228.  The right to petition is a constitutionally-protected fundamental right. U.S. Constitution, Amend. I. Here, Judge Failla willfully and intentionally destroyed Carrington's right to petition, by destroying his right to litigate in reliance on the Federal Rules of Civil Procedure, and instead substituting an entirely foreign "Individual Rules of Practice in Civil Cases."

229.  An elementary and fundamental requirement of Due Process in any proceeding which is to be accorded finality is Notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. [*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)]

230.  Under the Federal Rules of Civil Procedure, each Defendant is required to file a responsive pleading within 21 days of being served. See FRCP Rule 12(a)(1). Under Judge Failla's "Individual Rules of Practice in Civil Cases," there is no duty for Defendant to file a responsive pleading at all. Instead, the "Individual Rules of Practice in Civil Cases" allow a Defendant to file a "response" (not a pleading), which in this case meant that Defendants were allowed to completely ignore Carrington's actual sex-abuse case, to commence discovery proceedings *against* Carrington, then in effect to *prosecute* Carrington for his supposed spoliation of evidence, which amounted to a prosecution against Carrington for being an alleged false accuser, and/or for Carrington's supposedly malicious attempt to prosecute Defendants.

231.  Stylized as a "Letter Motion for Further Discovery," but occurring at a time when discovery had never opened in the case, Judge Failla improperly granted Defendants "Letter Motion" to commence "further" discovery proceedings *against* Carrington. Once armed with that, through and succession of "Letters" to Judge Failla, Defendants were allowed to effectively sue Carrington in Judge Failla's private court system, under what amounts to a Malicious Prosecution theory. Defendants assert that Carrington's sex-abuse claims are baseless, and that he manipulated email evidence to falsely accuse.

232.  But the Federal Rules of Civil Procedure are well-equipped for Defendants to effectively respond to a meritless lawsuit, and that is with a Motion to Dismiss under Rule 12(b)(1) and/or 12(b)(6). Under the heightened pleading standard of the *Twombly* (2007) and

1   *Iqubal* (2009) cases, Defendants to meritless cases have no difficulty obtaining quick dismissals.

2   And once that dismissal is obtained, Defendants to a truly meritless action may *then* proceed on a

3   malicious prosecution claim. At most, Defendants would be allowed to litigate counterclaims at

4   the same time as Carrington's claims.

5       233.   Under the Federal Rules of Civil Procedure, discovery opens after the completion of

6   the disclosures under FRCP Rule 26, which only occurs after the pleadings are settled, and which

7   is all explained in the mandatory Scheduling Conference Order. But under the Judge Failla's

8   "Individual Rules of Practice in Civil Cases," Defendants may be authorized to commence

9   unilateral discovery – on what amount to counterclaims against Carrington – prior to any

10   responsive pleading or FRCP Rule 26 compliance.

11       234.   The closest comparison between Defendant's "Letter Motions" under the "Individual

12   Rules of Practice in Civil Cases" and any combination of procedures known under the Federal

13   Rules of Civil Procedure would be a combination of a Rule 12 Motion to Dismiss and a

14   subsequent separate lawsuit the other direction for Malicious Prosecution.

15       235.   Under the Federal Rules, a Rule 12 Motion to Dismiss (or any dispositive motion)

16   would require the Court to assume as true all of Carrington's well-pleaded allegations, and

17   dismiss the case with prejudice only if Carrington *still* could not plausibly state any claim. See

18   *Twombly* and *Iqbal* and progeny.

19       236.   But under Failla Rules, the Court was free to engage in fact finding regarding

20   Defendants' claims against Carrington, while allowing absolutely no factual inquiry into

21   Carrington's claims whatsoever. All Judge Failla's fact-finding was in the face of Carrington's

22   demand for a jury trial, and for a jury to try the facts of the case. None of this could legally occur

23   under the Federal Rules.

24       237.   Likewise, under the applicable State law, a Malicious Prosecution claim against

25   Carrington would first require Defendants to prevail against Carrington *on Carrington's claims,*

26   and then find that no reasonable person in Carrington's circumstances would have believed he

27   had reasonable grounds to bring any lawsuit. [see e.g. CACI Jury Instruction # 1501]

28

238.  Under Failla Rules however, there was no requirement that Defendants first prevail against Carrington on Carrington's claims. No, by avoiding all substantive process and procedure mandated  by the Fourteenth Amendment, as codified in the Federal Rules of Civil Procedure, and proceeding instead under Judge Failla's own "Individual Rules of Practice in Civil Cases," Defendants were permitted to sue Carrington for multiple hundreds of thousands of dollars in attorney fees, while completely ignoring Carrington's sex-abuse claims, as if they didn't exist. In fact, as soon as Judge Failla Ordered that the prior case would proceed under the "Individual Rules of Practice in Civil Cases" - which directly conflicts with the entirety of the Federal Rules of Civil Procedure and all applicable case law - Rovier Carrington's prior claims essentially *did* cease to exist. In no sense can Rovier Carrington be said to have had his "day in court."

239.  Defendants never prevailed and could not possibly have prevailed on Carrington's sex-abuse claims against them, because, as Judge Failla openly admits in her purported Order of Sept. 11, 2020, she never reached any consideration of the merits of Carrington's case. [see EXHIBIT 002, p.19]

240.  Not only were Defendants not required to file a responsive pleading, it is unclear how they could have done so even if they had intended to, in light of Judge Failla's "Letters Only" Rule. [see EXHIBIT 004, p. 27]

241.  With regarding to engaging in motion practice, the Federal Rules of Civil Procedure and its associated case law establish the process to which Rovier Carrington is legally entitled under the Due Process clause. Here, Carrington was stripped of any ability to prosecute or to defend Motions according to the Federal Rules of Civil Procedure, because that was simply not the body of law Judge Failla chose to obey. Instead, Judge Failla obeyed and asserted "jurisdiction" under her own "Individual Rules of Practice in Civil Cases," which has a completely different set of rules. The prior litigation occurred in a United States District Court in *name only.* For all intents and purposes, the prior litigation occurred in an independent, foreign court system of Judge Failla's making.

242. Because he was unaware that the Federal Rules of Civil Procedure were not going to be controlling law in his case, it follows that Rovier Carrington could not possibly have been given legally sufficient Notice of *any* type of action against him, let alone an action seeking hundreds of thousands of dollars, and to destroy Carrington's fundamental right to petition.

243. During the prior litigation, had Rovier Carrington been aware the Federal Rules of Civil Procedure were not going to be controlling law in his case, and that Judge Failla's own "Individual Rules of Practice in Civil Cases" would control instead, Carrington could have immediately petitioned the Court of Appeal, or petitioned the United States Supreme Court, for a Writ of Mandate, arguing that his Due Process rights had been destroyed by the existence and enforcement of Judge Failla's "Individual Rules of Practice in Civil Cases," in what amounts to Judge Failla's own independent Court system.

244. It is therefore legally impossible that Rovier Carrington was served legally sufficient Notice of any legal proceeding in Judge Failla's courtroom at any time, because with regard to Rovier Carrington, no legal proceedings have ever taken place in Judge Failla's courtroom at any time.

245. Judge Failla's purported jurisdiction under her own "Individual Rules of Practice in Civil Cases" constitutes nothing less than the creation of her own independent Court **System**, completely outside the United States District Court, and operating completely outside and in contradiction to Federal Rules of Civil Procedure. Such facts shock the conscience and offend

246. Therefore, the Court should issue a Declaratory Judgment that Judge Failla acted in the complete absence of all jurisdiction, or alternatively in excess of jurisdiction, by avoiding the Federal Rules of Civil Procedure, and impermissibly asserting jurisdiction under the "Individual Rules of Practice in Civil Cases". Failla's Rules must be deemed unconstitutionally violative of Due Process clause in each and every manner in which shown to conflict directly with the Federal Rules of Civil Procedure.  All orders issued by Judge Failla in the prior Carrington litigation are Void for lack of Due Process.

/ / /

/ / /

**SECOND CAUSE OF ACTION**
**SEXUAL ASSAULT OF MINOR**
**STATUORY RAPE - PENAL CODE § 261.5**
[Against Defendants BRIAN GRADEN; and DOES 1 THROUGH 5]

247.  Plaintiff repeats and incorporates by reference all facts alleged above.

248.  Plaintiff was 17 years of age when BRIAN GRADEN drugged and raped him, as described above, in violation of California Penal Code § 261.5, which criminal statute also explicitly creates a private right of action. (See § 261.5(e)(1)). Graden had unlawful sexual intercourse, i.e an act of sexual intercourse accomplished with Carrington, a person who was never not the spouse of the Graden.

249.  For the purposes of P.C. § 261.5, a "minor" is a person under the age of 18 years and an "adult" is a person who is at least 18 years of age. Carrington was 17 years old at the time in question.

250.  Notwithstanding any other provision of P.C. § 261.5, an adult, such as Graden, who engages in an act of sexual intercourse with a minor, such as Carrington, in violation of P.C. § 261.5 may be liable for civil penalties.

251.  Carrington did not consent to sex with Graden, because as a minor, Carrington was legally incapable of consent.

252.  Therefore, Graden is liable to Carrington for civil penalties for committing Statutory Rape.

**THIRD CAUSE OF ACTION**
**SEXUAL ASSAULT OF ADULT**
**RAPE - PENAL CODE § 261(a)**
[Against Defendants Harvey Weinstein; Estate of Sumner Redstone; Brian Graden; Trustees of the Brad Alan Grey Trust; Stanton "Larry" Stein; and DOES 11 - 50]

253.  Plaintiff incorporates the allegations contained in paragraphs 1 through 126 above as though set forth in full.

254.  Defendants Harvey Weinstein; Estate Of Sumner Redstone; Brian Graden; Trustees Of The Brad Alan Grey Trust; Stanton "Larry" Stein raped Plaintiff, as described above, in violation of California Penal Code § 261.

255.   None of the sex alleged under this cause of action was voluntary by Carrington. P.C. § 261 provides specific descriptions of circumstances constituting coerced sex, which apply here as follows:

256.   Each sex act described by Carrington was accomplished by each of the Defendants against the Carrington's will by threatening to retaliate in the future against Carrington by blackmailing and blacklisting, as described above, and there was at all times reasonable possibility, indeed a strong likelihood that the Defendants will execute the threat.

257.   Under the penal code, "duress" means a direct or implied threat of force, violence, danger, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted. The total circumstances, including the age of the victim, and his or her relationship to the defendant, are factors to consider in appraising the existence of duress.

258.   In light of the foregoing, each of the Defendants named is severally liable to Carrington in a civil action for Sexual Assault on an Adult.

## FOURTH CAUSE OF ACTION
### SEXUAL HARASSMENT - Cal. Gov. Code §§ 12923, 12940(j)
[Against Defendants HARVEY WEINSTEIN; ESTATE OF SUMNER REDSTONE; BRIAN GRADEN; TRUSTEES OF THE BRAD ALAN GREY TRUST; STANTON "LARRY" STEIN; and DOES 11 THROUGH 50]

259.   Plaintiff repeats and incorporates by reference the facts alleged above.

260.   On or about November 23, 2010 Sumner Redstone signed an entertainment contract with Carrington for Viacom to produce Carrington's "The Life of a Trendsetter" with MTV, on condition Carrington gave Redstone creative control of the cast and a percentage of Carrington's dark comedy "Inheritance." Redstone agreed to allow Carrington to film his reality show on the Paramount lot, but demanded that Carrington obey his "daily rules," and only work with producers Redstone approved.

261.   Brad Grey signed a management and development contract for Paramount Pictures with Carrington on or about January 13, 2011. Grey agreed to manage Carrington's career and appear with Carrington in his reality show "The Life of a Trendsetter," as the executive producer of Carrington's

1  dark comedy "Inheritance." The reality show would capture the casting, development and filming of

2  "Inheritance" at Paramount.

3      262.  On April 22, 2015, Carrington met with Graden alone at the Mondrian Hotel in West

4  Hollywood. At this meeting, Graden started out with cocktails which had been prepared prior to

5  Carrington's arrival, assuredly with GHB. After a drink, Graden presented two contracts to

6  Carrington explained to Carrington what they (presumably) meant. Carrington did not fully read

7  them. He told Carrington that one was with Brian Graden Media to produce Carrington's reality

8  show and his dark comedy, and the other was a Non-Disclosure Agreement ("NDA") which

9  Graden required before he would sign the production contract. He explained that as a condition,

10  the production contract required full control of Carrington's career and his email passwords. The

11  NDA covered Graden's underage sex with Carrington and all other sexual contacts with

12  ViacomCBS personnel. The contracts were fully executed and Carrington gave Graden his

13  password.

14      263.  By tolerating, even welcoming the corporate policy of sexual favors in exchange for

15  success, Defendants created a work environment that was hostile, intimidating, offensive,

16  oppressive, or abusive towards Carrington.

17      264.  Carrington was a person providing writing, production and show-creation services

18  under a contract with Defendants.

19      265.  Carrington was subjected to harassing conduct because he is Black, and/or because he

20  is bi-racial, and/or because he is bi-sexual.

21      266.  The harassing conduct by Defendants was so severe and pervasive that it has caused

22  severe and likely permanent emotional distress.

23      267.  Any reasonable Black or bi-racial or bi-sexual person in Carrington's circumstances

24  would have considered the work environment to be hostile, intimidating, offensive, oppressive,

25  or abusive.

26      268.  Carrington considered the work environment to be hostile, intimidating, offensive,

27  oppressive, or abusive.

28      269.  Defendants engaged in the sex abuse and sex harassment. Moreover, Defendants also

1   knew about sex abuse and sex harassment of others besides Carrington, and failed to take

2   immediate and appropriate corrective action. As above, even Graden/BGM's attorney Larry

3   Stein participated in the rape culture with Graden. Indeed, sex abuse and harassment was and is

4   "Standard Operating Procedure" in Defendants' corporate culture.

5       270.  Carrington was harmed by the sex abuse and sexual harassment, and is suffering

6   PTSD and emotional distress, requiring possibly lifelong treatment. It is Plaintiff's understanding

7   that complications from sex abuse can manifest long after the acts are over.

8       271.  The sexual abuse was a substantial factor in causing Carrington's harm.

9       272.  Therefore, the Defendants named above are jointly and severally liable to Carrington

10   for Sexual Harassment.

11                   **FIFTH CAUSE OF ACTION**
   **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

12               [Against All Defendants except Judge Failla]

13       273.  Plaintiff repeats and incorporates by reference all facts alleged above.

14       274.  Stockholm syndrome is a condition in which hostages develop a psychological alliance

15   with their captors during captivity.

16       275.  Proving Intentional Infliction of Emotional Distress requires a showing that

17   Defendant's conduct was both "extreme" and "outrageous." The words "extreme" and

18   "outrageous" are not synonymous. Rather, they function as a double threshold for the nature of

19   the conduct and how unusual it is. [see Restatement (Third) of Torts: Liability for Physical and

20   Emotional Harm. § 46. (Am. Law Inst. 2012)]

21       276.  Here, by instituting a Sex Cult as Standard Operating Procedure within the industry,

22   and by not only tolerating but welcoming sex abuse and associated threats, blackmailing and

23   blacklisting as "normal," Defendants have exhibited conduct that is extreme and outrageous.

24       277.  The Defendants here are major Hollywood power brokers. They have the power to

25   make or break entire careers. They have the power to destroy reputations. They have the power

26   to either "green light" lucrative entertainment franchises, or to make sure a person never works

27   again. At all relevant times  Defendants occupied a position of power and control over Plaintiff.

28

278.  At minimum, Defendants and each of them acted with reckless disregard of the probability that Carrington would suffer emotional distress, knowing that human beings subjected to sexual abuse and sexual harassment are prone to all sorts of chronic negative health consequences. Such is common knowledge, and Defendants knew it.

279.   Any reasonable person in Carrington's position is expected to suffer emotional distress if subjected to the types and amounts of sexual abuse and harassment as described throughout this complaint.

280.  With respect to the requirement that the plaintiff show severe emotional distress, the courts have set a high bar. Severe emotional distress means "emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it." *Potter v. Firestone Tire & Rubber Co*, 6 Cal. 4th at 1004.

281.  Here, no reasonable person could be expected to endure the emotional distress of being forced and coerced into unwanted sex acts on a regular basis as a condition of contract. Likewise, no reasonable Black person should be expected to endure the emotional distress of a licensed attorney stating, "Niggers never win in the courtroom," especially since the Defendants wield the corrupt power and influence necessary to destroy Carrington's litigation, at least in Judge Failla's courtroom.

282.  In deciding whether conduct meets the threshold of "outrageous," the RESTATEMENT (SECOND) OF TORTS §46(1)(1965) instructs us that the existence of a special relationship in which there is  "abuse of a position, or a relation with the other, which gives [the actor] … the power to affect [the] interests.".. of another may "produce a character of outrageousness that otherwise might not exist." [*Bridges v. Winn Dixie*, 176 Ga. App. 227, 230, 335 S.E.2d 445,447 (1985)]

283.  Here, Defendants occupied a vastly superior position of bargaining power as compared to Carrington. If Carrington wanted any sort of position in the entertainment industry at all, he was required to perform unwanted sex acts upon whomever and keep quiet about it.

284.  In addition to emotional distress related to the sex abuse, Defendants have also caused emotional distress in Carrington by the extreme and outrageous conduct related to colluding and

1    corruptly influencing Judge Failla in the prior case, as described above.

2        285.  The intentional, malicious conduct of Defendants and each of them is the actual and

3    proximate cause of Carrington's PTSD, his severe emotional distress, including fear, worry,

4    mortification, outrage, shame, humiliation, degradation, anger, and depression.

5        286.  Therefore, Defendants and each of them are liable to Carrington for Intentional

6    Infliction of Emotional Distress.

7                              **SIXTH CAUSE OF ACTION**
                **DEPRIVATION OF CIVIL RIGHTS – 42 U.S.C. § 1983**
8       **Destruction of Carrington's First, Seventh Amend. Rights to Petition, Jury Trial**
                      **Without Substantive or Procedural Due Process**
9            [Against Judge Failla in her individual capacity but for liability only,
              and against all other Defendants as defacto State Actors for damages]
10

11       287.  Plaintiff repeats and incorporates by reference all facts alleged above as though set

12   forth in full.

13       288.  The Fourteenth Amendment due process clause of the United States Constitution

14   empowers this Court to nullify conduct by a State Actor that "shocks the conscience," offends "a

15   sense of justice" or runs counter to the "decencies of civilized conduct." [*Rochin v. California*,

16   342 U.S. 165, 175, 72 S. Ct. 205, 211 (1952)]

17       289.  To state a substantive due process claim, the plaintiff must show as a threshold matter

18   that a state actor deprived it of a constitutionally protected life, liberty or property interest.

19   [*Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008)] Procedural due process claims require

20   (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of

21   adequate procedural protections. [*Kildare v. Saenz*, 325 F.3d 1078, 1085 (9th Cir. 2003)]

22       290.  The right to petition is a constitutionally protected fundamental right. U.S.

23   Constitution, Amend. I. Moreover, Plaintiff asserts a property right and property interest in any

24   litigation to which he is party.

25       291.  Here, at the behest of all Defendants, Judge Failla willfully and intentionally destroyed

26   Carrington's right to petition and jury trial, by asserting jurisdiction and conducting a litigation

27   proceeding under authority of her own "Individual Rules of Practice in Civil Cases," instead of

28   and in contradiction to the authority set forth in the Federal Rules of Civil Procedure. *Supra*.

292. Jurisdiction in Judge Failla's courtroom constitutes a foreign jurisdiction. *Supra.*

293. An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. [*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)]

294. Here, at no time was Plaintiff given any notice that his right to be protected by the First and Seventh Amendment rights to petition and jury trial - which include a right to avail oneself of the procedures set forth in the Federal Rules of Civil Procedure – would be denied him *completely.*

295. Under the Federal Rules, Judge Failla could never have dismissed Carrington's complaint with prejudice. The complete denial of all required process and procedure was made possible only because Judge Failla decided instead to adjudicate under Failla Rules, not the Federal Rules. When Judge Failla made that decision to, she did so at the behest of the other Defendants, and specifically so as to benefit Carrington's legal adversaries by dismissing Carrington's claims with prejudice. Bribery, corruption and collusion between these Defendants and Judge Failla is a reasonable inference, because nothing else explains the dismissal with prejudice of Carrington's prior sex-abuse lawsuit.

296. Besides the purely constitutional injury, and the property injury related to the destruction of the prior lawsuit, Judge Failla's actions have caused Carrington severe emotional distress. Separate from and in addition to the Stockholm Syndrome emotional distress claims related to the underlying sex abuse, Carrington is further traumatized by the realization that judicial system he thought would provide him justice has instead conspired with his abusers to destroy him. Carrington suffers from Legal Abuse Syndrome, a form of PTSD increasingly recognized by mental health professionals. Among other things, Defendants' actions are the actual and proximate cause of Carrington's severe humiliation, fear, shock, anger, mortification, anxiety, worry, dread, despondency, and depression.

297. The plain facts here case ***do*** shock the conscience, they ***do*** offend any sense of justice, and they ***do*** run contrary to the decencies of civilized conduct.

298.  Therefore, Judge Failla, and each of the other named Defendants is jointly and severally liable for the deprivation of Plaintiff's substantive and procedural due process rights.

299.  Therefore, under 42 U.S.C. § 1983, Defendants and each of them are jointly and severally liable to Rovier Carrington for intentionally and willfully violating his Substantive and Procedural Due Process rights guaranteed by Fourteenth Amendment.

**SEVENTH CAUSE OF ACTION**
**CONSPIRACY TO DEPRIVATION OF CIVIL RIGHTS – 42 U.S.C. § 1983**
[Against All Defendants]

300.  Plaintiff repeats and incorporates by reference all facts alleged above.

301.  Under the Joint Action Test Defendants, and each of them, must be held as State Actors for civil rights purposes. *Supra.*

302.  In order to prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law conspired to deprive him of a federally protected right:

> To state a section 1983 conspiracy claim, a plaintiff must allege: (1) the existence of a conspiracy involving state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy.

[*Marchese v. Umstead*, 110 F.Supp.2d 361, 371 (E.D. Pa. 2000)]

303.  A conspiracy, generally, consists of an agreement between two or more persons to engage in an unlawful act. In some contexts, an overt act in furtherance is also required.

304.  Here, functioning as a well-coordinated single force, Defendants collectively planned, agreed and acted to deprive Rovier Carrington of his constitutional rights to petition and jury trial under the First and Seventh Amendments, respectively, without the Substantive or Procedural Due Process guaranteed by the Fourteenth Amendment, as well as being the actual and proximate cause of Carrington's physical, mental and emotional injuries.

305.  Therefore, under 42 U.S.C. § 1983, Defendants and each of them are jointly and severally liable to Rovier Carrington for a Conspiracy to Violate his Substantive and Procedural Due Process rights guaranteed by the Fourteenth Amendment.

/ / /

/ / /

**EIGHTH CAUSE OF ACTION**
**ALTERNATIVELY, FRAUD BY CONCEALMENT**
[Against Defendants Stanton "Larry" Stein; Diana A. Sanders; Russ August & Kabat LLP; Wook Hwang; Loeb & Loeb LLP; Christopher Lloyd Lavigne; Stephen Robert Fishbein; Shearman & Sterling LLP; and DOES 51-100]

306.  Plaintiff repeats and incorporates by reference all facts alleged above.

307.  As an alternative to holding Defendants as State Actors for Civil Rights, Plaintiff seeks to hold Defendants liable as private actors under a theory of Fraud by Concealment.

308.  California Business and Profession Code § 6068 provides:

> It is the duty of an attorney to do all of the following: . . . (d) To employ, for the purpose of maintaining the causes confided to him or her those means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law…

[Cal. B&P Code § 6068]

309.  Defendants and Carrington were engaged in litigation together as parties and attorneys. As such, they owed legal duties to each other not to engage in litigation practice under any rules other than the Federal Rules of Civil Procedure.

310.  During the prior litigation, each and every Defendant knew that the matter was being conducted in a matter utterly inconsistent with the Federal Rules of Civil Procedure, for the purpose of destroying Carrington's meritorious sex-abuse case. Each Defendant intentionally failed to disclose those facts to Carrington.

311.  Additionally, each Defendant took active steps to prevent Carrington from discovering certain facts, using such tactics as lying to Judge Failla. *Supra.*

312.  Carrington did not know of the above-stated concealed facts until it was too late to do anything about it.

313.  Defendants, and each of them, intended to deceive Carrington by concealing the facts, and lying to the judge, or knowing about the lies to the judge and not doing anything about it. Defendants' intent may be reasonably inferred, because nothing as egregious as the wrongdoing described throughout this Complaint could occur through mistake or mere negligence.

314.  Had the omitted information been disclosed, Carrington reasonably would have behaved differently. Had he known that the Federal Rules of Civil Procedure were not being

1  followed, and that the case had been, in effect transferred out of the U.S. District Court and into a

2  foreign jurisdiction of Judge Failla's own creation, then Carrington could have immediately

3  petitioned the Circuit Court of Appeals, or the United States Supreme Court, and sought

4  extraordinary relief.

5      315.  Carrington was harmed by the concealment. But for the concealment, Carrington

6  would not have suffered the complete destruction of property value of his meritorious court case,

7  nor the consequent emotional distress.

8      316.  The concealment by each Defendant and by Defendants collectively was a substantial

9  factor in causing Carrington's harm.

10     317.  The conduct of Defendants in defrauding Carrington out of his entire meritorious court

11  case constitutes fraud, malice and/or oppression as that term is understood in California Civil

12  Code § 3294(c). [See also CACI Jury Instruction # 1901]

13     318.  Therefore, Defendants and each of them is liable to Rovier Carrington for Fraud by

14  Concealment.

15  **IX.   PRAYER FOR RELIEF**

16     Wherefore, Plaintiff Rovier Carrington prays for relief as follows:

17     319.  **For Declaratory Judgment** - that Judge Failla's "Individual Rules of Practice in Civil

18  Cases" and all Orders issued under them in the prior case are VOID for violating Carrington's

19  First and Seventh Amendment rights to petition and to jury trial, without affording him the

20  process and procedure guaranteed by the Fourteenth Amendment.  Specifically, the Court should

21  find that by asserting jurisdiction under and obeying her own "Individual Rules of Practice in

22  Civil Cases" instead of the Federal Rules of Civil Procedure, Judge Failla created an

23  independent, foreign court system, separate and apart from the United States District Court.

24  Specific Orders to be deemed Void are (1) the Order dismissing Carrington's prior case with

25  prejudice, and (2) the Order enjoining Carrington from filing new litigation as a "Vexatious

26  Litigant." The Court should further find that "Vexatious Litigant" injunctions are deeply-rooted

27  in the principle of Res Judicata/Collateral Estoppel, while Carrington *never* had his day in court;

28

320.  **For general damages** – to compensate for the pain, suffering, and horrendous mental anguish reasonably expected to flow from the tortious conduct of Defendants other that Judge Failla, in amounts deemed reasonable by the Court. On the sex abuse claims, Plaintiff seeks not less than $100 Million as to Graden, $100 Million as to Redstone, $100 Million as to Grey, and $50 Million as to Weinstein. On Civil Rights claims against all Defendants other than Judge Failla, Plaintiff seeks not less than $100 Million jointly and severally; on fraud claims not less than $50 Million jointly and severally;

321.  **For special damages -** to compensate Carrington for monetary loss directly attributable to Defendants' action, including but not limited to expenses for medical treatment, in an amount to be proven at trial;

322.  **For punitive damages** - to punish Defendants, other that Judge Failla, to make examples of them, to discourage future such conduct, in amounts deemed reasonably certain to accomplish the purpose of punitive damages in light of Defendants' demonstrated financial positions;

323.  **For the cost of the suit** - in amounts to be documented at trial; and

324.  **For reasonable attorney fees -** as allowed by statute, in amounts to be documented at trial.

## X.    DEMAND FOR JURY TRIAL

325.  Plaintiff hereby demands a trial by jury on all issues so-triable, including all issues of fact.


Respectfully submitted on October 26, 2020,

_____

G. Scott Sobel

*Attorney for Rovier Carrington*

CARRINGTON v. GRADEN et. al. COMPLAINT – Sex Cult - Civil Rights

**SWORN AFFIDAVIT AND VERIFICATION**
by
ROVIER CARRINGTON

1)  I am Plaintiff Rovier Carrington. I have made a careful review of the complaint now before this Honorable United States District Court. I have personal knowledge of each and every fact I allege within the complaint, and I solemnly swear that each one is true.

2)  As to those matters alleged outside my personal knowledge, I believe them to be true, based on reasonable inference.

3)  If called before any tribunal, I could and would testify competently about the Sex Cult of the Hollywood Elite, i.e. the sex abuse and judicial corruption that has injured me so badly.

4)  I hereby promise and pledge that I will charitably donate 100% of any money I receive as a punitive damage award to establish or fund a 501(c)(3) nonprofit organization dedicated to benefitting victims of abuse similar to what happened to me.

5)  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed in Los Angeles, California on October 26, 2020

Rovier Carrington

CARRINGTON v. GRADEN et. al. COMPLAINT – Sex Cult - Civil Rights