EXHIBIT C

JABKCARC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ROVIER CARRINGTON,

4                    Plaintiff,

5              v.                              18 CV 4609 (KPF)

6    BRIAN GRADEN, et al.,

7                    Defendants.

8    ------------------------------x
                                         New York, N.Y.
9                                        October 11, 2019
                                         10:40 a.m.
10
     Before:
11
                    HON. KATHERINE POLK FAILLA,
12
                                         District Judge
13
                         APPEARANCES
14
     RUSS AUGUST & KABAT
15        Attorneys for Graden Defendants
     BY:  STANTON L. STEIN
16
     SHEARMAN & STERLING LLP
17        Attorneys for Defendants Viacom and Paramount
     BY:  CHRISTOPHER LLOYD LAVIGNE
18        STEPHEN ROBERT FISHBEIN
          ZACH DEATON
19
     LOEB & LOEB LLP
20        Attorneys for Grey Defendants
     BY:  WOOK J. HWANG
21

22

23

24

25

**Exhibit C-1**

JABKCARC

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please have a seat and

3    state your name for the record.

4          MR. STEIN:  Yes.  Stanton Stein, on behalf of Brian

5    Graden.

6          THE COURT:  Mr. Stein, I'm going to ask you to stand

7    when you speak, simply because I have a monitor in front of

8    your face, and I cannot otherwise see you.

9          MR. STEIN:  Yes, your Honor.

10          THE COURT:  Good morning to you.

11          MR. STEIN:  Good morning.

12          MR. LaVIGNE:  Good morning, Judge.  Chris LaVigne and

13    Steve Fishbein, on behalf of Viacom and Paramount.

14          THE COURT:  Are you taking the laboring oar today,

15    sir?

16          MR. LaVIGNE:  Yes, your Honor.

17          THE COURT:  Unless I hear otherwise.

18          Okay.  Thank you very much.

19          MR. HWANG:  Good morning, your Honor.  Wook Hwang, on

20    behalf of the Grey defendants.

21          THE COURT:  Good morning.

22          Today was a hearing.  It was scheduled for a hearing,

23    and I believe you've been following the docket in this case.

24    And so we received, by email yesterday, something from a

25    Mr. Loomis, indicating that he had, that day, been retained to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**Exhibit C-2**

JABKCARC

1    represent Mr. Carrington.  Within approximately ten minutes of

2    its receipt, we sent back the response that was later docketed,

3    and I believe we tried to email it to those who might not have

4    ECF capacities.

5            So, it is my belief that Mr. Carrington and Mr. Loomis

6    are aware of this conference and are aware of the fact that I

7    was not planning on adjourning it.

8            I did offer to Mr. Loomis the possibility of doing an

9    oral pro hac motion.  I would have let him represent

10   Mr. Carrington today with the understanding he would be

11   submitting the substantiating paperwork later on.  He is not

12   here.  I say this with not a tremendous amount of surprise, but

13   he is not here.

14           I have not received word from Mr. Loomis or from

15   Mr. Carrington regarding the possibility of appearing

16   telephonically.  Of course, that wasn't what I had directed,

17   but they could have at least asked, because I could have said

18   yes or no, as may be.

19           What does that mean for us is that I am here for a

20   hearing that is apparently not going to take place.  It does

21   not appear that there are witnesses who can testify.

22           I did note, in yesterday's endorsement, that

23   nonappearance would be deemed a waiver of opposition.  I think

24   today the better course of action, especially given the

25   granularity of the response that Mr. Carrington made, would be

**Exhibit C-3**

JABKCARC

1    to consider and accept that written response and to give it the

2    weight it is entitled to, but not -- I don't have him here to

3    talk to me, and there's not much that I can do.

4         Let me ask those of you, counsel at the back table,

5    whether any of you has had any communication with

6    Mr. Carrington or someone purporting to represent him in this

7    calendar week?

8         MR. STEIN:  Stan Stein, your Honor.

9         I have not heard from either of them or anyone else.

10         THE COURT:  Or anyone else.

11         Other than the exchange of documents regarding the

12    sanction motions, have you had any communications with

13    Mr. Carrington or someone purporting to represent him?

14         MR. STEIN:  No, I have not, your Honor.

15         THE COURT:  My recollection, which may be faulty, is

16    that there were several individuals he either named or sort of

17    advised me existed that were possible candidates to replace the

18    Landau firm.  I remember two or three names being given to me.

19    My understanding, from my docket, is that none of those

20    individuals has entered a notice of appearance.

21         MR. STEIN:  None of those individuals has contacted

22    me, nor have they entered a notice of appearance, your Honor.

23         THE COURT:  Then you and I are on the same page.

24    Thank you, sir.

25         Mr. LaVigne, the same question, sir?

**Exhibit C-4**

JABKCARC

1          MR. LaVIGNE:  Your Honor, I have not heard from

2     Mr. Carrington.  Last Friday, I received a voicemail, maybe

3     7:30 at night, from somebody named Greg Loomis, who said he

4     thinks I had contacted him within the prior two days.  That was

5     totally false.  I did not call him back.  I haven't had any

6     subsequent communications from him at all.

7          THE COURT:  Just one moment, sir.

8          When you say that he thought you contacted him, did he

9     indicate to you that he might be represented, did he mention

10    Mr. Carrington's name, did he mention the case, or was it less

11    explicit than that, where he just said --

12         MR. LaVIGNE:  It wasn't explicit at all, your Honor.

13    His exact words were, I got a voicemail, it was Friday evening,

14    I was on a train, I listened to it, it was hard to make out,

15    and I understood it to be Mr. Loomis saying he was a lawyer in

16    Los Angeles and saying, I think you might have called me within

17    the last couple of days.  That was it.

18         THE COURT:  When you realized that you had not called

19    him within the last couple of days, you assumed it was a

20    mistake?

21         MR. LaVIGNE:  I didn't know what it was about.  I

22    looked and saw Loomis may have had some relationship to

23    Carrington, but until he filed a notice of appearance or

24    anything else, I was not going to engage with him.

25         THE COURT:  Okay.  Thank you.

**Exhibit C-5**

JABKCARC

1          Mr. Fishbein, I imagine you have the same --

2          MR. FISHBEIN:  Correct.  I've not heard from

3    Mr. Carrington or any lawyer representing Mr. Carrington.

4          THE COURT:  Okay.

5          And Mr. Hwang?

6          MR. HWANG:  The same is true for us, your Honor.  We

7    haven't heard from Mr. Carrington, or any of his

8    representatives, or lawyers?

9          THE COURT:  You didn't even get a voicemail from

10   Mr. Loomis?

11         MR. HWANG:  No voicemail.  I didn't get that, your

12   Honor.

13         THE COURT:  That's, of course, fine.

14         A couple of other questions.

15         In connection with Mr. Carrington's opposition, which,

16   as I've just mentioned, I am considering today, there were a

17   couple of sworn statements filed by individuals who recalled

18   contemporaneously Mr. Carrington telling them certain things,

19   and these were presented to me as substantiation for some of

20   the allegations made in the complaint.  I would understand if

21   you, as attorneys, elected not to speak or not to contact any

22   of those individuals, but inasmuch as we are where we are in

23   this case because you were addressing the accuracy and the

24   legitimacy of certain communications, I was wondering if any of

25   you had attempted to reach out to any of the affiants or

**Exhibit C-6**

JABKCARC

1    declarants that submitted statements on behalf of

2    Mr. Carrington.

3            Mr. Stein?

4            MR. STEIN:  We have not, your Honor.  We felt that the

5    case was being decided on the issues of fraud on the Court and

6    spoliation of evidence, and none of those declarations had

7    anything to do with those issues.  We didn't feel we should be

8    getting into the merits of the case at this time.

9            THE COURT:  Okay.

10           Mr. LaVigne?

11           MR. LaVIGNE:  No, your Honor.  On behalf of Viacom and

12   Paramount, we did not attempt to reach out to any of those

13   third-party affiants.

14           THE COURT:  Okay.

15           And Mr. Hwang?

16           MR. HWANG:  Same is true for us as well.

17           THE COURT:  Thank you.

18           I'm wondering if you have with you -- and I understand

19   if you do not -- if you have Mr. Carrington's opposition.

20   There's a reference to statements produced by Microsoft.  I'm

21   looking -- if you have it, it's page 19 of his submission.  I'm

22   just trying to understand, there's a statement -- and this is

23   the part that, of course, piqued my interest -- that the

24   statement of the collective counsel that Microsoft had

25   indicated that Office 365 accounts, such as the Carrington

**Exhibit C-7**

JABKCARC

1    Diaries account, are controlled completely by the user, who has

2    the power to delete the account and the content therein, is a

3    fabrication of evidence that is found nowhere in Microsoft's

4    returns.

5         I was just wondering where that information came from

6    because I'm not sure I was able to source it to anything that

7    Microsoft produced.

8         Mr. Stein?

9         MR. STEIN:  Yes, your Honor.  That was in

10   conversations, I believe, with my associate, Diana Sanders.

11        THE COURT:  I see.

12        And Ms. Sanders spoke with individuals at Microsoft in

13   trying to interpret the materials that they had sent?

14        MR. STEIN:  Yes, your Honor.

15        THE COURT:  I appreciate that.  Thank you for letting

16   me know.

17        MR. STEIN:  And, unfortunately -- fortunately, she's

18   not here because she had her baby about ten days ago, and so

19   she's taking care of her baby.

20        THE COURT:  Well, congratulations.  And I'll still

21   think fondly of her work ethic even if she's not here today,

22   but that is great news.

23        Mr. Stein, let me talk to you about something else.

24        MR. STEIN:  Yes, your Honor.

25        THE COURT:  You want sanctions.

**Exhibit C-8**

JABKCARC

1           MR. STEIN:  Yes, your Honor.

2           THE COURT:  It's lovely that Mr. Carrington is willing

3  to dismiss the case, but you want it to be with prejudice, and

4  then you wanted even more than that, you wanted the costs of, I

5  imagine, much of the litigation that has been done in this case

6  to date, and, in fact, you want this case to be referred to the

7  United States Attorney's Office criminal division.

8           Am I correct on all of those points?

9           MR. STEIN:  You are correct, your Honor.

10          THE COURT:  And that is what was said to me in your

11 written submission, and I'm assuming that since then, you have

12 not thought differently about the sanctions that you are

13 seeking, correct?

14          MR. STEIN:  Correct.  And, as a matter of fact, as a

15 result of the letter that he sent to you accusing me personally

16 of misconduct and criminal conduct, I am even more adamantly

17 recommending that.

18          THE COURT:  Would you agree with me, sir, that the

19 particular emails at issue are not necessary to all of the

20 claims in his case?

21          MR. STEIN:  Well, I think they go to the foundation --

22          THE COURT:  Sir, I don't want -- let me be clear.  I

23 want you just to answer the question that I'm asking.  Don't

24 think about the question you think I'm asking.  I just want to

25 be clear.  It seems to me -- and you can disagree with me, but

**Exhibit C-9**

JABKCARC

1   then you'll have to explain why -- that those emails went to

2   the antitrust claim that got him federal jurisdiction, but

3   didn't necessarily go to some of the other claims that he made.

4   I don't think they spoke, one way or the other, to the assaults

5   that he has alleged happened to him.

6       My reason for asking is:  I appreciate what you're

7   going to tell me, which is, it doesn't matter, Failla, what has

8   happened for the last year of this case confirms the need to

9   dismiss the case in its entirety with prejudice.  But I am

10  asking a really simple question, which is:  When I got this

11  case, when I looked at those emails, a reaction that I had was

12  that there was a bit of gilding the lily because he didn't need

13  them.  He may have needed them for the antitrust claims, but he

14  didn't need them for the assault claims.

15      Am I incorrect in that regard?

16      MR. STEIN:  Well, your Honor, I think that the Darren

17  Stein email was put in there to show that Mr. Graden interfered

18  with his business activities, and that's why he added to the

19  email after talking to Brian Graden, when, in fact, Aaron Stein

20  indicates he didn't put that in the native email, and we have

21  the native email.  It wasn't in there, so it obviously was

22  added by him.

23      Secondly, I think some of the emails were -- those

24  that went to Reno Logan were intended for the purpose of

25  showing that the alleged incidents of assault occurred, and, in

**Exhibit C-10**

JABKCARC

1    fact, Reno Logan did not send any of those emails, so I think

2    Mr. Carrington was adding those to give credibility to his

3    assault allegations.

4            THE COURT:  And I agree with you on that point, and

5    I'm just wondering:  He didn't need to attach them as exhibits

6    to the complaint.  Was it not enough for him to have pleaded

7    that these incidents happened?

8            MR. STEIN:  I agree with your Honor.  I don't think

9    there was any reason to attach them.

10           THE COURT:  By the same token, he didn't need them for

11   his antitrust claim.  It was interesting.  It may have -- or it

12   may have been introduced to substantiate that claim, but for

13   purposes of Rule 12(b)(6), I didn't think it was necessary.

14           Do you agree?

15           MR. STEIN:  Yes.  Yes, your Honor, I do agree.

16           THE COURT:  Okay.  So, he has now said, I'm not going

17   to use the communications, correct?  He has foresworn use -- he

18   says he doesn't need them.  Maybe I'm saying two different

19   things.  He said he didn't need them to bring his claims.

20   Agreed?  He says that in his opposition.

21           MR. STEIN:  I believe he did, your Honor.

22           THE COURT:  I don't recall whether he agrees to

23   foreswear using them in this case, but I suspect if I precluded

24   them, but kept the case alive, he'd be perfectly happy with

25   that.  Now I'm going to ask the question that you thought I was

**Exhibit C-11**

JABKCARC

1    asking originally, which is:  Given that one of the things I

2    have to look at is whether there are lesser sanctions

3    available, what you're asking me to do is really the most

4    severe sanction I can impose, and I want to understand why you

5    believe it is appropriate, given the arguable marginal

6    relevance of the emails, or at least the lack of necessity to

7    the adequate pleading of his claims.

8        MR. STEIN:  It's not only the emails, your Honor.  He

9    has destroyed every piece of equipment that could have provided

10   exculpatory evidence for us, that could have been relevant to

11   our finding out about other witnesses and other information.

12   He has now made it impossible for us to put on our defense

13   because the relevant instruments that had all of those

14   materials have now intentionally been deactivated, destroyed,

15   turned in by Mr. Carrington.

16       THE COURT:  Let me please push back on that a little

17   bit.

18       As a theoretical matter, I could preclude the

19   documents and give a spoliation instruction that would result

20   in potentially an adverse inference being drawn against him and

21   yet still have a trial in this case.  So I just want to make

22   sure I understand why you're saying that it is impossible for

23   you to put on a defense, given what I can do in terms of

24   adverse inferences.

25       MR. STEIN:  But you don't know, your Honor, what other

**Exhibit C-12**

JABKCARC

1    information or documentation is contained within those possible

2    emails, texts, et cetera.  There is no way for the Court to

3    know, there's no way for us to know, what additional

4    information there would have been there that would have helped

5    us in presenting our case, in defending the case.

6             THE COURT:  Are you suggesting, sir -- of course,

7    you're speaking about contemporaneous emails, and, ideally, for

8    you, there's an email that says, today, I shall fabricate

9    documents in this case.

10            MR. STEIN:  Right.

11            THE COURT:  That probably didn't exist.  But putting

12   that to the side, are you suggesting that your ability to

13   identify percipient witnesses have also been compromised?

14            MR. STEIN:  Of course.  Of course, your Honor, because

15   he might have said something to one of these -- I don't know

16   whether these affiants are real or not.  He might have

17   fabricated them completely, given what he's done so far.

18            THE COURT:  I have no knowledge of that.  I won't be

19   able to find that, sir.

20            MR. STEIN:  I understand.

21            But all I'm saying is there might be communications

22   with those people about will you help me out in this and will

23   you say or -- I don't know what there is.  There is no way for

24   me to speculate because he's made it impossible for you or us

25   to know what evidence he's destroyed.  There is spoliation.

**Exhibit C-13**

JABKCARC

1    There is no question there is spoliation in this situation.

2           We know that in the two situations, he fabricated the

3    emails because we have both IT experts saying it, and we have

4    the individuals who allegedly was communicating with saying it.

5    So we know that he creates -- there might have been additional

6    false emails on his various devices, which we could have turned

7    to.  There might be all kinds of communications.  I can only

8    speculate because he's destroyed the evidence.

9           THE COURT:  Sir, is it your belief that every email

10   submitted to me was fabricated?  I think the answer is no, that

11   some of the ones he submitted were, in fact, legitimate emails,

12   correct?

13          MR. STEIN:  I believe that --

14          THE COURT:  No?

15          MR. STEIN:  Maybe one.

16          THE COURT:  I thought there was --

17          MR. STEIN:  Maybe one.  Exhibit 1.  But all the others

18   were fabricated or false.

19          THE COURT:  Okay.

20          What else would you like me to know, sir, before I

21   turn to Mr. LaVigne?

22          MR. STEIN:  Well, your Honor, I could -- I don't think

23   it's necessary because I believe your Honor has meticulously

24   analyzed the information in this case.  I believe your Honor

25   has been more patient than I would have been in terms of giving

**Exhibit C-14**

JABKCARC

1   Mr. Carrington an opportunity to respond.  So, if the Court

2   would like, I can go through all of the emails and all of the

3   evidence, fabrication, and spoliation one by one, but I believe

4   your Honor has that information.  It's certainly part of our

5   moving papers, so --

6           THE COURT:  Exactly.  I didn't think it would be

7   dissimilar to the written submissions that you've given to me.

8           MR. STEIN:  It would not be, your Honor.

9           THE COURT:  And I think I understand as well, but you

10  please tell me if I'm incorrect, that you had the opportunity

11  you wanted to have to respond to the opposition submission that

12  Mr. Carrington gave to me, because that is a 35-page submission

13  that includes 28 pages of single-spaced written discussion to

14  me, and statements or refutation of certain arguments that

15  you're making or attempts to refute, and, as well, several

16  appendices.

17          Am I correct, sir, that your reply submission answered

18  everything you wanted to answer about his opposition?

19          MR. STEIN:  Yes, your Honor.

20          THE COURT:  Okay.

21          I will happily hear from you if there's something you

22  want to tell me.  I don't want you to restate what's in the

23  written submissions that I commit to you that I have read.  So,

24  it's up to you.  If there's something you want to highlight or

25  something want to be sure I understand, I'm here, but,

**Exhibit C-15**

JABKCARC

1    otherwise, I will turn to Mr. LaVigne and ask him the same set

2    of questions I was just asking you.

3            MR. STEIN:  All right.

4            The only thing that I would say, your Honor -- and I

5    prefer not to go into detail about it -- is the allegations

6    about me, that he put in his most recent letter, are absolutely

7    100 percent false.  And I know that the Court has taken it from

8    the docket.  There are reporters in the room.  I can just say,

9    as a member of the bar -- and I'm more than happy to be sworn

10   under penalty of perjury -- they are 100 percent false.  I

11   never even met my client, Mr. Graden, until November of 2017.

12   I have an email with me where I'm introduced to him for

13   purposes of a publicist.  So, obviously, in June of 2016, I

14   didn't know the man, could not have participated in any of the

15   activities alleged.  And I have never met Mr. Carrington in my

16   entire life, to my knowledge.

17           And I didn't have an opportunity to respond to that.

18   I just wanted to put that on the record.

19           THE COURT:  It is there, sir.  Okay, thank you very

20   much.

21           MR. STEIN:  Thank you.

22           THE COURT:  Mr. LaVigne, let me please turn to you.  I

23   think you understand the reasons for the questions that I have

24   been posing, and you have to understand that what you all are

25   asking me to do is the most serious sanction that I can --

**Exhibit C-16**

JABKCARC

1    you've asked me to impose, actually, the panoply of the most

2    serious sanctions I can impose, dismissal with prejudice,

3    imposition of costs, and referral to the U.S. Attorney's

4    Office.

5            MR. LaVIGNE:  That's right.

6            THE COURT:  So it's not enough for you to say because

7    this is really bad.  I need to understand, with greater detail

8    than I currently have, why these are appropriate sanctions and

9    why nothing short of these will suffice.

10           MR. LaVIGNE:  Your Honor, for a couple of reasons.

11           Number one, this is the most serious sanction.  This

12   is the most serious obstructive and disrespectful conduct I've

13   certainly seen in my career with a litigant.  Now, to put that

14   in perspective, your Honor, to put that in perspective, this

15   has been a 17-month odyssey, and I can give a lot of data

16   points for the Court, but when you're focusing on the serious

17   sanctions you're considering, obviously, you want to look at

18   the relevance of the exploiated and fabricated evidence --

19   that's one part of the pie -- but at the same time, the whole

20   purpose of sanctions is deterrence, and it's a punitive

21   measure, and I think Judge Forrest counted that in some of the

22   cases that we cited in our brief.  I think when you take both

23   of these in tandem, we're left with nothing else to do.  This

24   is the most serious sanction.

25           If you focus on the relevance of these emails, there

**Exhibit C-17**

JABKCARC

1   are 40 emails that were attached, those emails were attached

2   after we filed our premotion to dismiss, our premotion letter.

3   We went through allegation by allegation in the initial

4   complaint and explained why they didn't state a cause of

5   action, including for lack of particularity.  What

6   Mr. Carrington did is he went back to his computer, and he

7   spoke with his lawyers and attached 40 different emails.

8           THE COURT:  Well, I don't know that you're asking for

9   the imposition of sanctions against the Landau firm.

10          MR. LaVIGNE:  We did not ask for that sanction.  We

11  did not ask for a sanction against the Landau firm.

12          THE COURT:  So I don't know if you're suggesting that

13  any work he did was with the knowledge and consent of the

14  attorneys who at one point were representing him.

15          MR. LaVIGNE:  I'm not making that allegation now.

16          THE COURT:  I will not consider it made.  Thank you.

17          MR. LaVIGNE:  I'm not making that allegation now.

18          But they attached 40 emails.  From the getgo, we've

19  had one simple question, are these authentic and give us the

20  natives, and it's taken us 17 months, and he has never been

21  able to present us with those natives.  And not only that, but

22  there's been obfuscation going on throughout the process.  The

23  Trendsetter account for my client -- that's the most relevant

24  account, Exhibits 2 to 6 -- that deals with the supposed

25  blacklisting, everything else involving Brad Grey.  From the

**Exhibit C-18**

JABKCARC

1    moment this issue became live, the Landau firm and

2    Mr. Carrington said that account has been deactivated for

3    years.  That was the representation.  It's in the FTI report.

4    After jumping through several hoops, including him seeking to

5    withdraw the case without prejudice, losing his lawyers, we

6    finally get a subpoena to Google, and it turns out that account

7    was deactivated on June 19th.  That's one day after, one day

8    after, they filed the amended complaint.

9          What's his explanation then?  Oh, it must have been

10   hacked.  But we were at this rodeo before.  We were at this

11   rodeo before when he was talking about hacking, when he raised

12   that at the September 19th conference, and he said two accounts

13   were hacked, his roviercarrington@gmail.com, his personal one,

14   and the Trendsetter -- sorry, and the Carrington Diaries.  He

15   never once said anything about this other email account.

16   That's one example.

17         Another example, just to give you a sense of what

18   we've been dealing with and the time and attorney costs it's

19   taken to navigate this, we asked for devices, turn over the

20   devices that you used to transmit these different

21   communications.  His lawyer initially said there were four or

22   five, and he had none of them.  That's why he said he didn't

23   turn in the iPhone 10.  Your Honor questioned him in a

24   teleconference in February 2019, and then, all of a sudden, he

25   says, oh, it's my iPhone 7, that's the only device I ever used,

**Exhibit C-19**

JABKCARC

1   the only device I ever used contemporaneously to send them and

2   to send them to the Landau firm, too.  We've proven that

3   statement is false.  That's a false statement.  The iPhone 7

4   was released at a date subsequent to the exchanges with Reno

5   Logan.  So he's just lying.  He's lying and lying.

6          And the reason why you have this type of sanction is

7   so a defendant can't use this Court as his tool with absolutely

8   no recourse.  You can't play hooky from this.

9          So he lied to the Court, he lied to your Honor on the

10  phone -- no doubt in my mind about it -- and then, again, we

11  filed our motion for sanctions, and we get this response, which

12  doesn't address anything.  It just comes up with more

13  counterexplanations.  And what are we supposed to do?  Every

14  single time he says something, respond?  He had his day to

15  appear.  He had his day to appear a month ago, he had his day

16  to appear today, he was well aware of it, and he just refused.

17  He's not showing up.

18         That conduct is more egregious than the cases we

19  cited.  It's more egregious than Ceglia, it's more egregious

20  than the Judge Forrest case.  It's not limited simply to

21  presenting false evidence.  It extends to lies, it extends to

22  spoliation, and it's constant.  Whatever evidence that Google

23  comes out and says, this account was deactivated, he comes

24  forward and says it's a hack.

25         So when you look at the overall conduct and the

JABKCARC

1    supervisory power of the Court, the punitive purposes for this,

2    the deterrent effect, this record, it needs to send a message

3    to other litigants they can't do this.  And we're asking for

4    dismissal with prejudice.  He tried to dismiss it without and a

5    referral to the U.S. Attorney's Office, they can investigate

6    this, and they'll do that independently, and for costs.

7            So the point your Honor made about the relevance of

8    these communications, I don't see -- respectfully, I don't see

9    how they can be deemed marginal.  It's the whole purpose why

10   they amended the complaint.

11           In terms of the sexual assault allegations, is it

12   absolutely necessary?  No, it's not necessary.  One can come

13   forward with witnesses and say I saw that, but, at the same

14   time, he's made it necessary, because allegations of sexual

15   assault, again, for the record, they're completely time-barred.

16   For all the reasons we laid out in our premotion, they should

17   be knocked out, but if he were ever to go forward, it's a case

18   about credibility.  It's a case about credibility, and it's not

19   as simple now as giving a spoliation instruction and saying you

20   can't use that, it goes to the heart of the case.  It goes to

21   the heart of the case, heart of the case.

22           The fact that he deleted all of these accounts, that's

23   deleting the core evidence to prove whether or not what he said

24   was true, whether or not what he presented to the Court was

25   false evidence.

**Exhibit C-21**

JABKCARC

1          So I don't think it can be found to be marginal.

2          THE COURT:  One moment, please, sir.

3          The initial complaint was filed in May of 2018,

4    correct?

5          MR. LaVIGNE:  Right.

6          THE COURT:  You were aware of the dispute before the

7    complaint was filed?

8          MR. LaVIGNE:  I was not.

9          THE COURT:  Okay.  Let me ask you this:  There were no

10   efforts undertaken by Mr. Carrington or his attorneys to advise

11   any of the defendants that a lawsuit was brewing?

12         MR. LaVIGNE:  Speaking for myself, Viacom, and

13   Paramount, the answer is no.

14         THE COURT:  That's fine.  I just wanted to know

15   whether there was any opportunity -- I guess why I was asking

16   was because I thought Mr. Stein's submission to me regarding

17   the authenticity or not of the emails was very, very shortly

18   after the complaint was filed.

19         MR. LaVIGNE:  So I think what happened there, your

20   Honor, I think the initial complaint, I think, summarized or

21   paraphrased an exchange between Mr. Graden, Mr. Carrington, and

22   Mr. Stein, and that, in turn, is what led to -- Mr. Stein to do

23   some forensic analysis through Mr. Keslaw.  Once we put that

24   forward to the Court, Mr. Carrington, as he's done many times

25   throughout the case with multiple affidavits, doubled down and

**Exhibit C-22**

JABKCARC

1   actually attached all these different emails and like 35

2   others.  That's the genesis of it.

3          The one other point I just want to emphasize is a lot

4   of these emails were -- all these -- stuff was deleted after

5   preservation orders were issued.  And that iPhone 7, which he

6   now says is the sole device ever used over the last ten years

7   to send any of this stuff, he turned that in in June, and he

8   testified to that or said that during a conference.  Again, he

9   did that after the preservation letter was sent.

10          THE COURT:  But to your reckoning, it wouldn't have

11   mattered because a lot of the key emails, you believe, would

12   have been done on the device that preceded the iPhone 7?

13          MR. LaVIGNE:  From my perspective, it's exculpatory

14   evidence, but, again, you can't just destroy exculpatory

15   evidence.  I mean, he's now saying these emails -- these emails

16   reflect contemporaneous communications, they corroborate sexual

17   assault, and in terms of the blacklisting, that is the case.

18   So, from my clients' perspective, this concept of blacklisting

19   the Sherman claims, I mean, that is essential evidence.  It's

20   in writing black-and-white supposedly showing collusion amongst

21   Hollywood executives to prevent him from even entering the

22   industry.  I mean, that's the case.

23          We're also named under like a vicarious type theory

24   for some of the sexual assaults, and, again, he added them to

25   avoid a motion to dismiss.  So, the fact that he says these are

**Exhibit C-23**

JABKCARC

1    all in this one device, and he had that device, and he got a

2    preservation order, and he let it go, that's clear spoliation,

3    and it's also evidence that this is all false and made up, and

4    we can't use it.  We don't have it.  He threw it away.

5         THE COURT:  You're asking not only to do this based on

6    violation of discovery rules, but based on Rule 11, correct?

7         MR. LaVIGNE:  Correct.

8         THE COURT:  Now, I'm thinking, perhaps incorrectly,

9    that you're really proceeding under the improper purpose prong

10   of Rule 11.

11        MR. LaVIGNE:  Correct.

12        THE COURT:  Because I'm not sure that I can make a

13   determination today, or in the near term, about the presence or

14   absence of evidentiary support for his allegations.  I believe

15   what you're saying is, irrespective of the truth or falsity of

16   some or all of the allegations in the complaint, these

17   documents, this pleading with these attachments, was interposed

18   for an improper purpose, whatever that may be.

19        Am I correct?  Because why I'm asking is, if we're

20   going the Rule 11 route, I'm really not sure that I can make

21   the evidentiary support determination, so that's why I was

22   assuming you were proceeding on the other prong.

23        MR. LaVIGNE:  Correct, your Honor.  Our position on

24   Rule 11 is it's for an improper purpose.  That evidence is

25   shown by his course of conduct.

**Exhibit C-24**

JABKCARC

1          I think in terms of the fabrication, we submit we've

2    met our burden by clear and convincing, and with the punitive

3    purposes of that, it fits solely within it.  For the

4    spoliation, it's a preponderance.  And, again, the punitive and

5    deterrent purposes, I submit, we've met that burden.

6          THE COURT:  I thought it was clear and convincing.

7          MR. LaVIGNE:  For spoliation, it's preponderance, your

8    Honor.  That's what the case law actually says.

9          THE COURT:  Okay.

10         MR. LaVIGNE:  I submit we can meet it even if it was

11   clear and convincing, as we have for fabrication.

12         THE COURT:  You are correct that it's preponderance.

13   What I'm thinking about is the fraud.  Fraud is clear and

14   convincing.

15         MR. LaVIGNE:  Correct.

16         THE COURT:  And you are asking, under that theory as

17   well, to dismiss based on fraud, to dismiss based on

18   spoliation, to dismiss based on a violation of Rule 11.  Am I

19   correct?

20         MR. LaVIGNE:  That's right, your Honor.

21         THE COURT:  Okay.  All right.

22         But your position today is that irrespective of the

23   standard, it's been met?

24         MR. LaVIGNE:  Absolutely.

25         THE COURT:  Okay.

**Exhibit C-25**

JABKCARC

1          I derailed you, sir.  I'll let you finish your

2     arguments.

3          MR. LaVIGNE:  Your Honor, I think we've really

4     addressed it in all the papers.  The one point that your Honor

5     asked about, his most recent submission, I believe we did

6     address that in his reply.  I would just underscore that the

7     first time in the record he claims this Trendsetter account was

8     hacked, which, again, is mostly relevant for Viacom and

9     Paramount, was on page 21, footnote 15, where he, out of the

10    blue, claims it was hacked in 2015.

11         If your Honor recalls, the allegations of hacking

12    first surfaced on a conference about a year ago, on

13    September 18th.  And we received a report from a forensic

14    examiner, I think, the night before that conference, and if

15    you'll recall that, your Honor, the claims there were that the

16    one active Gmail account, roviercarrington@gmail, that had been

17    hacked in, I think, May 2018, and then the Trendsetter --

18    sorry, the Carrington Diaries account had been hacked in

19    August 2018.  There was no mention at all of this Trendsetter.

20    And everybody had said representations were made in open court

21    to FTI that that had been deactivated for years.  The reason

22    this is coming so late is because Google records showed it was

23    actually deactivated the day after the complaint.  I submit

24    that's strong, compelling, irrefutable evidence.

25         THE COURT:  So your point is that your forensic expert

**Exhibit C-26**

JABKCARC

1    would have checked the Trendsetter account if only they hadn't

2    been told it had been deactivated for a period of years; in

3    fact, being told by Mr. Carrington and his counsel?

4         MR. LaVIGNE:  Yes.  And my point is that he's lying.

5    He deactivated the account the day after he filed the amended

6    complaint.  He deleted everything because he didn't want there

7    to be any trace at all.

8         THE COURT:  But he says to me -- and you've read it --

9    that in speaking with the GoDaddy folks, what he was trying to

10   do was simply to be factual for me and to tell me and to

11   confirm what he feared, which was that document retention or

12   email retention policies being what they are after the

13   deactivation of account, that there wasn't going to be any

14   returns from my order.

15        MR. LaVIGNE:  Your Honor, I submit, if that's what was

16   really happening, the GoDaddy accounts show that the back and

17   forth between the subscriber and GoDaddy, if that Carrington

18   Diaries really was hacked in August '18, why don't you see

19   customer calls that his account was hacked?  Okay?  The only

20   thing you see is, can they get my deleted emails, because there

21   was no hack, and he wanted to make sure there was no way

22   anybody could get those emails.  And he hasn't shown up, so I

23   can't question him about it.  That's the only fair inference

24   from this.

25        If your account gets hacked -- and if you recall that

**Exhibit C-27**

JABKCARC

1    expert report, the expert report said they were able to find

2    purged emails, and they had them in, like, an audit trail, and

3    in the middle of their analysis, somebody went in and deleted

4    it.  Do you honestly think if that really happened, nobody's

5    going to call GoDaddy, and there wouldn't be a record of that?

6    It's nonsensical.  It's nonsensical.

7            The one other point I want to emphasize to your Honor

8    is, they knew, and Carrington knew, that there was nothing in

9    these email accounts, including the Landaus, even though we're

10   not seeking sanctions against them, and they still let us go

11   through this entire process with FTI, which lasted weeks, and

12   weeks, and weeks, and they knew there was nothing there.

13           THE COURT:  They, not he?

14           MR. LaVIGNE:  They.  We're not seeking sanctions

15   against the Landaus, but they knew it.  They knew it.  That was

16   represented to the Court by them, so, "they."

17           THE COURT:  Anything else?

18           MR. LaVIGNE:  No, your Honor.

19           THE COURT:  Mr. Fishbein, do you want to follow on, or

20   are you okay?

21           MR. FISHBEIN:  No.  I think Mr. LaVigne has spoken for

22   our side.

23           THE COURT:  I thank you, sir.

24           Mr. Hwang.

25           MR. HWANG:  Thank you, your Honor.

**Exhibit C-28**

JABKCARC

1        I just want to clarify the record.  We started out

2    with 40 at-issue emails that were attached to the first amended

3    complaint.  There was one native found, and that was the single

4    communication as to which there is no dispute.  All 39 other

5    communications are disputed, and they were not located in

6    Mr. Carrington's accounts, any one of the three.

7        To address your Honor's question about the appropriate

8    sanctions, this is not just a Rule 11 motion, it's not about a

9    typical discovery abuse.  This is about fraud on the Court and

10    a complete flouting of the Court's August 7, 2018 order

11    requiring Mr. Carrington to preserve all relevant evidence.

12    Since that time, he's taken every conceivable measure to erase

13    any trace that would allow us to affirmatively prove that these

14    emails never existed.

15        Now, what proof is there?  The emails aren't there.

16    There are no natives.  We also have conclusive proof that he

17    has perpetrated fraud with respect to one email that we know

18    forensically was not in the form that he had attached in the

19    complaint, and that was the one where he added that phrase,

20    "after speaking with Mr. Graden."

21        So, with respect to all 39 of the disputed at-issue

22    communications, we've shown that they don't exist, that a fraud

23    has been perpetrated, and that he's taken every step to cover

24    his tracks all throughout this process to the point -- this

25    isn't a Rule 11 motion, it's not just about improper purpose,

**Exhibit C-29**

JABKCARC

1   but it's about the Court's inherent authority to issue

2   sanctions when judicial process is not taken seriously.  It's

3   about the integrity of the entire system.  There's no question

4   that under the case law, the Court has the power to impose

5   terminating sanctions, with prejudice, on the basis of this

6   complete abuse of the judicial process.  It's not about the

7   sufficiency of the allegations from 12(b)(6) purposes, it's not

8   about the merits of the case.  Ultimately, it's about, like

9   Mr. LaVigne said, deterring this type of conduct.

10          With respect to the question as to whether lesser

11  sanctions are appropriate, your Honor:  Here, if there's an

12  exclusionary order issued with respect to these at-issue

13  communications, that puts Mr. Carrington back in the exact same

14  place as if he had never fabricated these emails, attached them

15  to the complaint in a public filing.  So there's literally no

16  punitive sanction against Mr. Carrington if that's the remedy

17  we're entitled to.

18          The same goes for the adverse inference.  An adverse

19  inference is only going to be relevant if he seeks to continue

20  to use these emails, but if he says I'm not going to use these

21  emails, like he represented in his opposition, what adverse

22  inference could possibly be issued other --

23          THE COURT:  What I thought -- what I was contemplating

24  was a spoliation instruction that recites the fact that there

25  once were emails that have been deleted, and you may assume

**Exhibit C-30**

JABKCARC

1    that there was information in those emails that would have been

2    favorable to the defendants.  That's what I was thinking of.

3    So he doesn't need to make reference himself to those emails.

4    I would have thought you would have sought an instruction of

5    that type.

6          MR. HWANG:  Well, certainly.  Your Honor, again, this

7    is not just about spoliation.  I think the real key aspect of

8    the motion we've all made, we certainly assert several bases

9    upon which your Honor can dismiss this case, but the key one,

10   in my view, is fraud on the Court.  So it's not about a

11   spoliation instruction; it's about the integrity of the

12   judicial process.

13         With respect to the adverse inference that there were

14   once emails that he fabricated, what reasonable jury or

15   fact-finder possibly, after that inference is made, could come

16   to the conclusion that there's merit to the claims?  This goes

17   to Mr. LaVigne's point that the emails themselves go squarely

18   to the heart of the allegations in the case, and I would say

19   that's particularly true with respect to the Grey Defendants.

20   Exhibits 2 through 6 in the first amended complaint are all

21   filed as corroborating evidence to substantiate these bogus

22   allegations that there was sexual assaults that occurred in

23   2011.  Now, we know Logan disavows these emails absolutely,

24   they're absurd on their face, and we also know that the native

25   communications don't exist in any of Mr. Carrington's accounts.

**Exhibit C-31**

JABKCARC

1          So, we started this process in the summer of 2018.

2     Your Honor issued the August 7th preservation order, so that we

3     can get the at-issue communications.  Through the last year,

4     we've proven everything we possibly could with respect to the

5     authenticity or lack thereof of these emails.

6          This is an issue of credibility; it's not an issue

7     about the merits.  These are incontrovertible facts showing a

8     fraud on the Court has been perpetrated.  For those reasons, we

9     easily cleared the clear and convincing threshold for a finding

10    of fraud on the Court, and, accordingly, request sanctions with

11    prejudice.

12         One final point:  If a lesser sanction is imposed,

13    your Honor, what's to stop Mr. Carrington from then proceeding

14    with a voluntary dismissal of this action and then starting

15    again at square one in some other federal jurisdiction?  It's

16    another reason why any lesser sanction than termination with

17    prejudice wouldn't be appropriate here, your Honor.

18         THE COURT:  Your point, sir, on this last point is

19    that another receiving judge, particularly one who does not

20    have the firsthand knowledge that I do of the proceedings in

21    this case, might not agree with you -- might not have an

22    understanding of the appropriateness of sanctions, because they

23    just simply have heard it secondhand.

24         MR. HWANG:  Well, it's a little broader than that,

25    your Honor.  If Mr. Carrington were permitted to voluntarily

**Exhibit C-32**

JABKCARC

1    dismiss his case and, say, file in California federal court, he

2    doesn't have to attach these fabricated emails to his

3    complaint, in which case, we are literally back in square one.

4    And, again, as with the other lesser sanctions that might be

5    available in a different case, there's literally no punitive

6    measure against Mr. Carrington's conduct, the fabrication and

7    fraud on the Court that he's perpetrated.

8          THE COURT:  Okay.  Thank you very much.

9          MR. HWANG:  Thank you, Judge.

10         THE COURT:  I had prepared for this hearing before

11   yesterday, and so it was my intention to ask a lot more

12   questions, and to have witness testimony, and to have some

13   exploration of some of the allegations and some of the

14   refutation presented by Mr. Carrington, but he has elected not

15   to appear, and I, therefore, don't have that.  I have his

16   statements, and I have his written submission to me, and there

17   are parts of it that I can understand, parts that I can credit,

18   and parts that, ultimately, I think I am not able to credit.

19         And so, also in connection with this proceeding, it

20   was my intention to read into the record an oral opinion on

21   this matter.  That opinion has evolved as I have been presented

22   with the evidence I've been presented with, and so I say that

23   by way of introduction to explain that I am now going to read

24   an oral opinion into the record.  You will excuse me if it is a

25   little bit choppy, but there are things that -- holes that I

**Exhibit C-33**

JABKCARC

1   either expected to fill in or that have been filled in, but I

2   just didn't get to write them out.  And I'm going to just say,

3   at the outset, that I am dismissing the case with prejudice,

4   and that I am imposing the costs related to, the costs that are

5   fairly traceable to, the conduct that has brought us here

6   today, which is the use of what I believe to be fabricated

7   emails.

8           Why I'm being so particular about this is, I can think

9   of possibly work that was done that maybe could be divorced

10  from or may have been done even if the emails hadn't been

11  legitimate, but if you write to me and argue that, in fact,

12  every single minute of work, billable work, and of expenditures

13  undertaken on this case was attributable to fabricated emails,

14  I will listen to you.  I'm just not sure, at this point, that

15  I'd be willing to grant that much, but I will grant costs in

16  this case.

17          Now, there's an awful lot of backstory.  We were

18  really -- we've been dealing with this particular issue for

19  more than a year, and, as a result, there are a number of dates

20  and a number of events, and I do want to make sure the record

21  reflects them.  So I'll ask you for your patience as I read in

22  my understanding of what has happened, and what I have found,

23  and what I am going to do as a consequence of that.

24          The initial complaint in this case was filed on

25  May 2nd of 2018.  And on May 3rd, Mr. Stein informed

**Exhibit C-34**

JABKCARC

1   Mr. Carrington's attorneys that much of the complaint contained

2   inaccurate information, and that is from Mr. Stein's

3   declaration to me.

4          The defendants then sent preservation notices to

5   plaintiff and his counsel on May 21st of 2018, May 22nd of

6   2018, June 20th of 2018, and June 21st of 2018.  Prior to the

7   first conference with the Court, the defendants reasserted

8   these concerns to plaintiff's attorneys, who responded with an

9   amended complaint, which included what we've now termed the

10  at-issue communications, 40 emails, supposedly exchanged with

11  Mr. Brian Graden and with several nonparties, including Darren

12  Stein and Reno Logan, that purportedly substantiated and

13  corroborated plaintiff's claims.

14         The emails included Exhibits 1 through 6, purported

15  communications with Reno Logan, through plaintiff's Trendsetter

16  Gmail account, Exhibits 8 through 9, which were purported

17  communications with Brian Graden through the Rovier Carrington

18  Gmail account, and Exhibits 10 through 11, purported

19  communications with Brian Graden and nonparty Darren Stein,

20  through what the parties have termed the Carrington Diaries

21  account.  All of the at-issue communications were attached to

22  the amended complaint as forwarded emails to the Landau firm.

23  Perhaps one of them may have been a native, stand-alone email

24  communication, but the vast majority of them -- 39, if not 40

25  of them -- were forwarded emails to the Landau firm.

**Exhibit C-35**

JABKCARC

1          Thereafter, there was an effort made to undertake --
2     to figure out how these emails came to be.  There was a
3     subpoena return from Google, which confirmed that the
4     Trendsetter account was, in fact, deactivated on June 19th of
5     2018, one day after the amended complaint was filed and after
6     the first preservation order was sent.
7          We also found out, during the course of the hearing in
8     February of 2019, that the plaintiff turned in his iPhone 7,
9     which he represented to me to be the vehicle used to transmit
10    all of the communications after the initial preservation order.
11         After that, I received several declarations from
12    nonparties, along with the forensic expert declaration,
13    suggesting that these emails did not, in fact, exist in
14    Mr. Graden's, Mr. Logan's, or Darren Stein's accounts.  I asked
15    for -- I ordered limited discovery and the preservation of any
16    communications concerning any portion of the at-issue
17    communications.  I then selected FTI as a neutral examiner.
18         FTI's investigation found -- of the Gmail account and
19    the Carrington Diaries account, found none of the native
20    versions besides the one whose validity was not contested.  And
21    plaintiff informed the Court that the Trendsetter account had
22    been deactivated for years, which is why no effort was
23    undertaken to review it.
24         The investigation by FTI did find the forwards that
25    Carrington sent to the Landau firm, his prior counsel, but none

**Exhibit C-36**

JABKCARC

1   of the underlying emails.  Plaintiff provided an affidavit from

2   his own expert, stating that he had transferred the contents of

3   the Trendsetter account to the Carrington Diaries account in

4   2017, but no natives of the emails purportedly sent from the

5   Trendsetter account were found in the Carrington Diaries

6   account, and the defendants assert that the absence of these

7   native emails, coupled with the existence of the forwarded

8   emails, just could not be explained.

9          Plaintiff responded that he had been the victim of a

10  hack.  The defendants observed that a hack could not explain

11  why the one valid email still existed and why the forwarded

12  emails from Mr. Carrington to the Landau group remained.

13         Mr. Carrington refused to turn over his phone at that

14  time.  I then issued a subpoena for further discovery on the

15  accounts, given FTI's inability to find records of the at-issue

16  communications.  There was a Rule 11 notice that was served on

17  the Landau firm on October 2nd of 2018, and a few days later,

18  that firm withdrew.

19         It is the allegation of the defendants that the Landau

20  firm may have helped, assisted, perpetuated misconduct by

21  Mr. Carrington, although they are not seeking that here.  I do

22  note that in an email of August 24th of 2018, the Landau firm,

23  again, asserted that the Trendsetter account had been

24  deactivated years before the filing of this action.  They did

25  raise a series of challenges to the neutral forensic examiner,

**Exhibit C-37**

JABKCARC

1    and, ultimately, they were unable to obtain the plaintiff's

2    iPhone 10 for imaging.

3         In February of 2019, I issued an order that subpoenas

4    be issued to GoDaddy, Microsoft, and Google, the Internet

5    service providers for plaintiff's three email accounts, to

6    obtain subscriber information, nonsubscriber information, and

7    that FTI conduct an analysis of the iPhone 10, plaintiff's

8    phone, and emails produced to or by the ISPs.  The subpoena to

9    Google revealed that the Trendsetter account had only been

10   deactivated the day after the amended complaint was filed and

11   not years earlier, as had been repeatedly represented.

12        The GoDaddy returns, which it should be noted are

13   not -- I'll be brief about this, because they're not in the

14   public filings, but there was an indication that the Carrington

15   Diaries account had been closed and deleted by plaintiff on or

16   about September 8th of 2018, one month after the Court's order

17   to preserve evidence.

18        The GoDaddy production also revealed that plaintiff

19   reached out to GoDaddy to confirm that a subpoena would not

20   return information about emails within a deleted account.  The

21   returns also show repeated password changes throughout 2018,

22   undercutting a previous claim that had been made that one of

23   the defendants might have known of Mr. Carrington's password

24   and hacked into his account.

25        The returns for the Gmail account produced no

**Exhibit C-38**

JABKCARC

1    instances of the at-issue communications.  FTI refused the

2    plaintiff's most recent and current iPhone, and it concluded

3    that Mr. Carrington's data had migrated from the previous

4    iPhone, but, again, found no evidence of the at-issue

5    communications in any of those accounts.

6          The defendants point out to me that plaintiff informed

7    the Court that he sent every single one of the at-issue

8    communications from his iPhone 7, and that is, in fact, what he

9    said, and that is the phone that was returned in June of 2018.

10   But perhaps adding fuel to the fire of defendants' concerns,

11   the defendants point out to me that Apple did not release the

12   iPhone 7 until 2016, which postdates many of the at-issue

13   communications.

14         Now, I have noted to the parties that there's a very

15   substantial submission that was submitted by Mr. Carrington, it

16   is dated May 20th of this year, and I won't go into it in great

17   detail other than to confirm that I have read it in very

18   careful detail.  There are allegations in the opposition that

19   the defendants conspired to do the following things:  To send

20   preservation of e-discovery letters; challenge the

21   authenticity; hack and delete emails and cover their trail;

22   stay this action pending the resolution of the email

23   authenticity; preventing other discovery from taking place;

24   seeking discovery, knowing that Mr. Carrington could no longer

25   produce the emails he had in their native form; blame

**Exhibit C-39**

JABKCARC

1    Mr. Carrington for the deletion and for the fact that discovery

2    results were fruitless; and then seek terminating sanctions.

3         A lot of this opposition is an objection to the manner

4    in which the subpoena returns were handled.  I have no problem

5    with the way they were handled.  There are many, many claims of

6    hacking and many efforts to explain why the returns were what

7    the returns were.  As but one example, there was a discussion

8    about the renewal or not of the Carrington Diaries account, and

9    he indicated that he did so, essentially, because of the advice

10   of his counsel, that his counsel advised him to take the

11   website down, and that he did not wish to pay to maintain the

12   account.

13        He also argues that the outreach to the GoDaddy entity

14   regarding confirming that there would be no returns -- no

15   emails produced in response to the subpoena was actually to be

16   of help to the Court.  I'll note, in case anyone is wondering,

17   I actually don't credit that response, given the specifics of

18   the communications found in the GoDaddy chron file.  I would

19   have thought that if that was his concern, he might have raised

20   it at our conferences, and he did not.  I do think he was

21   actually just seeking to confirm that nothing was going to be

22   done, and that my efforts to generate these subpoenas to the

23   ISPs were going to be fruitless.  But that is only part of the

24   reason for the order that I'm issuing today.

25        There was also a statement by the plaintiff that he

**Exhibit C-40**

JABKCARC

1    stopped using the Trendsetter account in 2015, and that I

2    should, I guess, draw some distinction between deactivation, as

3    it means, and his decision not to use it as much. I don't draw

4    that distinction. I would have liked to have known about the

5    Trendsetter account, so I could have perhaps done something

6    before it was turned off.

7           He also raises what I will call a no harm/no foul

8    allegation regarding the iPhone 7 because of the discussions

9    about migration. Defendants then, as I noted, replied and did

10   provide a response to something that was sort of a light motif

11   of his opposition, an affidavit from Defendant Graden denying

12   having received any at-issue communications or having knowingly

13   received the password.

14          There are now the legal arguments.

15          There is a request that I terminate this case and

16   impose sanctions based on fraud. And as I mentioned in my

17   discussions with Mr. LaVigne, in order to do that, there must

18   be clear and convincing evidence that Mr. Carrington has

19   sentiently set in motion some unconscionable scheme calculated

20   to interfere with the judicial system's ability impartially to

21   adjudicate the action. I'm quoting here from the case of

22   Scholastic v. Stouffer, a Southern District decision from 2002,

23   that itself is quoting from a First Circuit decision of 1989.

24   The Scholastic decision was then affirmed by the Second Circuit

25   in 2003.

**Exhibit C-41**

JABKCARC

1              There are many arguments that the defendants have

2      raised in the course of seeking termination on this basis.  I'm

3      not going to go into them in detail because they are in the

4      written submission, and the plaintiff gave the response that

5      I've been outlining to the parties.  Separately, there was a

6      request for termination of this action and sanctions based on

7      spoliation.  Now, here, using a preponderance standard, I must

8      find that the party having control over the evidence, and an

9      obligation to preserve it at the time it was destroyed,

10     destroyed the records with a culpable state of mind, and that

11     the destroyed evidence was relevant to the parties' claim or

12     defense, such that a reasonable trier of fact could find that

13     it would support that claim or defense.

14             I'm quoting here from Residential Funding Corporation

15     v. DeGeorge Financial Corporation, a Second Circuit decision

16     from 2002.  And I think here is perhaps where the defendants

17     have the best arguments.  They argue, among other things, that

18     there is clear evidence of spoliation because of the

19     deactivation of the Trendsetter account well after the first

20     preservation order, as well, the turning in of the iPhone 7 in

21     June of 2018 in the thick of all of these disputes about the

22     authenticity of the documents, the deletion of the Carrington

23     Diaries account in September of 2018, more than a month after

24     the Court's preservation order on the theory that this may have

25     taken some precedence over the defense counsel's requests for

**Exhibit C-42**

JABKCARC

1    preservation.  And something that I think has been brought into

2    sharper relief today is the significance of the materials that

3    were lost.  It was argued to me that the spoliation was

4    particularly egregious because it was for the purposes of

5    defeating an inquiry into the fraud, and I had thought that

6    that was very important to me, but each of the defense counsel

7    who spoke with me very eloquently explained to me what they

8    can't do, and what they can't find, and what is closed to them

9    as a result of these accounts being deactivated.  And I had

10   thought of it really in terms of the effects on me and the

11   problems that I would have proving or finding certain claims to

12   be proved or not proved as a matter of law or the propriety of

13   trial on same, but I do now understand with greater clarity how

14   difficult it would be to put up a defense to these claims when

15   so many avenues of information were closed off after the

16   complaint was filed.  So I thank counsel for giving me greater

17   information on that.

18          There is, as well, a request for sanctions based on

19   improper conduct under Rule 11 and specifically, as I confirmed

20   with counsel, the improper purpose prong.  In this regard as

21   well, folks are seeking attorneys' fees, and costs, and

22   referral to the United States Attorney's Office.

23          The arguments are largely duplicative of the

24   spoliation arguments on the theory that I would need to credit

25   the defendants' assertions of fraud and spoliation in order to

**Exhibit C-43**

JABKCARC

1    assume that the claims were brought in bad faith and for an

2    improper purpose.  The defendants have argued as well that

3    since all discovery has flowed from plaintiff's misconduct,

4    they are entitled to attorneys' fees as a matter of law, citing

5    to me the Shangold decision from the Second Circuit from 2008,

6    and, as well, they are seeking referral for criminal

7    prosecution.

8         I will say this:  I'm taking that under advisement.  I

9    think a criminal referral is, if you will -- and not to make

10   light of this -- the nuclear option of all the things that I've

11   been asked to do.  I am considering it, but I'm not making that

12   determination today.  If I elect to do it, you probably won't

13   know about it unless something were to take place.  And so I

14   think, again, it is such a severe sanction, that I'm not

15   prepared to do it today, and if I do it in the future, I'm not

16   telling you about it.

17        Let me, please, then, proceed to my analysis.

18   Ultimately, based on the written submissions, from all sides,

19   and based on the discussions I've had today and in the past,

20   and my own observations from having presided over numerous

21   conferences, and having written numerous endorsements and

22   orders in this case, I find the defendants have provided ample

23   support under any standards for the argument that if plaintiff

24   fabricated these emails, the proper remedy is dismissal of the

25   case.  Even if -- and this was the discussion I was having with

JABKCARC

1    Mr. Stein at the beginning of this conference -- some portion

2    of these claims could survive without the emails, the fact of

3    the fabrication necessitates dismissal.  It is a very harsh

4    sanction, and I've thought about it a lot before imposing it.

5    I'll explain at the end why it is -- well, I'll explain now why

6    it is.

7            In my mind, there was a possibility that upon

8    realizing that these were fabricated, upon realizing that he

9    had been caught, to use the vernacular, that Mr. Carrington

10   would have admitted it and said, yes, I did, I'm really sorry,

11   I don't really need these emails, let me go forward with all of

12   the witness testimony I have, and let's move on.  And that

13   would have been a different state of affairs, and I think it

14   would have been very difficult in that setting to dismiss the

15   case with prejudice and impose costs.

16           But this is not merely, to use Mr. LaVigne's

17   expression, doubling down, it's trebling down or quadrupling

18   down, and we could just go on for a while, because at each

19   junction, I'm being told something else.  I don't think I'm

20   being told the truth, and I'm getting further and further away

21   from a resolution of what happened to these emails and what

22   happened to the other emails in these accounts.  So we got to

23   the point where counsel withdrew, and somehow it was counsel's

24   fault.  There was more than one extremely localized hack that

25   only seemed to affect the emails that I care about, and it was

**Exhibit C-45**

JABKCARC

1    not lost on me, and perhaps it was of surprise to

2    Mr. Carrington, that GoDaddy kept a chron file of their

3    communications in which there were discussions that made clear

4    that Mr. Carrington's concern was that there be no trace of

5    these emails.

6          Given that, there's really not much -- whether I had

7    this as a preponderance or a clear and convincing, I have to

8    find, I do find, that these emails were fabricated, and that

9    was bad enough, but the deactivation of the accounts, the

10   efforts undertaken to really foreclose what is necessary

11   discovery in this case, and the stream of lies to me,

12   necessitate the sanctions that I am imposing.

13         I sat down, and I thought about how serious this was

14   and how serious it is to dismiss a case with prejudice.  It is

15   a very harsh sanction, but I have nothing else that I can do,

16   because as hard as I try, I still can't find a single version

17   of the at-issue communications in any of the plaintiff's

18   devices.  The Trendsetter account, which is of significance

19   to -- I believe to certain of counsel -- and it is of interest

20   to me -- it's been deactivated years after I was told it was

21   deactivated.  The fact that it wasn't used matters not to me.

22   I really wanted that information, and I can't have it.

23         So, today, I have no logical explanation for where the

24   at-issue communications are, how they were created, other than

25   fabrication.

**Exhibit C-46**

JABKCARC

1          FTI found no evidence of the at-issue communications

2     in either the Carrington Diaries or the Gmail account, despite

3     finding the forwards, and that makes no sense to me.  And I've

4     tried to figure out a logical way of understanding that, and I

5     just can't.  Again, we talk about the targeted hack, and I just

6     cannot believe that Mr. Carrington is that unlucky.  And I also

7     cannot believe, based on all of the information I have before

8     me, that Mr. Graden would undertake or had the facility with

9     computers to undertake the hacks that are discussed here and

10    would not have deleted the forwards to counsel.

11          I also note that Mr. Carrington deactivated the

12    Carrington Diaries account, as I've mentioned, in September of

13    2008, despite numerous preservation orders, and the arguments

14    given to me, that he didn't want to pay for it, makes no sense

15    to me at all, especially given the preservation orders and

16    especially given his obvious awareness of the challenges to the

17    authenticity of these emails.

18          Mr. Carrington has never provided an explanation for

19    how the forwards exist in the accounts for emails that were

20    sent -- let me say that more precisely.  The explanation he has

21    not provided is an explanation of how the forwards exist in the

22    Carrington Diaries account for emails that were sent by the

23    Trendsetter account when there is no evidence of the emails

24    being sent from the Trendsetter account to the Carrington

25    Diaries account.  It makes no sense to me.

**Exhibit C-47**

JABKCARC

1        I also do not understand what possessed Mr. Carrington

2    to turn over his iPhone in the middle of this litigation, in

3    the middle of this dispute about the authenticity of these

4    emails.  All that I can conclude is that in every instance

5    where the plaintiff appears, again, to use the vernacular, to

6    be caught, he attempts to argue something new, that these

7    issues are the result of someone else's doing, that they are

8    the result of the hacking by one of the defendants or by

9    defense counsel, and it's all just one large conspiracy.  I

10   have difficulty, and indeed I cannot, credit that.  I have

11   enough sworn statements and enough exploration of what I do

12   have to suggest that this is not the case.

13        And as I've mentioned, the purported hack does not

14   explain why Mr. Graden has similar-looking emails that match in

15   part, but not in whole, the at-issue communications.

16        Instead, there is an explanation from plaintiff, but I

17   just don't credit it.  It's another coverup involving

18   Mr. Graden and Mr. Stein.  Every time the defense has produced

19   compelling evidence of spoliation, of fabrication, of

20   obstruction of the litigation in this case, the plaintiff has

21   provided an explanation.  And I believe that going forward,

22   every time it happens, he will provide yet another explanation.

23   They are of increasingly tenuous credibility, and they can't

24   explain what I have in the record.

25        For these reasons, I can find, even under a clear and

**Exhibit C-48**

JABKCARC

1    convincing evidence standard, that Mr. Carrington has

2    sentiently set in motion some unconscionable scheme, calculated

3    to interfere with the judicial system's ability impartially to

4    adjudicate the action, referring to the Scholastic decision I

5    cited earlier to the parties.

6           I just want to end on this note:  The allegations in

7    the complaint are extraordinarily disturbing, and I think

8    anyone should be disturbed by them.  Mr. Carrington, in his

9    opposition, makes a point of reminding me of the seriousness of

10   the allegations and of expressing a concern in this me-too era

11   that if I were to do as defense counsel and defendants have

12   requested, that I would be silencing a victim of egregious

13   sexual assault.  I do agree that the Court exists as a place

14   for protection of victims of crimes, but I have a larger

15   mandate that extends beyond any one litigation, of any one

16   plaintiff, to ensure that this Court is not used for the

17   perpetration of fraud.

18          And so I'll never know how much of Mr. Carrington's

19   complaint was true and how much wasn't, but I do know that in

20   the hopes of bringing this complaint and prosecuting it in this

21   court, he engaged in a course of conduct that is itself

22   egregious, and that goes against everything that I have and I

23   have to preserve as a judge.  And so recognizing, and with a

24   measure of regret, that I'll never get to know the merits of

25   these allegations, I believe that my only option, and I'm very

**Exhibit C-49**

JABKCARC

1    comfortable with this option, is to dismiss this case with

2    prejudice, to impose costs, and to consider, but today I'm

3    rejecting, the request of a referral to the United States

4    Attorney's Office.

5            Now, I'm going to ask defense counsel just something

6    very candidly, because that's the kind of judge I am:  Do you

7    really think it's worth it to submit -- it will take you time

8    to gather together the fees, and expenses, and the submissions

9    regarding costs.  I do not know that you will ever see this

10   money.  You have, on one level, what you wanted, which was the

11   dismissal of this action with prejudice.

12           Mr. Stein, do you still wish to seek costs?

13           MR. STEIN:  Yes, your Honor, we do.  My major concern

14   here, your Honor, is that I need a deterrent, as many

15   deterrents as possible, to possibly convince Mr. Carrington not

16   to carry on the fraudulent conduct which he has in the past.  I

17   think it's important that he see as many negative repercussions

18   from his conduct as possible, so that it will deter him from

19   continuing to take such action.

20           As you know, according to his letter, he has now gone

21   to the police department in Los Angeles and Beverly Hills in

22   order to register complaints against Mr. Graden and myself, and

23   so I'm going to have to be dealing with that, probably,

24   although no enforcement agency has contacted us, and we've been

25   unable to determine from those agencies whether he, in fact,

**Exhibit C-50**

JABKCARC

1    went to them or what the result of that was.  But I think we

2    have to continue to pile on -- and I mean this in the most

3    respectful way -- every deterrent conceivable in order to

4    prevent this individual from continuing his fraudulent conduct.

5    His allegations -- I heard the Court say you can't know the

6    truth of those allegations because you can't get to the merits,

7    but based upon the allegations that he's made against numerous

8    celebrities alleging misconduct on their part, sexual

9    encounters with them, attempts to kill people, based upon that,

10   this man will continue to misconduct himself unless there is

11   real deterrence.  I think the dismissal will have some effect.

12   Fortunately, he won't be able to refile in another court and

13   start over again, but I think having the remedy of damages for

14   fees and costs hanging over his head is the only prospect for

15   deterrence in this situation.

16           THE COURT:  All right, sir.

17           Mr. LaVigne, do you have anything to add?  Because I

18   presume your clients are, as well, seeking costs?

19           MR. LaVIGNE:  Yes, your Honor, we want to continue

20   with that portion of the relief and seek attorneys' fees.

21           THE COURT:  All right.

22           Mr. Stein has given me quite a detailed explanation as

23   to why he thinks it's appropriate.  Is there anything you wish

24   to add to that, or do you just wish to echo what he has said?

25           MR. LaVIGNE:  Your Honor, I'll echo what I said

**Exhibit C-51**

JABKCARC

1    earlier about the egregiousnesses of the conduct, how that

2    warrants sanctions.  We also don't know what -- I don't know

3    what Mr. Carrington's financial state is, but regardless, based

4    on the conduct itself and us meeting the standard, we want to

5    proceed with that.

6              THE COURT:  Okay.

7              Mr. Hwang?

8              MR. HWANG:  Yes, your Honor, we certainly appreciate

9    the finding of liability on Mr. Carrington's part as to the

10   attorneys' fees incurred by defendants.  I certainly have to

11   speak to my clients about whether it's worth the expense of

12   putting together a cost submission, but after speaking with

13   them, we'll make a determination as to whether it makes sense

14   to make such a filing.

15             THE COURT:  Thank you, sir.

16             My expectation -- you're welcome to sit down -- is

17   that I would use the standards that I would use in fee-shifting

18   cases.  Some people call it incorrectly lodestar, but it is the

19   number of reasonable hours expended and reasonable rates.  Now,

20   I'm telling you this because, for some of you, what you may

21   consider a reasonable rate may be something that I might not

22   consider a reasonable rate, but it may be as well that there

23   were a number of people involved in it because of the

24   complexity of the issues and the number of folks who had to get

25   involved on an expedited basis to recognize what was going on

**Exhibit C-52**

JABKCARC

1  with the documents.

2          I will take seriously anything that you say to me and

3  submit to me, but I do want you to know that reasonable rates

4  and reasonable number of hours are things I will take very

5  seriously.

6          I want to give you, especially because Mr. Hwang is

7  going to be thinking about this as well, an adequate amount of

8  time to give me a submission, and I don't, candidly, know what

9  that is for you.  My thought was December 2nd, because I think

10  that that's enough time, but you all will have to tell me if,

11  for example, you're going to be on trial, as I am, for the

12  entire month of November, or if there is something else that

13  makes this date impracticable.

14          Mr. Hwang, I'm going to begin with you.  Does that

15  work for you, sir?

16          MR. HWANG:  Absolutely, your Honor.

17          THE COURT:  All right.

18          Would you be taking the position that the costs of

19  putting together the submission are, as well, recoverable?

20          MR. HWANG:  Absolutely, your Honor.

21          And to your Honor's question earlier, I would say --

22  and I think this is true for pretty much all defense counsel --

23  that the substantial bulk, and majority, and perhaps nearly all

24  of the expenses incurred in this action were in connection with

25  proving fabrication of the emails.

**Exhibit C-53**

JABKCARC

1          THE COURT:  Because we never -- you never -- let me

2   say this correctly.  I never permitted you to file an answer or

3   move to dismiss?

4          MR. HWANG:  Correct, your Honor.

5          And, of course, that remains to be seen with the

6   submissions that we may make by December.

7          THE COURT:  Understood, sir.  I thank you.

8          Mr. LaVigne, does that date work for you and your

9   colleagues?

10          MR. LaVIGNE:  Yes, your Honor.

11          THE COURT:  Mr. Stein, does that date work for you and

12   your colleagues?

13          MR. STEIN:  Yes, your Honor.

14          THE COURT:  All right.

15          I believe, because I've kept you here for an hour and

16   a half, that I've addressed everything that we set out to

17   address, but if there is an issue that lingers, I'd like to

18   know what it is.  It is my present intention to issue an order

19   later today that indicates that for the reasons set forth on

20   the record, I am dismissing the complaint with prejudice; I

21   will entertain applications for costs and expenses, to be filed

22   on this date; and that I am denying at this time the

23   application for a criminal referral to the United States

24   Attorney's Office.

25          I imagine, because I know who's in front of me, that

**Exhibit C-54**

JABKCARC

1    someone's going to get a transcript of this, and if and when

2    you do, I would ask you to send it to Mr. Carrington.  He's not

3    on the docket.  He doesn't get this otherwise.  Will one of you

4    commit to me today that you will get the transcript and send it

5    to him at my request?

6            MR. LaVIGNE:  I will.

7            THE COURT:  Thank you, Mr. LaVigne.  Then that is

8    fine.

9            Is there anything else we should be addressing today?

10   Mr. Hwang?

11           MR. HWANG:  Nothing from us, your Honor.

12           THE COURT:  Thank you, sir.

13           Mr. Stein?

14           MR. STEIN:  Only, your Honor, if there's anything we

15   can do to help the Court make its decision regarding reference

16   to the U.S. Attorney's Office, we'd be delighted to do so.

17           THE COURT:  I'm sure, sir.  I have the information

18   that I need.

19           Let me just ask this question:  Which office were you

20   thinking, Central District of California or Southern District

21   of New York?

22           MR. STEIN:  Southern District of New York.

23           MR. LaVIGNE:  Southern District of New York.

24           THE COURT:  Based on the fabrication?

25           MR. STEIN:  The fabrication, yes, your Honor.

**Exhibit C-55**

JABKCARC

1          THE COURT:  Understood.  All right.

2          I have the material I need.  I thank you, sir.

3          MR. STEIN:  Thank you, your Honor.

4          THE COURT:  Mr. LaVigne, is there anything else from

5    your colleagues?

6          MR. LaVIGNE:  No, your Honor.

7          THE COURT:  All right.

8          Will your associate get to speak next time?

9          MR. LaVIGNE:  I think he'd love to.

10         THE COURT:  All right.

11         MR. DEATON:  Absolutely, your Honor.

12         THE COURT:  And you are who?

13         MR. LaVIGNE:  We are on the record.

14         THE COURT:  You are Mister?

15         MR. DEATON:  Mr. Deaton.

16         THE COURT:  Yes, I saw Mr. LaVigne sharing glances

17   with you during my submission, so it must have been that you

18   did very excellent work on the written submission that I must

19   have been impressed by, so there.  Take the credit for it now,

20   sir.

21         MR. DEATON:  Sure, sure, absolutely.  Thanks.

22         THE COURT:  Thank you very much.

23         I thank you, all, for sitting as I gave the oral

24   opinion.  I'm sure you would have preferred a written one, but

25   it was easier for me.

**Exhibit C-56**

JABKCARC

1            We are adjourned.   Thank you.

2            COUNSEL:   Thank you, your Honor.

3                            *  *  *

**Exhibit C-57**