EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROVIER CARRINGTON,

                              Plaintiff,

                    -v.-

BRIAN GRADEN; BRIAN GRADEN MEDIA, LLC;
VIACOM, INC., VIACOM INTERNATIONAL,
INC.; PARAMOUNT PICTURES CORPORATION;
BRAD GREY; BRAD GREY ESTATE; and BRAD
ALAN GREY TRUST,

                              Defendants.

18 Civ. 4609 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

    In an Order issued on October 11, 2019, this Court granted the

motion — jointly filed by Defendants Brian Graden, Brian Graden Media,

LLC (together, the "Graden Defendants"), Viacom Inc., Viacom International

Inc., Paramount Pictures Corporation (together, the "Viacom Defendants"),

Brad Grey, the Brad Grey Estate, and the Brad Alan Grey Trust (together,

the "Grey Defendants," and with the Graden and Viacom Defendants,

"Defendants") — for terminating sanctions with costs against Plaintiff Rovier

Carrington.  As part of that Order, the Court offered Defendants an

opportunity to petition for attorneys' fees and costs, and counsel for each

group of Defendants has filed a petition, seeking in the aggregate more than

$700,000 in attorneys' fees and $47,000 in costs.  For the reasons set forth

in the remainder of this Opinion, the Court grants Defendants' motions in

part and awards $253,996.65 in attorneys' fees and $39,815.05 in costs to

the Graden Defendants; $178,623.00 in attorneys' fees and $2,726.50 in

**Exhibit E-1**

Case 2:20-cv-09825-VAP-JC    Document 33-6    Filed 12/22/20    Page 3 of 41    Page ID
#:934
Case 1:18-cv-04609-KPF    Document 184    Filed 09/28/20    Page 2 of 40

costs to the Viacom Defendants; and $128,709.55 in attorneys' fees and

$4,123.34 in costs to the Grey Defendants.

**BACKGROUND**[1]

**A.    The Complaint**

Plaintiff alleged sexual offenses, unfair competition, fraud,

misappropriation, federal antitrust violations, and New York State and City

labor law violations by Defendants occurring at various times over a period

of years.  (Am. Compl. ¶¶ 153-275).  But to summarize the pleadings

without a nod to the copious factual allegations is to divest Plaintiff's

narrative of its thrall.  Plaintiff, who discloses early on in his complaint that

he is "related to Hollywood royalty," is a writer, actor, and producer of

television shows.  (*Id.* at ¶ 22).  In September and October 2010, Plaintiff

worked on a reality television show entitled "The Life of a Trendsetter."  (*Id.*

at ¶ 10).

According to Plaintiff, in 2010 and 2011, he allegedly had several

sexual encounters with Brad Grey, the late Chairman and CEO of

---

[1]    The facts regarding the underlying action are drawn from the Amended Complaint
("Am. Compl." (Dkt. #40)) and its attached exhibits ("Exhibits" (Dkt. #40-1)).
However, the instant motion relates primarily to Plaintiff's conduct in this litigation.
As such, the Court draws facts regarding the procedural history from the record in
this case, including the Memorandum of Law in Support of Defendants' Joint Motion
for Sanctions Against Plaintiff ("Def. Sanctions Mem." (Dkt. #130)); the Declaration
of Stanton L. Stein submitted in connection with the underlying sanctions motion
("Stein Decl." (Dkt. #131)) and its supporting exhibits; the transcript of the
February 7, 2019 telephone conference ("Feb. 7, 2019 Tr."); and the transcript of the
October 11, 2019 hearing ("Oct. 11, 2019 Tr.").

For ease of reference, the Court refers to the Viacom Defendants' memorandum in
support of attorneys' fees and expenses as "Viacom Fee Mem." (Dkt. #152); the
Declaration of Christopher LaVigne as "LaVigne Fee Decl." (Dkt. #153); the
Declaration of Wook Hwang on behalf of the Grey Defendants as "Hwang Fee Decl."
(Dkt. #155); the Graden Defendants' memorandum in support of attorneys' fees and
expenses as "Graden Fee Mem." (Dkt. #157); the Declaration of Stanton L. Stein as
"Stein Fee Decl." (Dkt. #158); and the Supplemental Letter of Stanton L. Stein as
"Stein Supp. Ltr." (Dkt. #183).

**Exhibit E-2**

Paramount Pictures.  (Am. Compl. ¶¶ 32-62).  In consequence, on or about June 9, 2011, Viacom purportedly asked Plaintiff to sign a non-disclosure agreement and made an offer to give him "an envelope filled with cash."  (*Id.* at ¶¶ 63-64).  When Plaintiff refused, Viacom and Paramount terminated his business relationship and "blacklisted" him from the entertainment industry for the next three years.  (*Id.* at ¶¶ 67-69).

In an effort to "move forward with his reality show, and come off Viacom's banned list," Plaintiff agreed in September 2014 to engage in a sexual relationship with Brad Graden, former President of Programming at MTV Networks.  (Am. Compl. ¶ 87).  Plaintiff asserts that, during this relationship, Mr. Graden engaged in repeated acts of sexual misconduct, including drugging Plaintiff's drink on at least one occasion.  (*Id.* at ¶¶ 85-129).  Plaintiff further alleges that Mr. Graden deceived and sexually exploited him with false promises of producing Plaintiff's show, and then misappropriated Plaintiff's concept of a "reality dating show."  (*Id.* at ¶¶ 169-72; *see also id.* at ¶¶ 130-33, 137-38).

## B.    Procedural History

The procedural history of this case is, if possible, more interesting than the substance of Plaintiff's allegations.  As such, and even though the instant motions are unopposed by Plaintiff, the Court provides a detailed procedural history herein.

### 1.    Initial Concerns Regarding the Authenticity of Evidence

On May 2, 2018, Plaintiff commenced this action by filing a counseled complaint (the "Complaint") in New York State Supreme Court, New York County.  (Dkt. #8).  The following day, counsel for the Graden Defendants

**Exhibit E-3**

advised Plaintiff's then-counsel, the Landau Group, that certain documents referenced in the Complaint appeared "highly questionable and inaccurate." (*See* Stein Decl. ¶ 2). Defendants then sent notices for preservation of documents and electronically stored information to Plaintiff in care of his counsel on May 21, 2018, May 22, 2018, June 20, 2018, and June 21, 2018. (Stein Decl., Ex. A and B).

The case was removed to this Court by the Viacom Defendants on May 24, 2018. (Dkt. #1, 8). On June 14, 2018, Defendants filed three pre-motion letters (one per defense group) regarding anticipated motions to dismiss. (Dkt. #28, 31, 34). In these letters, Defendants reiterated their concerns about the accuracy of Plaintiff's allegations and the authenticity of his evidence, citing specific concerns about an email — dated October 24, 2017 — supposedly between Plaintiff and non-party Darren Stein. (*See, e.g.,* Dkt. #31).

Plaintiff responded by filing an Amended Complaint on June 20, 2018, that attached 11 exhibits. (*See generally* Am. Compl.). The Exhibits comprised approximately 40 emails, allegedly exchanged with Brian Graden, Darren Stein, and non-party Reno Logan. Of specific relevance to the instant motions are the communications attached as: (i) Exhibits 2 through 6, which are purported communications with Reno Logan through Plaintiff's trendsetterrovheir@gmail.com email account (the "Trendsetter Account"); (ii) Exhibits 8 and 9, which are purported communications with Brian Graden through Plaintiff's roviercarrington@gmail.com email account (the "Gmail Account"); and (iii) Exhibits 10 and 11, which are purported communications with Brian Graden and Darren Stein through Plaintiff's

**Exhibit E-4**

Case 2:20-cv-09825-VAP-JC     Document 33-6     Filed 12/22/20     Page 6 of 41     Page ID
#:937
Case 1:18-cv-04609-KPF     Document 184     Filed 09/28/20     Page 5 of 40

rovier@thecarringtondiaries.com email account (the "Carrington Diaries Account").[2]  All of the communications were attached to the Amended Complaint as forwarded emails to the Landau Group, rather than as stand-alone, native-format email communications.  (Def. Sanctions Mem. 4).

While Defendants sought to obtain as much information as possible concerning the provenance of Plaintiff's exhibits, Plaintiff (with or without his counsel's knowledge) was taking proactive steps to destroy this same information.  To that end, on June 21, 2018, one day after filing the Amended Complaint and one month after receiving the first preservation notice, Plaintiff deactivated the Trendsetter Account.  (Def. Sanctions Mem. 4; Stein Decl., Ex. A and B).  In the same month, Plaintiff discarded his iPhone 7, which he later represented to the Court to be the *only* device he used to transmit the emails contained as Exhibits 2 through 11 of the Amended Complaint.  (Feb. 7, 2019 Tr. 11:11-16; *see also* Def. Sanctions Mem. 4).

### 2.    The Court Orders Limited Discovery Concerning the Authenticity of Communications

As part of their pre-motion submissions to the Court on July 2, 2018, Defendants attached evidence indicating that certain of the Exhibits had been fabricated.  (Dkt. # 48, 49, 50; *see also* Dkt. #46, 57).  Additionally, on July 23, 2018, counsel for the Graden Defendants submitted declarations from Darren Stein and Reno Logan, in which the declarants asserted that the communications purportedly sent to or by them had been falsified.  (*See* Hwang Fee Decl. ¶ 9).

---

[2]     Exhibit 7 included purported communications between Plaintiff and an employee of HBO, which communications Plaintiff was unable to produce in native format.

**Exhibit E-5**

On July 24, 2018, the Court issued an Order finding that "Defendants [had] presented sufficient evidence to warrant immediate discovery limited to the authenticity of various emails attached as exhibits to the Amended Complaint," and directed Defendants to file a proposed order providing for such discovery. (Dkt. #58). In accordance with the Court's Order, Defendants filed a proposed order on July 31, 2018, which if granted would have permitted limited discovery into the authenticity of the disputed exhibits. (Dkt. #59). Plaintiff requested that the Court issue an alternative version of the proposed order. (Dkt. #60-62). Defendants opposed Plaintiff's alternative version, principally because the changes Plaintiff suggested would allow for the production of communications in their forwarded format rather than in their native format, thereby undermining Defendants' investigation into the origins of these documents. (Dkt. #63). On August 7, 2018, the Court issued an Order for limited discovery concerning the authenticity of communications, using the form Defendants had submitted, without prejudice to or limiting any existing duty to preserve relevant materials that had arisen in connection with this action. (Dkt. #64). Plaintiff and Defendants were both ordered immediately to preserve the originals and copies of each and every document constituting or containing any portion of the communications attached as: (i) Exhibits 2 through 11 to the Amended Complaint; (ii) Exhibit A to the Declaration of Darren Stein (Dkt. #56-2); and (iii) Exhibits 1 through 4 to the Declaration of James Kelshaw (Dkt. #56-3) (collectively, the "At-Issue Communications").

Pursuant to Court orders dated August 7 and August 22, 2018, FTI Consulting was selected as the neutral e-discovery vendor to search

**Exhibit E-6**

Plaintiff's relevant email accounts in order to locate and produce native-format versions of the At-Issue Communications. (Dkt. #64, 70; *see also* Stein Decl., Ex. L). Despite being provided access to Plaintiff's Carrington Diaries and Gmail Accounts on or about August 24, 2018, FTI found no native versions of any of the 40 At-Issue Communications in those accounts, other than an October 9, 2017 exchange between Plaintiff and Darren Stein, the validity of which was not contested by Defendants. (Stein Decl., Ex. I; *see also* Def. Sanctions Mem. 6 (noting that the October 9, 2017 exchange "is the *only* one of the At-Issue Communications as to which authenticity is not in dispute. None of the other 39 At-Issue Communications were found to exist in Plaintiff's email accounts in native form.")).[3] Notably, although the FTI investigation found none of the disputed emails in its native format, it did find the forwarded versions of the emails that Plaintiff had sent to the Landau Group between February and May 2018 for inclusion in Plaintiff's pleadings. (Def. Sanctions Mem. 11).[4]

On September 17, 2018, Plaintiff claimed that the Gmail Account and Carrington Diaries Account had been subject to a "hack" on May 24, 2018. (Dkt. #76). As Defendants noted in their Joint Motion for Sanctions, neither Plaintiff nor his counsel raised the specter of this highly localized hack at any time before FTI engaged in its search for native-format versions of the

---

[3] FTI was not able to access Plaintiff's Trendsetter Account. (Dkt #131, Ex. L). The Landau Group advised FTI that the Trendsetter Account had been "deactivated for years." (*Id.*, Ex. H).

[4] Months later, Plaintiff responded to the FTI investigation by providing an affidavit from his own expert, who in February 2019 stated that "[a]s relayed to" him, the Trendsetter Account had not been accessed since 2015 and its contents had been transferred to the Carrington Diaries Account in October 2017. (Stein Decl., Ex. N at ¶ 13). In point of fact, no native-format versions of the emails purportedly sent from the Trendsetter Account were found in the Carrington Diaries Account.

**Exhibit E-7**

Case 2:20-cv-09825-VAP-JC    Document 33-6    Filed 12/22/20    Page 9 of 41    Page ID
#:940
Case 1:18-cv-04609-KPF    Document 184    Filed 09/28/20    Page 8 of 40

At-Issue Communications.  (Def. Sanctions Mem. 7).  Moreover, Defendants

observed that an alleged hack could not explain why one valid email from

Darren Stein still existed in its original form, or why forwarded emails to the

Landau Group remained intact.  (*Id.*).

On September 24, 2018, the Landau Group moved to withdraw as

counsel for Plaintiff.  (Dkt. #78).  In response, Defendants submitted a letter

on September 26, 2018, voicing their concerns that the withdrawal of

Plaintiff's counsel might affect Plaintiff's compliance with the Court's

discovery directives.  (Dkt. #80).  The Court shared Defendants' suspicions

and accordingly permitted Defendants to participate in an initial portion of

the telephone conference scheduled for October 5, 2018, with the Landau

Group and Plaintiff.  (*Id.*).  Pursuant to discussions at the telephonic

conference, the Court granted the Landau Group's motion to withdraw as

counsel.  (Dkt. #82).  Thereafter, Plaintiff requested to proceed *pro se*, and

the Court granted his request on October 16, 2018.  (Dkt. #83).

### 3.    Defendants' Motion for Additional Court-Ordered Discovery

On October 2, 2018, during the pendency of the Landau Group's

motion for withdrawal, Defendants jointly sent Plaintiff a letter providing

notice of their intent to move for sanctions against Plaintiff and the Landau

Group, pursuant to Rule 11 of the Federal Rules of Civil Procedure, unless

the Amended Complaint was withdrawn within 21 days.  (Stein Decl.,

Ex. M).  Defendants' authenticity issues were then put on hold between

October 2018 and January 2019 for several reasons, including: (i) the

aforementioned motion to withdraw (Dkt. #78); (ii) Plaintiff's motion to

transfer venue to the Supreme Court of California, County of Los Angeles,

**Exhibit E-8**

which motion was later withdrawn (Dkt. #85, 93); (iii) Plaintiff's refusal to accept service at his home address (Dkt. #89); and (iv) Plaintiff's efforts to secure extensions of time to file a reply submission in which he could expand upon his arguments for transfer (Dkt. #91).

Once those issues were resolved, Plaintiff requested to dismiss the case without prejudice on January 18, 2019. (Dkt. #95). The Court addressed Plaintiff's request, as well as Defendants' outstanding discovery requests regarding the authenticity of the At-Issue Communications, during a telephonic conference held on February 7, 2019. (Dkt. #99 (scheduling endorsement), 110 (transcript)). During the conference, and in light of FTI's documented inability to locate the At-Issue Communications, the Court permitted Defendants to serve subpoenas on the Internet Service Providers ("ISPs") for Plaintiff's email accounts — Google LLC ("Google"), Microsoft Corporation ("Microsoft"), and GoDaddy.com, LLC ("GoDaddy") — to obtain subscriber and non-subscriber information. (Dkt. #102). Additionally, the Court ordered Plaintiff to turn over his iPhone X to FTI for mirror-imaging, in order to locate evidence pertaining to the At-Issue Communications. (*Id.*).[5]

The ISP subpoena returns revealed that Plaintiff had fabricated, destroyed, and misrepresented evidence. To begin, Google's subpoena response revealed that Plaintiff's Trendsetter Account had in fact been deactivated on June 19, 2018, during the pendency of this litigation. (Stein Decl., Ex. P; *see also* Def. Sanctions Mem. 9). Thus, Plaintiff's repeated

---

[5]    The Court had previously ordered Plaintiff to turn over his iPhone X on August 7 and August 22, 2018. (Dkt. #64, 70).

**Exhibit E-9**

Case 2:20-cv-09825-VAP-JC    Document 33-6    Filed 12/22/20    Page 11 of 41    Page
ID #:942
Case 1:18-cv-04609-KPF    Document 184    Filed 09/28/20    Page 10 of 40

representations that the Trendsetter Account had been deactivated "for years" were false.  (Stein Decl., Ex. H; Sep. 18, 2018 Tr. 38:11-14).  As Defendants note (Def. Sanctions Mem. 9), the timing is critical because the Trendsetter Account was deactivated one day after Plaintiff filed an Amended Complaint that attached emails allegedly sent from that Account.  By consequence then, if not by design, Plaintiff's false statements regarding the date of deactivation foreclosed the recovery of confirmatory information from the Trendsetter Account.  (*Id.*).

The GoDaddy subpoena returns were even more troubling.  They indicated that the Carrington Diaries Account had been closed and deleted by Plaintiff on or about September 8, 2018, one month after the Court's order to preserve evidence.  (Oct. 11, 2019 Tr. 38:12-17).[6]  Additionally, the GoDaddy production revealed that Plaintiff had specifically reached out to GoDaddy support personnel in order to confirm that a subpoena to that ISP would not return information about emails within a deleted account.  (*Id.* at 38:18-20).  Further, throughout 2018, the password of the Carrington Diaries Account was changed repeatedly, undermining Plaintiff's claims of hacking by or on behalf of any of the Defendants.  (*Id.* at 38:20-24).

As for the Gmail Account, FTI's search process "did not identify any original instances of the At-Issue Communications."  (Stein Decl., Ex. Q). Reasoning from this discovery, Defendants concluded that "Plaintiff's lone active and relevant email account has no native versions of the At-Issue

---

[6]    The Court notes that the GoDaddy subpoena returns were not filed on the public record.  (Dkt. #130 at 10; Dkt. #131, Ex. R and S).  Therefore, the brief discussion in the text is drawn from evidence cited during the October 11, 2019 hearing.

**Exhibit E-10**

Case 2:20-cv-09825-VAP-JC   Document 33-6   Filed 12/22/20   Page 12 of 41   Page
ID #:943
Case 1:18-cv-04609-KPF   Document 184   Filed 09/28/20   Page 11 of 40

Communications," and hypothesized that "Plaintiff deleted the entire

contents of the two other accounts from which these Communications

purportedly came." (Def. Sanctions Mem. 11).

FTI was able to conduct a forensic analysis of Plaintiff's iPhone X.

(Stein Decl., Ex. O).  The iPhone X had previously been understood by Court

and defense counsel as the means by which Plaintiff transmitted the At-

Issue Communications to counsel.  (*See* Dkt. #76).  However, at the

February 7, 2019 conference, Plaintiff announced that "it appears [Plaintiff's

former counsel, Kevin Landau] misrepresented to the Court and to the

defendants what iPhone [Plaintiff] used for forwarding the At-Issue

Communications." (Stein Decl., Ex. N at 4).  Instead, Plaintiff claimed that

he had sent the At-Issue Communications from an iPhone 7, long since

discarded, and that he did not have any of his previous email accounts

linked to his current iPhone X.  (Feb. 7, 2019 Tr. 11:11-16; *id.* at 13:1-7).[7]

### 4.    Defendants' Motion for Terminating Sanctions and Fees

On May 13, 2019, Defendants moved for terminating sanctions,

attorneys' fees, and costs against Plaintiff pursuant to Federal Rules of Civil

Procedure 11(c) and 37(b)(2)(A) and the Court's inherent powers, as well as

referral of the action to the United States Attorney's Office for the Southern

---

[7]     This clarification was not supported by the record.  As Defendants pointed out to the
Court, Apple did not release the iPhone 7 until 2016, which postdates many of the
At-Issue Communications.  (Def. Sanctions Mem. 12-13).  Further, contrary to
Plaintiff's representations while proceeding *pro se*, FTI found that "Mr. Carrington's
data [multiple Apple ID accounts, including the Gmail Account and Trendsetter
Account] *was* migrated from his previous iPhone." (Stein Decl., Ex. O (emphasis
added)).  And yet despite having migrated these accounts from his iPhone 7, "[n]o
instances of the At-Issue Communications were identified" on the iPhone X.  (*Id.*).

**Exhibit E-11**

District of New York for criminal prosecution. (Dkt. #123).[8]  In support of this serious request, Defendants asserted that Plaintiff had (i) committed fraud on the Court in fabricating the "At-Issue Communications"; (ii) deliberately destroyed and compromised evidence; (iii) violated the Court's August 7, 2018 Order directing that all parties preserve the At-Issue Communications; and (iv) improperly and in bad faith filed this lawsuit and engaged in misconduct and false statements throughout the pendency of the litigation. (*See generally* Def. Sanctions Mem.).

Plaintiff responded on May 20, 2019, by asserting a number of claims against Defendants and their attorneys, including violations of Court orders, professional misconduct, and criminal behavior. (Dkt. #127).[9]  Plaintiff further requested several forms of relief, from an order disbarring Defendants' attorneys to the revocation of the Court's Order setting a briefing schedule on Defendants' motion for sanctions and ordering Plaintiff to appear for a hearing on this motion. (*Id.*; *see also* Dkt. #116).  On May 21, 2019, the Court issued an order denying Plaintiff's requests for relief, explaining in relevant part that "[h]aving reviewed the letter and the docket, the Court does not see any evidence of misconduct by Defendants'

---

[8]     Defendants additionally allege that the Landau Group may have helped, assisted, or perpetuated misconduct by Plaintiff, although they did not initially seek sanctions against the Landau Group. (*See* Def. Sanctions Mem. 8). The Court makes no findings on this issue. It notes, however, that the Landau Group asserted that the Trendsetter account had been deactivated years before the filing of this action on August 24, 2018 (*id.*; *see also* Stein Decl., Ex. H); raised a series of unavailing challenges to the neutral forensic examiner (*see* Dkt. #69); and, ultimately, failed to secure any of Plaintiff's iPhones for mirror-imaging (*see* Dkt. #76).

[9]     Plaintiff first submitted a letter via email on May 20, 2019. After the Court reminded Plaintiff that he was required to mail any documents to the Court's *Pro Se* Intake Unit (*see also* Dkt. #91, 100), Plaintiff filed his letter with the Court on May 22, 2019 (Dkt. #127).

**Exhibit E-12**

attorneys." (Dkt. #126 at 2). In the same order, the Court reminded Plaintiff that he had until June 27, 2019, to provide further opposition to Defendants' motion for sanctions. (*Id.*). Plaintiff did not file a separate document before that date; the Court thereby accepted Plaintiff's May 22, 2019 letter as his only opposition brief. (*Id.*).

On July 23, 2019, the Court received an email communication from Plaintiff, copied to Defendants' attorneys. (*See* Dkt. #139). Plaintiff submitted this email two days before a hearing scheduled for July 25, 2019, at which he had been ordered to appear personally; of note, the Court had scheduled the hearing on April 12, 2019. (*Id.*; *see* Dkt. #116). While the Court is generally disinclined to review submissions made via email, it noted that Plaintiff was claiming that medical issues prevented him from flying to the hearing. (Dkt. #139). Because the Court had scheduled the July 23, 2019 hearing for the express purpose of affording the defense and the Court an opportunity to question Plaintiff, the latter's personal appearance was required. (*Id.*). Accordingly, the July 25, 2019 hearing was adjourned *sine die.* (*Id.*).[10]

On August 26, 2019, the Court received notification from Plaintiff that (i) he was medically cleared to fly and (ii) an attorney would be entering a notice of appearance on his behalf presently. (Dkt. #143). In response, the Court scheduled a hearing sufficiently far off that Plaintiff could resolve his

---

[10]    The Court considered both the content and the timing of Plaintiff's July 23, 2019 submission to be inadequate, and ordered Plaintiff to submit weekly medical reports for *ex parte* review. (Dkt. #139). Despite that order, Plaintiff submitted only one medical report, dated July 29, 2019. (Dkt. #141; *see also* Dkt. #142 (order discussing Plaintiff's failure to comply)).

**Exhibit E-13**

representation issues and prepare for the hearing. (Dkt. #144). Specifically, it ordered Plaintiff to appear for an in-person hearing on Defendants' motion for sanctions on October 11, 2019. The Court additionally informed Plaintiff that he would "be required to appear in person for this hearing whether or not counsel has appeared before that time. The Court will not consider further requests from Plaintiff for extensions or adjournment of this date." (*Id.*).

The day before the hearing, on October 10, 2019, the Court received a letter from Greg Loomis, indicating that he had been retained to represent Plaintiff and seeking an adjournment. (Dkt. #146).[11] Cognizant of Plaintiff's previous efforts at delay, the Court denied Mr. Loomis' application to adjourn the hearing within 10 minutes of its receipt; it permitted Mr. Loomis to appear *pro hac vice* at the hearing; and it required Plaintiff to appear in person. (*Id.*; Oct. 11, 2019 Tr. 3:1-7). Despite the Court's prior orders, neither Plaintiff nor any individual purporting to represent him appeared before the Court at the sanctions hearing held on October 11, 2019. (Dkt. #147; Oct. 11, 2019 Tr. 3:11-18).[12]

Although the Court had warned Plaintiff that his failure to appear could result in the Court deciding Defendants' motion unopposed, the Court in fact reviewed and considered all the submissions that Plaintiff had provided in opposition to Defendants' sanctions motion. (Dkt. #147; *see* Dkt. #127, 136, 137). The Court found that even if, as Plaintiff alleged,

---

[11]  Mr. Loomis's letter was dated October 9, 2019, but was emailed to and received by the Court the following day.

[12]  Neither Mr. Loomis nor any other attorney filed a notice of appearance as Plaintiff's counsel during this period.

**Exhibit E-14**

Case 2:20-cv-09825-VAP-JC   Document 33-6   Filed 12/22/20   Page 16 of 41   Page
ID #:947
Case 1:18-cv-04609-KPF   Document 184   Filed 09/28/20   Page 15 of 40

some portion of his claims could survive if the At-Issue Communications
were to be excluded, the fact and complexity of his fabrication efforts
necessitated dismissal.  (Oct. 11, 2019 Tr. 45:1-3; *see* Stein Decl., Ex. N at
4).  It then detailed, at long length, the tortuous investigation in which it
and defense counsel had been involved for nearly 16 months.  (Oct. 11,
2019 Tr. 34:17-41:13).

The Court next considered the legal issues inhering in Defendants'
motion for sanctions.  (Oct. 11, 2019 Tr. 41:14-44:7).  Ultimately, and with a
measure of regret, the Court concluded that the only proper sanction was
termination of Plaintiff's complaint with prejudice:

> Mr. Carrington has never provided an explanation for
> how the forwards exist in the accounts for emails
> that were sent — let me say that more precisely.  The
> explanation he has not provided is an explanation of
> how the forwards exist in the Carrington Diaries
> account for emails that were sent by the Trendsetter
> account when there is no evidence of the emails
> being sent from the Trendsetter account to the
> Carrington Diaries account.  It makes no sense to me.
>
> I also do not understand what possessed Mr.
> Carrington to turn over his iPhone in the middle of
> this litigation, in the middle of this dispute about the
> authenticity of these emails.  All that I can conclude
> is that in every instance where the plaintiff appears,
> again, to use the vernacular, to be caught, he
> attempts to argue something new, that these issues
> are the result of someone else's doing, that they are
> the result of the hacking by one of the defendants or
> by defense counsel, and it's all just one large
> conspiracy.  I have difficulty, and indeed I cannot,
> credit that.  I have enough sworn statements and
> enough exploration of what I do have to suggest that
> this is not the case.
>
> And as I've mentioned, the purported hack does not
> explain why Mr. Graden has similar-looking emails
> that match in part, but not in whole, the at-issue
> communications.

**Exhibit E-15**

Case 2:20-cv-09825-VAP-JC    Document 33-6    Filed 12/22/20    Page 17 of 41    Page
ID #:948
Case 1:18-cv-04609-KPF    Document 184    Filed 09/28/20    Page 16 of 40

Instead, there is an explanation from plaintiff, but I just don't credit it. It's another coverup involving Mr. Graden and Mr. Stein. Every time the defense has produced compelling evidence of spoliation, of fabrication, of obstruction of the litigation in this case, the plaintiff has provided an explanation. And I believe that going forward, every time it happens, he will provide yet another explanation. They are of increasingly tenuous credibility, and they can't explain what I have in the record.

For these reasons, I can find, even under a clear and convincing evidence standard, that Mr. Carrington has sentiently set in motion some unconscionable scheme, calculated to interfere with the judicial system's ability impartially to adjudicate the action, referring to the *Scholastic* decision I cited earlier to the parties.

(*Id.* at 47:18-49:5).[13]  The Court dismissed Plaintiff's claims with prejudice against all Defendants.  (Dkt. #147).  It declined, however, to issue a criminal referral to the United States Attorney's Office for the Southern District of New York.  (*Id.*).

---

[13]     *See also* Oct. 11, 2019 Tr. 45:16-46:12:

But this is not merely, to use Mr. LaVigne's expression, doubling down, it's trebling down or quadrupling down, and we could just go on for a while, because at each junction, I'm being told something else.  I don't think I'm being told the truth, and I'm getting further and further away from a resolution of what happened to these emails and what happened to the other emails in these accounts.  So we got to the point where counsel withdrew, and somehow it was counsel's fault.  There was more than one extremely localized hack that only seemed to affect the emails that I care about, and it was not lost on me, and perhaps it was of surprise to Mr. Carrington, that GoDaddy kept a chron file of their communications in which there were discussions that made clear that Mr. Carrington's concern was that there be no trace of these emails.

Given that, there's really not much — whether I had this as a preponderance or a clear and convincing, I have to find, I do find, that these emails were fabricated, and that was bad enough, but the deactivation of the accounts, the efforts undertaken to really foreclose what is necessary discovery in this case, and the stream of lies to me, necessitate the sanctions that I am imposing.

**Exhibit E-16**

The Court permitted Defendants' counsel to submit applications for fees and costs that were fairly traceable to the issue of authenticating At-Issue Communications. (Dkt. #147). On December 2 and 3, 2019, the Court received Defendants' individual motions for fees. (Dkt. #151, 155, 156).[14] Upon receipt of Defendants' motions, the Court provided Plaintiff with an opportunity to respond in opposition by January 6, 2020. (Dkt. #164).

On January 6, 2020, the Court received an *ex parte* communication, sent as an email from Plaintiff to the Court's Chambers inbox, in part to request an extension to the deadline set. (Dkt. #172). However, Plaintiff also made several significant accusations about Defendants and their counsel in his email, and further requested that the email be considered as privileged by the Court. (*Id.*). The Court refused to consider Plaintiff's request on an *ex parte* basis, but offered Plaintiff the opportunity re-file his request on the docket and under seal. (*Id.*). Plaintiff, however, chose not to accept the Court's invitation. (Dkt. #173). Accordingly, the Court ordered that the briefing on Defendants' motion for fees was closed, and the Court now considers the motions unopposed. (*Id.*).

### DISCUSSION

Defendants seek a total of $751,651.19, comprising: (i) $704,986.30 in fees for attorneys and support staff (reflecting $236,653.80 for the work of

---

[14] In connection with the resolution of these motions, the Court requested clarification from the Graden Defendants as to the fees sought. In response, the Court received a supplemental submission from Stanton L. Stein, which submission included as well a final tally of the costs incurred in the preparation of the Graden Defendants' fee petition. (Stein Supp. Ltr. 1-2). The supplemented figures are cited here.

**Exhibit E-17**

Case 2:20-cv-09825-VAP-JC    Document 33-6    Filed 12/22/20    Page 19 of 41    Page
ID #:950
Case 1:18-cv-04609-KPF    Document 184    Filed 09/28/20    Page 18 of 40

Shearman & Sterling LLP; $295,317.50 for Russ August & Kabat; and
$173,015.00 for Loeb & Loeb LLP); and (ii) $46,644.55 in costs (reflecting
$2,726.50 for Shearman & Sterling LLP; $39,815.05 for Russ August &
Kabat; and $4,123.34 for Loeb & Loeb LLP).  (*See generally* LaVigne Fee
Decl.; Hwang Fee Decl.; Stein Fee Decl.; Stein Supp. Ltr. 1-2).  For certain
Defendants, these figures include the fees incurred in litigating their fee
application.  (*Id.*).

## A.    Applicable Law

Federal Rule of Civil Procedure 37 provides that when "a party ... fails
to obey an order to provide or permit discovery ... the court where the action
is pending may issue further just orders."  Fed. R. Civ. P. 37(b)(2)(A).  Such
just orders may include "striking pleadings in whole or in part; ... dismissing
the action or proceeding in whole or in part; [or] rendering a default
judgment against the disobedient party."  *Id.*  Further, "the court *must* order
the disobedient party, the attorney advising that party, or both to pay the
reasonable expenses, including attorney's fees, caused by the failure, unless
the failure was substantially justified or other circumstances make an
award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C) (emphasis added).

A court may also impose sanctions on a party for misconduct in
discovery under its inherent power to manage its own affairs.  *Hawley* v.
*Mphasis Corp.*, 302 F.R.D. 37, 46 (S.D.N.Y. 2014) (explaining that in order to
impose sanctions under its inherent power, a court must find that a plaintiff
has acted in "bad faith, vexatiously, wantonly, or for oppressive reasons");
*see generally Goodyear Tire & Rubber Co.* v. *Haeger*, 137 S. Ct. 1178, 1186-
87 (2017); *Va. Props., LLC* v. *T-Mobile Ne. LLC*, 865 F.3d 110, 114 (2d Cir.

**Exhibit E-18**

2017).  In contrast with Rule 37, a court's inherent power to impose sanctions includes the power to impose "attorney's fees representing *the entire cost* of litigation."  *Shanchun Yu* v. *Diguojiaoyu, Inc.*, No. 18 Civ. 7303 (JMF), 2019 WL 6174204, at *5 (S.D.N.Y. Nov. 20, 2019) (emphasis added) (citing *Chambers* v. *NASCO, Inc.*, 501 U.S. 32, 45 (1991)).

In the instant case, the Court imposed sanctions on Plaintiff pursuant to both Rule 37 and under its inherent powers.  (Dkt. #147; *see also* Dkt. #170).  Absent a showing of substantial justification or injustice, this Court must order Plaintiff to pay the reasonable expenses caused by his sanctionable conduct.  *See Novak* v. *Wolpoff & Abramson LLP*, 536 F.3d 175, 178 (2d Cir. 2008) (per curiam) (declining to hold that "Rule 37(b)(2) expenses are mandatory," but finding that "[t]he use of the word 'shall' certainly suggests that an award of expenses is mandatory unless one of the two exceptions—substantial justification or other circumstances— applies").  In this application, Defendants "bear[ ] the burden of demonstrating that [their] requested fees are reasonable."  *Figueroa* v. *W.M. Barr & Co., Inc.*, No. 18 Civ. 11187 (JGK) (KHP), 2020 WL 2319129, at *2 (S.D.N.Y. May 11, 2020) (quoting *TufAmerica Inc.* v. *Diamond*, No. 12 Civ. 3529 (AJN), 2016 WL 1029553, at *3 (S.D.N.Y. Mar. 9, 2016)), *reconsideration granted in part*, 2016 WL 3866578 (S.D.N.Y. July 12, 2016), *and* 2018 WL 401510 (S.D.N.Y. Jan. 12, 2018)).

Attorneys' fees are awarded by determining the "'presumptively reasonable fee,'" often referred to as the "lodestar."  *Millea* v. *Metro-North R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n* v. *Cty. of Albany*, 522 F.3d 182, 183 (2d Cir.

**Exhibit E-19**

Case 2:20-cv-09825-VAP-JC    Document 33-6    Filed 12/22/20    Page 21 of 41    Page
ID #:952
Case 1:18-cv-04609-KPF    Document 184    Filed 09/28/20    Page 20 of 40

2008)); *see also Perdue* v. *Kenny A. ex rel. Winn*, 559 U.S. 542, 552-53
(2010).  This fee is calculated by multiplying the "reasonable hourly rate and
the reasonable number of hours required by the case." *Millea*, 658 F.3d at
166.  Courts may, only after the initial calculation of the presumptively
reasonable fee, adjust the total when it "does not adequately take into
account a factor that may properly be considered in determining a
reasonable fee." *Lilly* v. *City of New York*, 934 F.3d 222, 230 (2d Cir. 2019)
(citing *Millea*, 658 F.3d at 167).  More fundamentally, the Second Circuit
has recognized that a district court exercises considerable discretion in
awarding attorneys' fees.  *See Millea*, 658 F.3d at 166; *see also Arbor Hill*,
522 F.3d at 190.

When evaluating reasonable hourly rates, courts look at "the rate a
paying client would be willing to pay," and take into account "all case-
specific variables." *Arbor Hill*, 522 F.3d at 189-90.  It is well-settled that "a
reasonable, paying client wishes to spend the minimum necessary to litigate
the case effectively," and that "such an individual might be able to negotiate
with his or her attorneys, using their desire to obtain the reputational
benefits that might accrue from being associated with the case." *Id.*  The
Second Circuit's "forum rule" also requires courts to "generally use 'the
hourly rates employed in the district in which the reviewing court sits' in
calculating the presumptively reasonable fee." *Simmons* v. *N.Y.C. Transit
Auth.*, 575 F.3d 170, 174 (2d Cir. 2009) (quoting *Arbor Hill,* 493 F.3d at
119); *see also Miroglio S.P.A.* v. *Conway Stores, Inc.*, 629 F. Supp. 2d 307,
314 (S.D.N.Y. 2009).  Finally, courts in this District have recognized that an
"attorney's customary billing rate for fee-paying clients is ordinarily the best

20

**Exhibit E-20**

Case 2:20-cv-09825-VAP-JC    Document 33-6    Filed 12/22/20    Page 22 of 41    Page
ID #:953
Case 1:18-cv-04609-KPF    Document 184    Filed 09/28/20    Page 21 of 40

evidence of" a reasonable hourly rate.  *In re Stock Exchs. Options Trading Antitrust Litig.*, No. 99 Civ. 962 (RCC), 2006 WL 3498590, at *9 (S.D.N.Y. Dec. 4, 2006).

When evaluating the number of hours, a court must make "a conscientious and detailed inquiry into the validity of the representations that a certain number of hours were usefully and reasonably expended."  *Haley* v. *Pataki*, 106 F.3d 478, 484 (2d Cir. 1997) (internal quotation marks and citation omitted).  In addition, a court should examine the hours expended by counsel with a view to the value of the work product to the client's case.  *See Lunday* v. *City of Albany*, 42 F.3d 131, 133 (2d Cir. 1994) (per curiam).  The Court is to exclude "excessive, redundant[,] or otherwise unnecessary hours, as well as hours dedicated to severable unsuccessful claims."  *Quaratino* v. *Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999).

In determining whether hours are excessive, "the critical inquiry is 'whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures.'"  *Samms* v. *Abrams*, 198 F. Supp. 3d 311, 322 (S.D.N.Y. 2016) (quoting *Grant* v. *Martinez*, 973 F.2d 96, 99 (2d Cir. 1992)).  And where "the billing records are voluminous, it is less important that judges attain exactitude, than that they use their experience with the case, as well as their experience with the practice of law, to assess the reasonableness of the hours spent."  *Yea Kim* v. *167 Nail Plaza, Inc.*, No. 05 Civ. 8560 (GBD) (GWG), 2009 WL 77876, at *4 (S.D.N.Y. Jan. 12, 2009) (internal quotation marks and citation omitted).  A court also retains the discretion to make across-the-board percentage reductions to exclude

**Exhibit E-21**

unreasonable hours, colloquially referred to as "trimming the fat." *See In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 226, 237 (2d Cir. 1987); *E.S.* v. *Katonah-Lewisboro Sch. Dist.*, 796 F. Supp. 2d 421, 431 (S.D.N.Y. 2011), *aff'd sub nom. E.S. ex rel. B.S.* v. *Katonah-Lewisboro Sch. Dist.*, 487 F. App'x 619 (2d Cir. 2012) (summary order).

A court also looks at the nature of the legal matter and context of the fee award in considering what is a reasonable rate and reasonable time spent on a matter. *Figueroa*, 2020 WL 2319129, at *3. The Second Circuit has suggested that courts should consider factors including "the experience, reputation, and ability of the attorneys," "awards in similar cases," and more broadly,

> the purpose of the award; that is, a different presumptively reasonable fee may be warranted if the fee is being awarded as a sanction for misconduct than if the fee is being awarded in connection with a successful outcome in a statutory fee-shifting case in order to make its determination.

*Arbor Hill*, 522 F.3d at 190 (citing 12 factors enumerated in *Johnson* v. *Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), *abrogated on other grounds by Blanchard* v. *Bergeron*, 489 U.S. 87, 109 (1989)); *see also Figueroa*, 2020 WL 2319129, at *3.[15]

---

[15]   The twelve factors enumerated in *Johnson* are (i) the time and labor required; (ii) the novelty and difficulty of the questions; (iii) the level of skill required to perform the legal service properly; (iv) the preclusion of employment by the attorney due to acceptance of the case; (v) the attorney's customary hourly rate; (vi) whether the fee is fixed or contingent; (vii) the time limitations imposed by the client or the circumstances; (viii) the amount involved in the case and results obtained; (ix) the experience, reputation, and ability of the attorneys; (x) the "undesirability" of the case; (xi) the nature and length of the professional relationship with the client; and (xii) awards in similar cases. *See Arbor Hill*, 522 F.3d at 186 n.3 (citing *Johnson* v. *Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), *abrogated on other grounds by Blanchard* v. *Bergeron*, 489 U.S. 87 (1989)).

**Exhibit E-22**

Case 2:20-cv-09825-VAP-JC   Document 33-6   Filed 12/22/20   Page 24 of 41   Page
ID #:955
Case 1:18-cv-04609-KPF   Document 184   Filed 09/28/20   Page 23 of 40

Finally, each of the defense teams has sought, or requested an

opportunity to seek, attorneys' fees and costs incurred in drafting and

submitting the instant fee petitions.  Counsel for the Grey and Graden

Defendants have submitted substantiation for those fees and costs in their

submissions, while counsel for the Viacom Defendants have requested an

opportunity to make supplemental submissions.  Courts in this Circuit have

not been uniform in their allowance of "fees on fees," *see, e.g.*, *Makinen* v.

*City of New York*, No. 11 Civ. 7535 (ALC) (GWG), 2019 WL 970945, at *2

(S.D.N.Y. Feb. 28, 2019) (discussing different approaches), but this Court

will permit such recovery here, to the extent it is reasonable.  After all, the

Court's sanction included imposition on Plaintiff of "the costs related to, the

costs that are fairly traceable to, the conduct that has brought us here

today, which is the use of what I believe to be fabricated emails." (Oct. 11,

2019 Tr. 34:4-7).  Reasonable fees and costs incurred in preparing the fee

petitions are "fairly traceable" to Plaintiff's sanctionable conduct.  *See

generally Weyant* v. *Okst*, 198 F.3d 311, 316 (2d Cir. 1999) ("a reasonable

---

This Court has previously noted that after *Arbor Hill* was decided, the Supreme
Court cast doubt on the usefulness of the *Johnson* factors as a methodology for
calculating attorneys' fees, stating that the method "gave very little actual guidance
to district courts." *Echevarria* v. *Insight Med., P.C.*, 102 F. Supp. 3d 511, 515 n.2
(S.D.N.Y. 2015) (quoting *Perdue* v. *Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010)
(internal quotation marks omitted)).  However, as the Court also noted, the *Perdue*
court focused on enhancements to an attorneys' fees award applied by the district
court; while the *Arbor Hill* decision, at its core, simply instructs district courts to
take the *Johnson* factors (and other factors) into account when determining the
reasonable hourly rate, and then to use that reasonable hourly rate to calculate the
presumptively reasonable fee.  *Id.*

Furthermore, *Arbor Hill* has yet to be overruled by the Second Circuit.  In fact, the
Second Circuit recently confirmed the validity of *Arbor Hill* and the use of the
*Johnson* factors in calculating the lodestar amount as a threshold matter, rather
than to enhance or cut the lodestar amount itself.  *See Lilly* v. *City of New York*, 934
F.3d 222, 231 (2d Cir. 2019) (explaining how the *Perdue* court confirmed the long-
standing approach to calculating attorney's fees endorsed by the Second Circuit in
*Arbor Hill*).

**Exhibit E-23**

fee should be awarded for time reasonably spent in preparing and defending an application for ... fees").

**B.    Calculating Reasonable Attorneys' Fees**

    **1.    Determining the Reasonable Hourly Rate**

The Court first addresses the reasonableness of the hourly rates charged by counsel and paid by Defendants; it addresses in the following section the reasonableness of the hours billed.  It begins with several observations regarding the case, and regarding the factors that it has considered in setting reasonable rates here.

Plaintiff's allegations were exceptionally serious.  As the Court noted in its October 11, 2019 decision, it is an unfortunate consequence of Plaintiff's perfidy that the Court will never know the degree to which those allegations were true.  (*See* Oct. 11, 2019 Tr. 49:6-50:4).  The fact remains, however, that Plaintiff's claims had enormous personal, professional, and reputational consequences for each Defendant, and needed to be investigated and addressed fully.

That is why the conduct for which Plaintiff was sanctioned was so insidious.  Plaintiff levied egregious allegations of misconduct by Defendants, and then purported to substantiate part or all of that conduct with fabricated evidence.  Worse yet, as Defendants and the Court toiled for months to determine the *bona fides* of his evidence, Plaintiff proffered ever-changing explanations, each of which consumed substantial resources to disprove.  (*See* Graden Fee Mem. 2 (noting that proving Plaintiff's fabrication and spoliation of evidence was an "arduous and technical task"); *see also* Stein Decl. ¶ 17; Viacom Fee Mem. 4; Hwang Fee Decl. ¶¶ 28-31).  All the

**Exhibit E-24**

Case 2:20-cv-09825-VAP-JC    Document 33-6    Filed 12/22/20    Page 26 of 41    Page
ID #:957
Case 1:18-cv-04609-KPF    Document 184    Filed 09/28/20    Page 25 of 40

while, Plaintiff remained one step ahead, willfully foreclosing opportunities
to obtain evidence — not merely evidence that might put the lie to Plaintiff's
indelicate allegations, but more basic evidence Defendants needed to meet
Plaintiff's claims. And when the truth finally emerged, Plaintiff repeatedly
delayed his day of reckoning — by motion to transfer, by notice of dismissal,
and by adjournment request — before ultimately electing not to appear at
all.

Given this backdrop, it was important that each Defendant have
appropriate counsel. Certain of the attorneys here have specific experience
in the entertainment industry, including experience addressing false claims
made against entertainers; others have substantial prosecutorial and/or
white-collar defense experience; and still others have specific experience
with litigation involving spoliated evidence. The point to be made is that the
issues in this case were hardly run of the mill, but rather required
substantial expertise by counsel. This expertise was apparent from the
quality of counsel's submissions to the Court and the tenacity with which
counsel investigated Plaintiff's claims. The Court is also cognizant of the
fact that, through hard work at a high level of skill, counsel was able to
achieve a favorable result for their clients, in the form of dismissal of the
case with prejudice. The hourly rates charged by counsel reflected their
expertise.

The Court has written and reviewed many complex commercial
litigation fee decisions over the years, and it recognizes that there has not
been perfect consistency in assessing the reasonableness of attorneys' rates.
*See Tessemae's LLC* v. *Atlantis Capital LLC*, No. 18 Civ. 4902 (KHP), 2019

**Exhibit E-25**

WL 2635956, at *4 (S.D.N.Y. June 27, 2019) ("Courts in this District have determined that hourly rates ranging from $250 to $1,260 per hour, for attorneys' work on a commercial litigation matter, were reasonable."). Here, the Court has focused on certain factors. As suggested by the introduction to this section, the Court has put a premium on the expertise of each counsel, both in terms of years in the profession and relevant experience. The Court has also considered, albeit to a lesser extent, the substantial overhead costs that are built into the rates of attorneys at larger law firms.

The Court also notes that the hourly rates each counsel seeks were billed to, and paid by, their respective clients. Payment of fees by clients has been recognized by courts as "solid evidence" of their reasonableness in the market, *Bleecker Charles Co.* v. *350 Bleecker St. Apt. Corp.*, 212 F. Supp. 2d 226, 230-31 (S.D.N.Y. 2002), although the Court must still exercise its discretion and look to the prevailing rates within this District. *See A.V.E.L.A., Inc.* v. *Estate of Monroe*, No. 12 Civ. 4828 (KPF) (JCF), 2014 WL 3610902, at *2 (S.D.N.Y. July 18, 2014) ("[T]he actual billing arrangement is a significant, though not necessarily controlling, factor in determining what fee is 'reasonable.'" (alteration in original) (internal quotation marks omitted) (quoting *Crescent Publ'g Grp., Inc.* v. *Playboy Enters., Inc.*, 246 F.3d 142, 151 (2d Cir. 2001))).

Further, it is significant to the Court that Defendants' fee petitions arise in the context of a sanctions proceeding. From Defendants' perspective, the Court's order limiting sanctions to fees and costs that are fairly traceable to Plaintiff's use of fabricated emails is too narrow; they would argue that the entire litigation was grounded in fraud, and that they

26

**Exhibit E-26**

Case 2:20-cv-09825-VAP-JC    Document 33-6    Filed 12/22/20    Page 28 of 41    Page
ID #:959
Case 1:18-cv-04609-KPF   Document 184   Filed 09/28/20   Page 27 of 40

never should have had to expend any legal fees in defending against it.
Given the state of the record, the Court is not in a position to disagree with
their argument.  If nothing else, the Court recognizes that, even were it to
allow Defendants' fee petitions in full, each of them is still out substantial
sums of money.

Keeping in mind all of these factors, the Court considers the parties'
requests, beginning with Shearman & Sterling, counsel to the Viacom
Defendants.  Counsel seeks hourly rates of $995 and $1,196 for partner
Stephen Fishbein; $900 and $1,036 for partner Christopher LaVigne; and
$317 and $572 for associate Austin Zachary Deaton.  (*See* Viacom Fee
Mem. 6; LaVigne Fee Decl. ¶ 6).[16]  Like all Defendants' counsel, these
attorneys have tailored their fee petition materials to include only those legal
fees and costs incurred in work specifically related to the issue of
authentication and to exclude those associated with broader work.  (Viacom
Fee Mem. 2).[17]

Focusing on recent decisions from this District, the Court concludes
that rates of **$900** for Mr. Fishbein and **$850** for Mr. LaVigne are
reasonable on the specific facts of this case.  *See Tiffany & Co.* v. *Costco
Wholesale Corp.,* No. 13 Civ. 1041 (LTS) (DCF), 2019 WL 120765, at *10
(S.D.N.Y. Jan. 7, 2019) (finding hourly rates between $625 and $845 for a

---

[16]    The Court pauses to note here that while it recognizes the reality of periodic
increases in attorney billing rates, it has for administrative convenience determined
a single hourly rate for each legal professional in this case.

[17]    The Court understands that, at the time of its submission, Shearman had billed its
clients, with the exception of the fees incurred in drafting the instant motion.
(LaVigne Fee Decl. 2).  For this reason, Shearman requests leave to file a
supplemental petition.

**Exhibit E-27**

partner "are reasonable considering the prevailing rates for firms engaging in complex litigation in this district"); *In re AOL Time Warner S'holder Derivative Litig.*, No. 02 Civ. 6302 (CM), 2010 WL 363113, at *10 (S.D.N.Y. Feb. 1, 2010) (finding, in 2010, hourly rates of $850 for partners and $550 for associates reasonable where "the complexity of this case demanded exceptionally able counsel"); *cf. Themis Capital* v. *Democratic Republic of Congo*, No. 09 Civ. 1652 (PAE), 2014 WL 4379100, at *7 (S.D.N.Y. Sept. 4, 2014) ("[P]artner billing rates in excess of $1,000 an hour[ ] are by now not uncommon in the context of complex commercial litigation."); *MSC Mediterranean Shipping Co. Holding S.A.* v. *Forsyth Kownacki LLC*, No. 16 Civ. 8103 (LGS), 2017 WL 1194372, at *3 (S.D.N.Y. Mar. 30, 2017) (finding reasonable the rate of $1,048.47 charged by partners at Gibson Dunn); *Rubenstein* v. *Advanced Equities, Inc.*, No. 13 Civ. 1502 (PGG), 2015 WL 585561, at *7 (S.D.N.Y. Feb. 10, 2015) (estimating that "more than 25 percent of partners at large New York firms charge $1,000 per hour or more for contracts and commercial work"). To paraphrase a sister court in this District, while "it is notorious that no ordinary American could afford such fees, businesses [like Viacom and Paramount] can and, indeed, regularly pay as much." *Vista Outdoor Inc.* v. *Reeves Family Tr.*, No. 16 Civ. 5766 (JSR), 2018 WL 3104631, at *6 (S.D.N.Y. May 24, 2018).

Similar adjustments are appropriate for the Shearman associate involved in this case, Austin Zachary Deaton. Recent decisions from this District have awarded junior associates at large firms an hourly rate of between $275 and $450. *See Kim* v. *Kum Gang, Inc.,* No. 12 Civ. 6344 (MHD), 2015 WL 3536593, at *2 (S.D.N.Y. June 5, 2015) (awarding

**Exhibit E-28**

Case 2:20-cv-09825-VAP-JC   Document 33-6   Filed 12/22/20   Page 30 of 41   Page
ID #:961
Case 1:18-cv-04609-KPF   Document 184   Filed 09/28/20   Page 29 of 40

Shearman & Sterling associates an hourly rate between $275 and $300,

varying on years of experience); *Errant Gene Therapeutic, LLC* v. *Sloan-*

*Kettering Inst. for Cancer Research*, 286 F. Supp. 3d 585, 588-89 (S.D.N.Y.

2018) (approving, in commercial litigation, hourly rates for partners of $765

and for associates of up to $450); *TufAmerica*, 2016 WL 1029553, at *6

(reasonable rate for junior associates ranged from $375 to $425 per hour);

*Tiffany*, 2019 WL 120765, at *10 (reasonable rate for associates ranged from

$315 and $585 per hour, depending on experience).  Accordingly, the Court

finds an hourly rate of **$375** to be reasonable for Mr. Deaton.[18]

Next, the Court turns to Russ August & Kabat, counsel for the Graden

Defendants, which seeks hourly rates of $950 for partner Stanton L. Stein;

$425 for senior associate Diana A. Sanders; $375 for associate Mary Keller;

$55 for assistant Cheryl Zive; and $55 and $195 for assistant and paralegal

Kieanna Jolaei.  (*See* Stein Fee Decl. ¶¶ 4-8, 16; Stein Supp. Ltr. 1-2).[19]

Like the Viacom Defendants, the Graden Defendants have represented that

these rates were actually charged to Defendant.  (*Id.* at ¶ 3).

In light of the cases previously cited, the Court finds that a reasonable

hourly rate for Mr. Stein is **$900**.  *Cf. Phoenix Four, Inc.* v. *Strategic*

*Resources Corp.,* No. 05 Civ. 4837 (JB), 2006 WL 2135798, at *2 (S.D.N.Y.

Aug. 1, 2006) (finding, 14 years ago, partner rates of $600 and senior

---

[18]   In keeping with the practice outlined in footnote 15, the Court has assessed a single
reasonable rate for Mr. Deaton.  The Court recognizes that the rate is slightly higher
than the $312 rate at which Mr. Deaton initially billed, but notes that the majority
of his work done on the case was billed at the higher $572 rate.

[19]   The supplemental submission of the Graden Defendants recites a charge of 0.3
hours billed by attorney Bennett A. Bigman in preparing the fee petition.  (Stein
Supp. Ltr. 1).  Because the Court has not been provided with information
concerning attorney Bigman's experience or background, it has disallowed the
charge.

**Exhibit E-29**

associate rates of $440 per hour reasonable for a small firm doing general and complex commercial litigation). According to his Declaration, the attorneys' fees figure reflects Mr. Stein's extensive work and experience in entertainment litigation, including cases involving false allegations of impropriety. (Stein Fee Decl. ¶ 4; *id.,* Ex. 3). The Court also recalls that it was the Graden Defendants' counsel that first raised to it the issue of fabrication, and that was deeply involved obtaining sworn statements disproving the fact of certain emails.

Senior associate Sanders has seven years of experience and has been working on the case since its inception alongside lead counsel. (Stein Fee Decl. ¶ 5). According to Stein's Declaration, "the legal work on this matter has been conducted predominantly by [Stein's] associate, Diana A. Sanders." (*Id.*). The Court acknowledges that Ms. Sanders has proven her dedication to the case, including telephonic participation in hearings at the tail end of her pregnancy. (*See* Dkt. #135). Accordingly, the Court finds **$425** per hour to be reasonable for Ms. Sanders. *See H.B. Auto. Grp., Inc.* v. *Kia Motors Am., Inc.,* No. 13 Civ. 4441 (VEC) (DF), 2018 WL 4017698, at *5 (S.D.N.Y. July 25, 2018) (finding $395 per hour is reasonable for a lead associate at a big law Firm), *report and recommendation adopted sub nom. H.B. Auto. Grp., Inc.* v. *Kia Motors Am.*, No. 13 Civ. 4441 (VEC) (DF), 2018 WL 4007636 (S.D.N.Y. Aug. 22, 2018).

By contrast, the Court will only approve a reduced rate of **$275** per hour for associate Keller. Ms. Keller — who assisted in drafting the application for attorneys' fees and did not work on the authenticity issues — is a 2017 graduate of University of Southern California and had

**Exhibit E-30**

minimal experience in complex commercial litigation at the time she began working on this case.  (Stein Fee Decl. ¶ 6).  A lower rate is more in line with approved rates for junior associates in this District.  *See Agudelo* v. *E & D LLC*, No. 12 Civ. 960 (HB), 2013 WL 1401887, at *2 (S.D.N.Y. Apr. 4, 2013) ($200 per hour for three years of experience); *Trustees of N.Y.C. Dist. Council of Carpenters Pension Fund* v. *Richie Jordan Constr. Inc.,* No. 15 Civ. 3811 (PAE), 2015 WL 7288654, at *5 (S.D.N.Y. Nov. 17, 2015) ($175 per hour for one and a half years removed from law); *Anthony* v. *Franklin First Fin., LTD.*, 844 F. Supp. 2d 504, 508 (S.D.N.Y. 2012) ($175 per hour for three years of experience).

The paralegal rates requested for Kieanna Jolaei are at the high end of the range that courts in this District have ordinarily found reasonable.  Even for senior paralegals, with more than Ms. Jolaei's seven years of experience, courts have typically capped the rate at $200 per hour.  *See H.B. Auto. Grp., Inc.*, 2018 WL 4017698, at *5 (reducing senior paralegal with 18 years of relevant experience from approximately $215 to $200 per hour).  Consistent with recent precedent, the Court reduces her hourly rate slightly, to **$150**. *See Tatintsian* v. *Vorotyntsev*, No. 16 Civ. 7203 (GHW), 2020 WL 2836718, at *5 (S.D.N.Y. June 1, 2020) (finding "$150 per hour is reasonable for a paralegal in a complex commercial litigation matter"); *TufAmerica*, 2016 WL 1029553, at *6 ("[Recent cases in this district suggest that the prevailing rate for paralegals is between $100 and $200 per hour.").  By contrast, the legal assistant hourly rates billed by Kieanna Jolaei and Cheryl Zive of **$55** are reasonable.  *N.Y.C. Dist. Council of Carpenters* v. *Reilly Partitions, Inc.,* No. 18 Civ. 1211 (JGK), 2018 WL 2417849, at *3 (S.D.N.Y. May 29, 2018)

**Exhibit E-31**

(finding a rate of $90 per hour for the services of legal assistants reasonable).

Finally, the Court addresses the fee petition of Loeb & Loeb LLP, counsel for the Grey Defendants, who seek hourly rates of $795 and $765 for partner Wook Hwang; $770 and $725 for senior associate Sarah Schacter; $495 for junior associate Noah Weingarten; $405 and $395 for paralegal Shantanu Alam; $275 for paralegal Alec Wickersham; $405 for Director of Litigation Support Josh Gorruso; $390 for managing clerk Lawrence Mehringer; and $275 for assistant managing clerk Christian Perez. (*See* Hwang Fee Decl. ¶ 25).

The Court observes, as an initial matter, that the Grey Defendants' counsel seek fees for eight attorneys, paralegals, and support staff.  Recent decisions from this District have considered the hourly rates of Loeb & Loeb LLP partners and associates in the analogous context (in terms of complexity) of copyright violations.  *See Craig* v. *UMG Recordings, Inc.*, 380 F. Supp. 3d 324, 339 (S.D.N.Y. 2019); *Rock* v. *Enfants Riches Deprimes, LLC*, No. 17 Civ. 2618 (ALC), 2020 WL 468904, at *5 (S.D.N.Y. Jan. 29, 2020) (finding hourly rates of $912.01 and $740 reasonable for partners with over 20 years of experience; $575 for senior litigation associate; and $400 for a litigation associate with over five years of experience), *reconsideration denied sub nom. Rock* v. *Enfants Riches Deprimes, LLC.,* No. 17 Civ. 2618 (ALC), 2020 WL 2793026 (S.D.N.Y. May 29, 2020).  The Court concurs with the analyses presented in these decisions, and working from them determines the reasonable hourly rates to be **$725** for partner Hwang, **$575** for senior

**Exhibit E-32**

associate Schacter, and **$350** for junior associate Weingarten based on their comparative levels of experience.

Turning to the Grey Defendants' proposed rates for paralegals and support staff, the Court finds that these rates exceed the reasonable hourly cost for similarly situated professionals in this district. *See Vista Outdoor Inc.*, 2018 WL 3104631 ("[C]ourts in this District typically award rates not to exceed $200 per hour for paralegals."); *accord Rock*, 2020 WL 468904, at *6. Courts have also chosen to reduce hourly rates for paralegals when no information was provided as to their experience and expertise. *See Sid Bernstein Presents, LLC* v. *Apple Corps Ltd.*, No. 16 Civ. 7084 (GBD), 2018 WL 1587125, at *5 (S.D.N.Y. Mar. 29, 2018) (reducing paralegal rates from $185 to $100 where no information was provided regarding their experience); *Yea Kim,* 2009 WL 77876, at *9 (reducing paralegal rates to $90 because the Court was "given no information whatsoever as to their experience and expertise"). According to Mr. Hwang's Declaration, Mr. Alam has over 25 years of experience as a litigation paralegal, but no similar information has been provided on Mr. Wickersham's relevant experience. (Hwang Fee Decl. ¶ 24). The Court thus finds that **$200** per hour is reasonable for Mr. Alam; **$180** per hour for Mr. Wickersham; and **$150** per hour for Mr. Perez. A sister court in this District has previously awarded Mr. Gorruso as Director of Litigation Support and Mr. Mehringer as managing clerk "fees in the high-end range of what is reasonable for paralegals and thus finds a rate of $200 per hour reasonable." *Rock*, 2020 WL 468904, at *6. For substantially similar reasons, the Court finds **$200** per hour reasonable for each of Mr. Gorruso and Mr. Mehringer.

**Exhibit E-33**

Case 2:20-cv-09825-VAP-JC   Document 33-6   Filed 12/22/20   Page 35 of 41   Page
ID #:966
Case 1:18-cv-04609-KPF   Document 184   Filed 09/28/20   Page 34 of 40

## 2.  Determining the Hours Reasonably Expended

For the Court, the more difficult issue has been determining the number of hours these legal professionals have reasonably expended.  As presaged by its earlier discussions, the Court recognizes that the heinous nature of Plaintiff's allegations, coupled with his ever-changing (and at times inconsistent) explanations for his conduct, significantly increased counsel's workload.  (*See* Hwang Fee Decl. ¶ 34 (collecting Court observations of the delays occasioned by Plaintiff's obstructive conduct)).  The Court observed multiple occasions where defense counsel would be presented with an explanation from Plaintiff or his counsel that necessitated investigation; when defense counsel's diligent inquiry called into question the bases of that explanation, Plaintiff would simply pivot to a wholly different explanation, and the game would begin again.  The Court also recognizes the efforts made by each team of defense attorneys to tailor the respective fee petitions to the categories of expenses authorized by the Court, which efforts are discussed further herein.  (*See* Oct. 11, 2019 Tr. 52:15-53:5).  And yet the hours billed still strike the Court as unreasonably high.

In prior fee petitions, this Court has alternated between the use of an across-the-board percentage reduction and the disallowance of certain hours billed.  *Compare Gamero* v. *Koodo Sushi Corp.*, 328 F. Supp. 3d 165, 175 (S.D.N.Y. 2018) (disallowing certain time entries billed), *with Marzullo* v. *Karmic Release Ltd.*, No. 17 Civ. 7482 (KPF), 2018 WL 10741649, at *3 (S.D.N.Y. Apr. 24, 2018) (imposing across-the-board reduction of 15%).  After poring over the billing documentation, the Court believes it appropriate

**Exhibit E-34**

Case 2:20-cv-09825-VAP-JC    Document 33-6    Filed 12/22/20    Page 36 of 41    Page
ID #:967
Case 1:18-cv-04609-KPF   Document 184   Filed 09/28/20   Page 35 of 40

to trim the fees sought by each firm, as explained in the remainder of this
section.

Beginning with counsel for the Viacom Defendants, the Court
recognizes, and appreciates, the efforts to extract from the bills those entries
directly related to Plaintiff's sanctionable conduct.  (*See* Viacom Fee Mem. 2
("For purposes of our fee award, we have excluded fees and costs associated
with broader work on this case, including research and drafting associated
with the contemplated motion to dismiss and associated with Plaintiff's
belated attempt to transfer venue."); LaVigne Fee Decl. ¶ 5 ("We have
redacted from these invoices: (1) time and cost entries for which the Viacom
Defendants are not seeking reimbursement pursuant to the Court's
October 11, 2019 Order, as well as payment-related instruction information;
and (2) portions of time entries that are protected from disclosure under the
attorney-client privilege or the attorney work-product doctrine.")).  The Court
also recognizes that counsel has not sought recovery for time billed by
paralegals and administrative staff, whom the Court is confident were
frequently employed to assist with counsel's submissions.

That said, certain entries suggest a duplication of efforts between
attorneys Fishbein and LaVigne, or between attorneys LaVigne and Deaton.
As well, the Court noticed certain idiosyncrasies in the recording of time,
with an unusual number of entries ending in .0 or .5; the Court is
concerned that these billings may be insufficiently precise.  Accordingly, the
Court has determined to reduce the fees sought by counsel for the Viacom
Defendants by **10%**, resulting in the following award of attorneys' fees:

**Exhibit E-35**

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
|---|---|---|---|
| Fishbein | $900 | 36.6 | $32,940.00 |
| LaVigne | $850 | 132.8 | $112,880.00 |
| Deaton | $375 | 140.4 | $52,650.00 |
| | | **Interim Total** | $198,470.00 |
| | | **Less 10%** | **$178,623.00**[20] |

Turning next to counsel for the Graden Defendants, the Court again recognizes and appreciates counsel's review of their own records to exclude unrelated fees and charges.  (*See* Stein Fee Decl. ¶ 11).  The Court also observes that the Russ firm charged for administrative support personnel, but did not charge for the legal research work performed by summer associate Lowe.  The Court notes that a substantial number of hours were billed by the senior member of the team, attorney Stein, but it acknowledges that even more hours were billed by the more junior attorney Sanders, and that the bulk of the work done preparing the fee petition was done by the junior member of the team, attorney Keller.  Here, too, the Court believes that a 10% reduction is appropriate, given a modest amount of duplication between attorneys Stein and Sanders, resulting in the following award of attorneys' fees:

---

[20]   The Viacom Defendants did not bill for the fees incurred in drafting their fee petition, and request leave to make that supplemental submission.  The Court will permit that submission as described *infra*.

36

**Exhibit E-36**

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
|---|---|---|---|
| Stein | $900 | 189.70 | $170,730.00 |
| Sanders | $425 | 226.8 | $96,390.00 |
| Keller | $275 | 33.8 | $9,295.00 |
| Zive | $55 | 5.3 | $291.50 |
| Jolaei (Assistant) | $55 | 42.4 | $2,332.00 |
| Jolaei (Paralegal) | $150 | 21.2 | $3,180.00 |
| | | **Interim Total** | $282,218.50 |
| | | **Less 10%** | **$253,996.65**[21] |

The Grey Defendants also took care to tailor their submissions to the Court's sanctions order.  (*See* Hwang Fee Decl. ¶ 13 (noting exclusion of "[a]ll fees and costs incurred on or before July 17, 2018," "[a]ll fees charged by Loeb & Loeb attorneys who did not work directly on matters pertaining to the Authenticity Issues in this action," and entries reflecting "work performed [that] was not directly related to the Authenticity Issues")).  Even here, however, there is fat to be trimmed.  While the Court appreciates that Mr. Hwang may have had more extensive or immediate experience than his colleagues with "investigating and litigating spoliation" (*id.* at ¶ 21), the fact remains that Mr. Hwang — who, as senior attorney and sole partner on the team, had the highest hourly rate — billed nearly three times as many hours as the two associates on the team.  To account for this "top-heavy"

---

[21]     As noted, the Graden Defendants included attorneys' fees incurred in drafting the fee petition in their supplemental submission.  (Stein Supp. Ltr. 1 n.1).

**Exhibit E-37**

distribution of hours, the Court will reduce the fees awarded to counsel for the Grey Defendants by **15%**.

| Timekeeper | Reasonable Rate | Hours Billed | Amount |
|---|---|---|---|
| Hwang | $725 | 157.5 | $114,187.50 |
| Schacter | $575 | 57.7 | $33,177.50 |
| Weingarten | $350 | 5.0 | $1,750.00 |
| Alam | $200 | 6.2 | $1,240.00 |
| Wickersham | $180 | 2.6 | $468.00 |
| Gorruso | $200 | 0.5 | $100.00 |
| Mehringer | $200 | 2.2 | $440.00 |
| Perez | $150 | 0.4 | $90.00 |
| | | **Interim Total** | $151,423 |
| | | **Less 15%** | **$128,709.55**[22] |

**C.    Calculating Reasonable Costs**

Finally, the Court considers the issue of costs.  "[A]ttorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients."  *LeBlanc-Sternberg* v. *Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998) (citation omitted); *accord Fisher* v. *SD Prot. Inc.*, 948 F.3d 593, 600 (2d Cir. 2020) ("An award of costs 'normally include[s] those reasonable out-of-pocket expenses incurred by the attorney

---

[22]    The Grey Defendants included attorneys' fees and costs incurred in drafting the fee petition through November 26, 2019, when the majority of work on the petition was completed.  (Hwang Fee Decl. ¶ 12).  The Court has accepted those billings as reasonable, subject to the reductions in rate and in number of hours outlined in the text.

**Exhibit E-38**

and which are normally charged fee-paying clients.'" (quoting *Reichman* v. *Bonsignore, Brignati & Mazzotta P.C.*, 818 F.2d 278, 283 (2d Cir. 1987)); *see generally Abraham* v. *Leigh*, No. 17 Civ. 5429 (KPF), 2020 WL 5512718, at *12 (S.D.N.Y. Sept. 14, 2020).

The Viacom Defendants seek **$2,726.50** in costs, reflecting the fees paid to FTI Consulting for forensic discovery.  (LaVigne Fee Decl. ¶ 8 & Ex. B).  The Grey Defendants seek **$4,123.34** in costs, reflecting forensic discovery services provided by FTI, legal research, litigation support, and mailing costs.  (Hwang Fee Decl. ¶¶ 5, 26, 35 & Ex. C-D).  The Graden Defendants seek $40,567.47 in costs, but have substantiated only **$39,815.05** of that figure, and thus the Court considers only the smaller amount.  (*Compare* Graden Fee Mem. 4, *with* Stein Fee Decl. ¶ 12 & Ex. 7).  The Court understands this figure to reflect compensable travel time in addition to forensic discovery services provided by FTI, legal research, electronic discovery software and data hosting fees, printing and scanning costs, and mailing fees.  These requests for costs are documented and, more importantly, are fairly traceable to Plaintiff's conduct, and the Court awards them, for a total costs figure of **$46,664.89**.

## CONCLUSION

For the reasons set forth herein, it is hereby ORDERED that Defendants are awarded attorneys' fees and costs in the following amounts:

i.    $178,623.00 in attorneys' fees and $2,726.50 in costs to the Viacom Defendants;

ii.   $253,996.65 in attorneys' fees and $39,815.05 in costs to the Graden Defendants; and

**Exhibit E-39**

Case 2:20-cv-09825-VAP-JC    Document 33-6    Filed 12/22/20    Page 41 of 41    Page
ID #:972
Case 1:18-cv-04609-KPF   Document 184   Filed 09/28/20   Page 40 of 40

     iii.      $128,709.55 in attorneys' fees and $4,123.34 in costs to the Grey Defendants.

The Clerk of Court is directed to terminate the motions pending at docket entries 151 and 156.

The Court understands that the Viacom Defendants would like an opportunity to submit a supplemental petition for fees incurred in the drafting of their fee petition. The Court will permit a brief letter submission outlining the legal professionals involved, the time spent, and the fees and costs incurred in this regard. The Viacom Defendants should imagine that the reasonable rates analysis will be identical to that contained in this Opinion, and they should strive to present a reasonable number of hours billed in accordance with this Court's analysis herein. Their submission is due on or before **October 23, 2020**; Plaintiff may respond on or before **November 13, 2020**.

The Clerk of Court is directed to mail a copy of this Opinion and Order to Plaintiff at his address of record.

SO ORDERED.

Dated:   September 28, 2020
         New York, New York

                                    KATHERINE POLK FAILLA
                                United States District Judge

**Exhibit E-40**